UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-cr-00128-RC |
| : | |
| WILLIAM POPE, and : | |
| MICHAEL POPE, : | |
| : | |
| Defendants. : | |

**OPPOSITION TO PRO SE DEFENDANT WILLIAM POPE'S REQUEST TO MODIFY THE PROTECTIVE ORDER AND TO COMPEL FULL ACCESS TO DISCOVERY**

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to pro se defendant William Pope's motion (ECF 67) for unfettered and unsupervised access to the global discovery in Relativity and evidence.com.

Pope's motion puts forward two primary arguments: (1) that standby counsel's facilitation of discovery impacts his ability to control the direction of his own case; and (2) the existing protective order imposes on his Sixth Amendment right to present an effective defense by denying him meaningful access to discovery. For the reasons discussed below, Pope's motion should be denied, and his purported discovery issues should be addressed under the terms of the existing protective order.

I. **Standby counsel's facilitation of discovery does not infringe upon Pope's Sixth Amendment right to represent himself**

On June 29, 2022, Pope's prior defense counsel filed a motion to withdraw. ECF No. 57. Included as an attachment to the filing was a June 28, 2022 letter from Pope to the Court in which

1

Pope stated that he had decided to exercise his constitutional right to represent himself. Among Pope's stated reasons for proceeding pro se was his purported need for greater access to global discovery. In response, the government took no position on Pope's decision to proceed pro se, but the government's filing made clear that the government would oppose any requests for direct unfettered access to the two discovery platforms—*i.e.*, evidence.com and Relativity.

During the *Farretta* colloquy on August 2, 2022, the Court repeated for Pope's benefit the government's position that, under the terms of the existing protective order, Pope would need stand-by counsel to facilitate his access to global discovery. With a full understanding of the government's position, Pope decided to proceed pro se, and on August 8, Nicole Cubbage entered an appearance as standby counsel for Pope.

Pope now argues that the government is thrusting standby counsel upon him to create a "barrier, filter, or undue burden" in order to keep him from the discovery that he says he needs. ECF 67 at 7. But the opposite is true—standby counsel was appointed to facilitate his access to material that he would otherwise not be allowed to access because of the highly sensitive nature of much of the content.

Moreover, the appointment of stand-by counsel for the narrow purpose of facilitating Pope's access to discovery does not in any way impact Pope's ability to "present his own case in his own way." *McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984). While the Sixth Amendment gives Pope the right to conduct his own defense and allows him to "control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial," *id*. at 174, this Court nonetheless retains broad discretion to appoint standby counsel to aid him—even over his objection. *See Faretta v. California*, 422 U.S. 806, 834, n.46 (1975). As such, courts

routinely appoint standby counsel, over defendants' objections, for more substantive and consequential roles than that played by Ms. Cubbage without infringing upon a pro se defendant's rights. *See, e.g. United States v. Gomez-Rosario*, 418 F.3d 90, 102 (1st Cir. 2005) (holding that standby counsel appointed to review defendant's motions and prevent frivolous motions from being filed "did not deprive [defendant] of control over his defense"); *United States v. Williamson*, 20-cr-195-RBW, 2021 WL 5178853, at *2 (D.D.C. Nov. 8, 2021) (same). Here, standby counsel's limited role of facilitating discovery does not mean that she is managing Pope's case, directing his defense, or infringing upon Pope's Sixth Amendment right to represent himself.

This same issue recently arose in a January 6 case before Judge Bates in *United States v. Victoria White*, 21-cr-563. Like Pope, defendant White opted to proceed pro se, and she decided that she wanted direct access to Evidence.com and Relativity. Judge Bates appointed standby counsel—over White's objection—based on the following reasoning:

> After reviewing the government's description of the discovery platforms, and after consultation with FPD, the Court concludes that it is technically unworkable for White to receive access to the full discovery to which she is entitled (and which she has indicated she would like to access) without the aid of counsel. The discovery is simply too complex, broad in scope, and ***sensitive in nature*** to ensure adequate access for White without the assistance of standby counsel to facilitate that access. ECF 45 at 4 (emphasis added).

Incidentally, Ms. Cubbage was also appointed standby counsel for defendant White and she entered an appearance on October 18.

## II. The existing protective order should remain in effect

### a. Legal Authority

Federal Rule of Criminal Procedure 16(d)(1) states that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief" in regulating discovery. Requests to limit discovery under Rule 16(d)(1) are subject to a "balancing

of interests," *United States v. Williams Cos., Inc.*, 562 F.3d 387, 395 (D.C. Cir. 2009), with the government's showing of good cause weighed against any imposition that the proposed limitation would place on the defendant's Sixth Amendment right to present an effective defense. *United States v. Celis*, 608 F.3d 818, 829 (D.C. Cir. 2010).

It is well established that protective orders are appropriate where the disclosure of discovery could jeopardize the national security of the United States, compromise an ongoing investigation, or infringe on the privacy of uncharged third parties and others associated with a case. *See, e.g., United States v. Concord Mgmt. & Consulting LLC*, 404 F. Supp. 3d 67, 75 (D.D.C. 2019); *United States v. Lindh*, 198 F. Supp. 2d 739, 742 (E.D. Va. 2002). Courts have also considered a defendant's use of social media as a relevant factor when weighing the risk that sensitive information could be widely disseminated. *See, e.g., United States v. Johnson*, 191 F.Supp.3d 363, 373 (M.D. Pa. 2016) (determining that protective order should remain in place, in part, because of defendants' heavy use of social media, and reasoning that "[i]n in this digital era, on-line social media affords a fast and efficient means of disseminating information to a wide group of recipients.").

### b. There is good cause for the existing protective order to remain in effect because of security concerns about highly sensitive CCTV footage

Following the events of January 6, 2021, surveillance footage from the U.S. Capitol Building is relevant to the investigation and prosecution of individuals who breached the Capitol. Obtaining this footage required the Department of Justice and the FBI to coordinate with the U.S. Capitol Police (USCP), which falls in the legislative branch. In obtaining this footage, the Department of Justice and FBI committed to protect the security interests of this co-equal branch

4

of government.

In his motion, Pope argues that the government is "arbitrarily" classifying CCTV footage as highly sensitive. ECF 67 at 8. But the decision to protect the dissemination of CCTV footage from the Capitol was not an arbitrary choice made by the DOJ in connection with January 6 litigation. Rather, the approach taken in January 6 cases is generally consistent with how Capitol CCTV footage has been protected in the past when it has been needed in connection with other court proceedings.

As set forth in the attached declaration from Thomas DiBiase, the General Counsel for the USCP, that agency has "consistently taken a restrictive view of releasing camera footage," and, well before the events of January 6, the agency has taken the position that CCTV video footage used in court cases should be subject to a protective order. Exhibit A. For example, Attachment 4 to the DiBiase Declaration is a motion for a protective order filed by the District of Columbia Office of Attorney General in a driving-under-the-influence case from 2018 that was pending in DC Superior Court. The motion describes the primary purpose of the CCTV footage:

> As part of its policing responsibilities, the USCP maintains and controls a series of video surveillance cameras throughout the Capitol Grounds. The purpose of the cameras is to assist in the maintenance of national security by detecting threats to U.S. Congressmen, their staff, and constituents, deterring and preventing terrorism, and providing for the safety and security of the Capitol Buildings and Grounds.

Consistent with the position that the DOJ has taken in January 6 cases, the motion states that a protective order was necessary because "[r]evealing the locations and capabilities of these cameras could jeopardize USCP's mission to protect the Capitol grounds." Exhibit A, Attachment 4 at 4.

Following the unprecedented attack on the United States Capitol, the USCP's security concerns have only increased. As set forth in paragraph 14 of the DiBiase Declaration, the USCP

is especially concerned about highly sensitive security information ending up in the hands of the very individuals who attacked the Capitol on January 6:

> The [USCP] has significant concerns with the release of any of its footage to defendants in the Capitol attack cases unless there are safeguards in place to prevent its copying and dissemination. The [USCP] is aware of efforts made before January 6, 2021, by such defendants and others, to gather information regarding the interior of the U.S. Capitol, including references to the tunnels below the Grounds and maps of the building's layout, which information is generally not publicly available. Our concern is that providing unfettered access to hours of extremely sensitive information to defendants who have already shown a desire to interfere with the democratic process will result in the layout, vulnerabilities and security weaknesses of the U.S. Capitol being collected, exposed and passed on to those who might wish to attack the Capitol again.

In light of these security concerns, and consistent with USCP's past practice of producing CCTV video pursuant to a protective order, all CCTV footage produced in January 6 cases has been subject to a protective order like the one issued in Pope's case. ECF 26.

    c.  **There is good cause for the existing protective order to remain in effect because of concerns about the highly sensitive information in Relativity**

The global discovery contained in the Relativity database far exceeds the information to which Pope is entitled under Federal Rule of Criminal Procedure 16, the *Jencks* act, or the government's *Brady* obligations. Nonetheless, this vast quantity of data has been made available to Pope and other defendants due to the unique circumstances of this matter, *i.e.*, literally hundreds of similar crimes being committed in the same place contemporaneously. By way of example, the FPD Relativity workspace contains over 60,000 tips provided to the FBI; information that if disclosed, would reveal the identities of tipsters and could jeopardize their safety. Moreover, the database also includes background information, including personal identity information accumulated about investigation subjects—including uncharged individuals; and financial, communications, and travel records pertaining to investigation subjects.

The amount of sensitive and highly sensitive material in Relativity is continually growing

is especially concerned about highly sensitive security information ending up in the hands of the very individuals who attacked the Capitol on January 6:

> The [USCP] has significant concerns with the release of any of its footage to defendants in the Capitol attack cases unless there are safeguards in place to prevent its copying and dissemination. The [USCP] is aware of efforts made before January 6, 2021, by such defendants and others, to gather information regarding the interior of the U.S. Capitol, including references to the tunnels below the Grounds and maps of the building's layout, which information is generally not publicly available. Our concern is that providing unfettered access to hours of extremely sensitive information to defendants who have already shown a desire to interfere with the democratic process will result in the layout, vulnerabilities and security weaknesses of the U.S. Capitol being collected, exposed and passed on to those who might wish to attack the Capitol again.

In light of these security concerns, and consistent with USCP's past practice of producing CCTV video pursuant to a protective order, all CCTV footage produced in January 6 cases has been subject to a protective order like the one issued in Pope's case. ECF 26.

    c.  **There is good cause for the existing protective order to remain in effect because of concerns about the highly sensitive information in Relativity**

The global discovery contained in the Relativity database far exceeds the information to which Pope is entitled under Federal Rule of Criminal Procedure 16, the *Jencks* act, or the government's *Brady* obligations. Nonetheless, this vast quantity of data has been made available to Pope and other defendants due to the unique circumstances of this matter, *i.e.*, literally hundreds of similar crimes being committed in the same place contemporaneously. By way of example, the FPD Relativity workspace contains over 60,000 tips provided to the FBI; information that if disclosed, would reveal the identities of tipsters and could jeopardize their safety. Moreover, the database also includes background information, including personal identity information accumulated about investigation subjects—including uncharged individuals; and financial, communications, and travel records pertaining to investigation subjects.

The amount of sensitive and highly sensitive material in Relativity is continually growing

with the addition of new materials derived from searches of subjects' digital devices and social media accounts and interviews with defendants, witnesses, and victims. Moreover, Pope's active social media presence and his posts encouraging the sharing of January 6 video footage only adds additional weight to the government's showing of good cause and further reinforces the need for tight control over highly sensitive discovery. *See* ECF 60-1.

### d. Pope is not entitled to special treatment

Pope's due process and equal protection arguments are without any merit for several reasons. First, the Supreme Court has made clear that "[t]here is no general constitutional right to discovery in a criminal case." *United States v. Ruiz,* 536 U.S. 622, 629, (2002). Second, the government has made available to Pope far more discovery than he is entitled to receive under Rule 16, *Brady*, and *Jenks*, and he can review anything he wants to subject to the terms of the protective order. Third, Pope's argument that he is being denied the right to understand the nature of the accusations against him (ECF 67 at 2) rings hollow considering that he has twice turned down the government's offer for a reverse proffer in which the government would describe the evidence that supports the elements of each offense.

Here, the relief that Pope requests is not equal treatment but rather special treatment that none of the other 900+ January 6 defendants have received to date—*i.e.*, direct unsupervised access to global discovery. Pope argues that he is entitled to special treatment because he is innocent until proven guilty, and he has a "long track record of being trustworthy." ECF 67 at 25. But Pope's "scout's honor" argument does little to placate the concerns as articulated in the DiBiase Declaration—especially after a grand jury has found probable cause that Pope obstructed, impeded, or interfered with USCP officers when he failed to follow their commands on January 6. Moreover, the decision to limit direct access to the discovery databases is not a punishment to Pope because he opted to proceed pro se: standby counsel has been appointed in *every* Capitol

siege case involving a defendant who has decided to represent themselves.[1] The Court should deny Pope's request for special treatment.

### e. The protective order does not violate Pope's Sixth Amendment right to prepare and present an effective defense

Pope contends that the protective order hampers his ability to develop an adequate defense, but this claim is vastly overstated. Courts regularly find that the requirement to have a defendant review protected discovery in the presence of counsel is proper and consistent with the Constitution. *See e.g.*, *United States v. Workman*, No. 18-CR-00020, 2019 WL 276843 (W.D. Va. Jan. 22, 2019) (upholding protective order issued by magistrate judge permitting defendant to access certain sensitive materials only in the presence of counsel); *United States v. Johnson*, 191 F.Supp.3d 363, 373 (M.D. Pa. 2016) ("requiring the Defendants to review the protected documents in the presence of counsel in no way impairs the effectiveness of their proffered defenses"); *United States v. Moore*, 322 Fed. Appx. 78, 83 (2d Cir. 2009) (affirming district court decision entering protective order allowing defendant to view certain discovery materials only in the presence of defense counsel). Pope states that the protective order is limiting his ability to create work product and witness files (ECF 67 at 8), but it is not clear how the protective order is preventing him from creating these materials. Under the terms of the existing protective order, Pope is allowed to possess material that is marked as Sensitive so long as it is secured in a safe place and the material is used solely in connection with his case. Moreover, there is no limitation on Pope's ability to create still frame images from highly sensitive CCTV footage if that will assist in his pre-trial preparations so long as the images are used solely in connection with his case.

---

[1]     *See United States v. Jeremy Brown* (21-cr-00609-APM); *United States v. Alan Hostetter* (21-cr-392-RCL); *United States v. Pauline Bauer* (21-cr-00386-TNM); *United States v. Brandon Fellows* (21-cr-00083-TNM); *United States v. Brian Mock*, (21-cr-00444-JEB); *United States v. Eric Bochene* (21-cr-00418-RDM); *United States v. Victoria White*, (21-cr-563-JDB).

Pope argues that the current arrangement—in which he must request global discovery from standby counsel—is inconvenient because standby counsel must download video to her own computer, which Pope states "has limited storage capacity and is unable to handle the amount of video relevant to this case." ECF 67 at 20.  Pope further states that it takes considerable time for her to download video and upload it to Dropbox for him to access.  But many of the challenges that Pope now complains of appear to be of his own creation because of the broad definition of what he considers relevant.  Rather than focusing on discovery from the time and locations in the Capitol where he was present, he has instead chosen to review footage and discovery from the entirety of the Capitol complex.  If his social media postings are any indication (*see* ECF 60-1), Pope is painstakingly searching for evidence that a coordinated group of federal agent provocateurs were responsible for inciting January 6.[2]  Pope is entitled to pursue the defense of his choosing, and he can search for evidence that will support this defense, but if his choice to scour all available footage for evidence of provocateurs is placing a burden on standby counsel's storage capacity (and her time), that is a situation of Pope's own making and does not entitle him to unsupervised access to global discovery.

Indeed, it might be more convenient for Pope to have direct access to global discovery, but a defendant's convenience is not the applicable standard where the government has made a showing of good cause for a protective order.  The relevant question is whether the limitations imposed on Pope are reasonable in light of the government's security concerns.  In cases involving detained pro se defendants, where the discovery-related restrictions far exceeded those placed on

---

[2]   The government has disclosed to Pope that the government is not aware of any person who was acting on behalf of any government agency as an "agent provocateur" – that is, as a person who committed or acted to entice another person to commit an illegal or rash act – with respect to January 6, 2021.

Pope, courts have found the limitations reasonable in view of the government's security concerns. *See, e.g.*, *United States v. Bisong*, 645 F.3d 384, 396-97 (D.C. Cir. 2011) (pro se defendant's contention that the district court denied him an opportunity to review discovery and prepare his pro se defense failed where district court ensured standby counsel had access to the discovery materials and was getting defendant the records he requested prior to trial); *United States v. Galloway*, 749 F.3d 238, 242 (4th Cir. 2014) (requirement that pro se defendant review discovery in the courthouse's lockup area and restriction on bringing discovery materials back to the detention center where he was being held did not deprive defendant of meaningful access to discovery); *United States v. Sarno*, 73 F.3d 1470, 1492 (9th Cir.1995) (no constitutional violation where government allowed defendant to review discovery to determine which documents should be copied for his pretrial preparation—but gave him only 20 hours to inspect 250,000 pages of material). Here, Pope complains that he is not personally able to utilize various tools in Relativity (ECF 67 at 8), but a defendant's constitutional right of access to the courts does not include a constitutional right to unfettered access to the eDiscovery platform of their choice. *See, e.g.*, *United States v. Cecrle*, No. 2:12-CR-400-JAD-GWF, 2014 WL 31674, at *6 (D. Nev. Jan. 3, 2014) (constitutional right of access to the courts does not require that access to materials be provided in any particular way).

  f. **The government has made good faith efforts to provide Pope with meaningful access to discovery so that he can prepare and present his defense**

  In the short time period Pope has proceeded pro se, the government has fielded a high volume of discovery requests from Pope, and the government has made a good faith effort to assist Pope when he has made reasonable requests—*e.g.*, checking with the FBI to see if a specific rioter

in the building has been identified. Government counsel has also shared information with standby counsel to assist Pope in accessing discovery.

However, at points the government has sought additional information from Pope when it has not been clear why requested information would be discoverable. *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998) ("To give rise to a disclosure obligation, the evidence's materiality must, of course, be evident to a reasonable prosecutor."); *United States v. Slough*, 22 F. Supp. 3d 1, 5 (D.D.C. 2014) (requested evidence must bear "more than some abstract logistical relationship to the issues in the case"); *see also United States v. Williamson*, No. CR 14-151 (RMC), 2014 WL 12695538, at *2 (D.D.C. Oct. 23, 2014) (Rule 16 cannot be used to engage in a "fishing expedition."); *cf United States v. George,* 786 F. Supp. 11, 15 (D.D.C. 1991) ("At least one of the rationales behind the materiality requirement (and limiting discovery by criminal defendants generally) is to insure that the government not expend excessive time and effort securing documents for the defendant")).

Many of Pope's discovery requests have had no apparent relevance to his case such as his September 28, 2022 request that the government produce documents and records regarding "[h]ow many years did Joe Biden spend in prison after he was arrested by US Capitol Police for trespassing?" And a number of Pope's discovery requests appear to be derived from false information that he has consumed and circulated online. For instance, Pope used his Twitter account (Exhibit B) to circulate false information put forward by a disbarred attorney about nonexistent CCTV cameras within a section of the Capitol.[3]  As stated in his motion, Pope

---

[3]  Pope's tweet included a link to a purported "news release" with the heading "Breaking - FBI Form 302 Reveal from Jonathon Moseley Coming, Despite Contempt Warning from Judge Mehta." The text of the release is available here: https://thepragmaticconstitutionalist.locals.com/post/2850451/breaking-fbi-form-302-reveal-from-jonathon-moseley-coming-despite-contempt-warning-from-judge-meh (last accessed November 12, 2022).

continues to believe that the government is improperly withholding CCTV footage despite the government's explanation of what has and has not been produced.

When the government has asked Pope to provide more specifics about his discovery requests, he has taken umbrage. As set forth in the DiBiase declaration, the USCP provided the FBI with video footage for an eight-hour period including footage that began at approximately 11:00 AM—about two hours before the initial breach of the Capitol's outer security perimeter. This footage is all available for Pope to review in Evidence.com without supervision. Accordingly, when Pope requested that the government produce footage from "all CCTV cameras on the east side of the Capitol from at least 6 a.m." the government asked why footage from 6 AM would be discoverable considering that Pope did not arrive on the East Front until more than 7 hours later. In response to the government's question, Pope replied:

> "Morning CCTV footage of individuals who battled with police and used megaphones to incite the crowd is relevant to all January 6 cases. Just because those individuals have close ties to folks from the intelligence community and were shaking hands with Bill Barr the weekend before the election does not mean you can withhold the footage as evidence."

Pope followed up later that day with a link to a video montage that he created and posted to Twitter,[4] the substance of which appears to be consistent with his past statements on social media that he believes the events of January 6 were incited by federal agents provocateurs with ties to the intelligence community.

Pope's argument that the government is hiding exculpatory needles in a global discovery "haystack" (ECF 67 at 10) is also without merit. For starters, the information in the Relativity database is searchable and can be filtered by specific defendants with the assistance of his standby

---

[4] Available at https://twitter.com/FreeStateWill/status/1564359076359950342?t=kxJqQknVwHKd3EYewRXiTA&s=19 (last accessed on November 12, 2022).

counsel. Whenever new discovery is added to Relativity, the government has sent Pope and his standby counsel a cover letter with a narrative description of what has been uploaded as well as spreadsheets describing the document categories and the corresponding Bates range to help Pope identify those categories of material that he would like his standby counsel to download for his review. To the extent the spreadsheets do not suit his needs, his standby counsel can work with the Relativity project manager to create whatever bespoke indexes Pope desires.

As noted in Pope's motion, counsel for the government proposed a meet-and-confer call with Pope and stand-by counsel in an effort to address Pope's questions about discovery and to narrow the issues to be decided by the Court. During the call, the government attempted to address Pope's misimpression that it is the government's duty to identify every video taken by other rioters in which Pope appears (however briefly) and to provide the video to him in case-specific discovery. The government has disclosed, and will continue to disclose, any documents or video that it intends to use in its case-in-chief or any footage the government is aware of that is material to a defense or is in anyway mitigating.[5] But Pope appears to harbor the illusion that the government needs to identify every instance in which he appears briefly in another rioter's camera footage. For example, in the link that he included on page 19 of his motion, Pope appears for only brief second

---

[5] Pages 23-24 of Pope's motion reference a conversation during the September 23 meet-and-confer. In an effort to illustrate for Pope the government's compliance with its ongoing discovery obligations, government counsel pointed out that the government had produced to Pope an FBI 302 of an interview with a USCP officer who had misidentified Pope as the individual who had attempted to wrestle away the officer's baton. As relayed to Pope, this officer's statement was inconsistent with the government's understanding of Pope's actions on January 6, which were disruptive but not violent. Following the officer interview, the government did some additional investigation and, based on information in an earlier 302, was able to confirm that it was another subject (and not Pope) who was involved in the baton incident. Both 302s and a short summary were provided to Pope and standby counsel. This disclosure by the government does not demonstrate Pope's need for unsupervised access to global discovery. On the contrary, the example shows that the government is meeting its obligation to Pope to provide discovery that could be used for mitigation or for purposes of impeaching a witness.

at the 2:36 mark of the video clip. It is unclear to the government why Pope considers this footage to be discoverable under Rule 16. The government is not hiding these snippets from Pope, and to the extent he identifies such footage—whether in the public domain or in global discovery—he is entitled to try to introduce it into evidence if he believes it supports his defense.

**III.    Pope's purported discovery issues can be remedied under the existing protective order**

During the September 23 meet-and-confer, government counsel explained that the protective order is not intended to hamstring Pope's ability to prepare his defense or to put on evidence at trial. It is the government's view that issues raised in his motion can be addressed under the existing protective order. For example, if Pope believes that there is specific CCTV footage that the government has "arbitrarily" classified as highly sensitive, he can ask the government to change the designation or he can raise the issue with the Court pursuant to the disputes provision of the protective order. ECF 26 at ¶ 8.

Moreover, the government recognizes that Pope will likely want to use video footage at trial, and some of that footage may currently be designated as highly sensitive. In the spirit of trying to find a pragmatic resolution, the government proposed that as part of scheduling order for trial the Court could set a deadline (*e.g.*, 90 days before trial) by which Pope would identify any highly sensitive material that he anticipates using at trial, so that the government could review and change the designations so that Pope could possess the material, organize his exhibits, and create demonstratives for trial. Such a process is consistent with paragraph 8 of the existing protective order. ECF 26. But as noted in his motion (ECF 67 at 24), Pope is not interested in this proposal.

## **CONCLUSION**

In this case, the balancing of interests requires that Pope's request for unfettered access to sensitive and highly sensitive material be denied. As this Court has already recognized, the

protective order is needed to adequately protect the government's legitimate interests. ECF No. 26. Specifically, the government has established good cause that the restrictions on access to sensitive and highly sensitive materials are needed to protect significant national security, law enforcement, and other governmental interests.

Respectfully submitted this 12 day of November, 2022.

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  /s/ *Jason M. Crawford*
Jason M. Crawford
Trial Attorney
U.S. Department of Justice
Detailed to the D.C. U.S. Attorney's Office
DC Bar No. 1015493
(202) 598-1099
Jason.M.Crawford@usdoj.gov