**DECLARATION OF THOMAS A. DIBIASE**

I, Thomas A. DiBiase, have personal knowledge of the following facts and will testify to them, if called to do so:

1. I have been the General Counsel for the United States Capitol Police ("USCP" or "Department") since August of 2020. From October 2019 to August of 2020, I served as the Acting General Counsel, and from April of 2010 to October of 2019, I served as the Deputy General Counsel. From 1991 to 1995, I also worked as a litigator at a New York-based law firm and then from 2007 to 2010 at a District of Columbia law firm. From 1995 to 2007, I served as an Assistant United States Attorney at the United States Attorney's Office for the District of Columbia.

2. As part of my duties at the USCP, I have authorized the release of camera footage from the Department's extensive system of cameras on U.S. Capitol Grounds (Grounds). These cameras, part of a sophisticated closed circuit video (CCV) system, are resident both inside and outside the buildings including the U.S. Capitol itself and the other Congressional office buildings on the Grounds. This CCV system provides the backbone of the security for the U.S. Capitol Grounds. The CCV system is monitored by sworn police officers 24-7 in our Command Center and is relied upon to provide real time information regarding any incident occurring on the Grounds. The first step whenever an incident occurs is for the Command Center to pull up the CCV cameras closest to the incident. This enables the Department to have a real-time view of the incident and provides an additional layer of safety for our officers when responding to any incident.

3. Access to this CCV system is strictly limited. Because the system is a closed circuit, access to the cameras only occurs from dedicated workstations and monitors located in a handful of

locations on the Grounds. Our system is secured, and may not be monitored or hacked by anyone not connected via a dedicated workstation and monitor.

4. The disclosure of any footage from these cameras is strictly limited and subject to a policy that regulates the release of footage. Per Department Directive 1000.002, Retrieval of Archived Video (see Attachment 1), the release of *any* footage from the Department's CCV system must be approved by the Assistant Chief of Police for Operations, the Department's second highest sworn officer. The Directive notes that, "[t]he Capitol Police Board [which oversees the USCP] directed that cameras would only be used for matters related to national security and legitimate law enforcement purposes (e.g., serious crimes). The [Assistant Chief of Police for Operations] is the sole authority for the approval of any and all requests for archived video footage...." The Directive goes on to note that, "[v]ideo footage received through an approved request shall not be delivered, copied, or transmitted to anyone other than necessary parties (e.g., court, General Counsel) without approval from the [Assistant Chief of Police for Operations]."

5. There is a specific Department form, a CP-411 (Attachment 2), which must be completed and signed by several officials including the Assistant Chief of Police for Operations before any camera footage can be released.

6. As part of my duties as General Counsel and my prior duties as the Deputy General Counsel, I have often been consulted regarding the release of camera footage. The Office of the General Counsel has consistently taken a restrictive view of releasing camera footage in cases other than serious crimes or national security. We regularly deny footage to civil plaintiffs who may have been involved in accidents on the Grounds unless they involved serious injuries or death. (Even in those cases, I have only approved an attorney or

investigator coming to the USCP and viewing the footage in our offices with a USCP employee present.) We are also often asked for camera footage related to non-USCP administrative investigations, and we generally do not provide that footage. We will, however, allow investigators from agencies with which we regularly work, such as the Architect of the Capitol, to view such footage in the presence of a USCP employee.

7. The primary, but not exclusive, reason for these restrictions is to protect the physical security of the Capitol compound and the safety of those who work in or visit the Capitol. Allowing less restricted access to the CCV system could present a dire safety risk to the Capitol and its inhabitants; even a knowledge of, for example, the location of each CCV camera might enable a bad actor to exploit vulnerabilities in the system.

8. Pursuant to 2 U.S.C. § 1979, USCP information designated as "security information" may only be released with the approval of the Capitol Police Board. Security information is defined as information that:

   (1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds; and

   (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol Police, or any incident command relating to emergency response.

9. That same statute also provides an exemption to the above restrictions for certain Congressional entities to obtain security information from the Capitol Police:

   (c) Rule of construction

   Nothing in this section may be construed to affect the ability of the Senate and the House of Representatives (including any Member, officer, or committee of either House of Congress) to obtain information from the Capitol Police regarding the operations and activities of the Capitol Police that affect the Senate and House of Representatives.

10. On February 8, 2023, I received a request from the Majority Staff Director from the Committee on House Administration (CHA), one of the four oversight committees of the Capitol Police. The Director requested that CHA be given the same access to the USCP footage that had been provided to the January 6 Select Committee (Select Committee)[1]. (This verbal request was followed by a formal letter with the same request from the Chairman of CHA on February 9, 2023.) Within days of the request, the Capitol Police installed three Genetec terminals in a House Office Building and provided to CHA the four hard drives I received from the Select Committee when it had completed its work. The USCP also provided one CHA staffer with a password to sign into the system. At no time was I nor anyone else from the Capitol Police informed that anyone other than personnel from CHA would be reviewing the camera footage.

11. On February 20, 2023, through a report from the media, the Capitol Police learned that access to the footage had been granted to members of the Tucker Carlson Show. That access was not previewed with the Capitol Police nor was the Capitol Police informed before that access was granted. I was informed that personnel from the Tucker Carlson Show were allowed to view whatever footage they wanted while supervised by staff from CHA but that no footage had been physically turned over to the show.

12. On February 27, 2023, the Staff Director requested a list of excluded Capitol Police cameras (Sensitive List) which I provided on March 1, 2023. This list was of cameras that the Capitol

[1] The Select Committee had access to all Capitol Police cameras from all exterior cameras, and all interior Capitol and Capitol Visitor's Center (CVC) cameras from January 6 at 1200-2000 hours which is estimated to be 12,671 hours of video. The Capitol Police later provided the Select Committee, at its request, with footage from all Capitol, Cannon, Longworth, and Rayburn interior cameras for January 3, 4, and 5 at 0700-2200 hours, January 6 at 0600-1200 hours and footage from all CVC interior cameras for January 5 at 0700-2200 hours. This is an additional 28,386 hours of video.

Police deemed to contain sensitive information such as evacuation routes or sensitive infrastructure or offices such as Sensitive Compartmented Information Facilities. It is substantially the same as the list provided to the prosecutors.

13. During numerous conversations with the Staff Director over several weeks, I emphasized the Capitol Police's desire to review every footage clip, whether it was on the Sensitive List or not, if it was going to be made public. I informed the Staff Director that this was the same process followed by the Select Committee and the prosecutors in all of the criminal cases: that we were shown and had to approve of every clip before it was made public. This was followed in all cases by both the Select Committee and the prosecutors.[2]

14. Of the numerous clips shown during the Tucker Carlson show on March 6 and 7, 2023, I was shown only one clip before it aired, and that clip was from the Sensitive List. Since that clip was substantially similar to a clip used in the Impeachment Trial and was publicly available, I approved the use of the clip. The other approximately 40 clips, which were not from the Sensitive List, were never shown to me nor anyone else from the Capitol Police.

15. Finally, I have read media reports that the Capitol Police footage may be shown to defendants facing charges related to January 6th. I have been told by the Staff Director of CHA that, as of last week, no footage has been shown to any defendant or defense counsel but that defense counsel have reached out to CHA seeking to review the footage.

* * * * *

[2] There were a series of clips from Capitol Police cameras that were shown during the second impeachment trial of President Donald J. Trump in February of 2021. None of those approximately 15 clips (some from the Sensitive List) were shown to the Capitol Police beforehand, the impeachment managers simply requested the clips and they were provided.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of March 2023.

Thomas A. DiBiase