# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:21-cr-00128-RC |
| v. | |
| WILLIAM ALEXANDER POPE, | |
| Defendant. | |

## RESPONSE TO THE GOVERNMENT'S MEMORANDUM AND UPDATE ON OTHER MATTERS CONCERNING DISCOVERY

**Update on Motion to Unseal the Undercover Police Provocateur Video**

I must inform the court that at a little after 7 p.m. CST on Friday, March 24, 2023, I became aware that a portion of the undercover police provocateur video had been publicly leaked. I do not know who posted the video, but what I do know is that at 5:03 p.m. CST an anonymous Twitter account (@OVERWATCHJ6) tweeted[1] "January 6 Care Package" with a link to a Rumble video.[2] That leaked video shows a little more than seven minutes of the undercover footage with captions. Rumble does not show an exact timestamp, but the video was uploaded on March 24, 2023, and at the time I first saw it, Rumble said that the video had been uploaded about 2 hours earlier, which would be around the time of the @OVERWATCHJ6 tweet.

Then on Sunday, March 26, 2023, an individual informed me that the full footage from the undercover police provocateur was being circulated by an individual in a public channel on an

---

[1] The @OVERWATCHJ6 tweet is available at: https://twitter.com/OVERWATCHJ6/status/1639387548018528257
[2] The leaked footage can be accessed on Rumble at: https://rumble.com/v2en5uk-january-6-care-package.html

app called Telegram. I do not know if the individual posting to Telegram is the original source of the leak, but immediately after learning the video was circulating, I tweeted out a reminder to defendants to not violate the protective order by leaking sealed materials[3].

On Thursday, March 30, 2023, I became aware of another undercover MPD video that was circulating on social media (which I have never possessed).[4] Upon further investigation, I discovered the second leaked video had also been circulated on Telegram on March 26, by the same individual who posted the videos my motion was seeking to release. At that time, the individual also posted an FBI interview (302) of Ray Epps, which I know had been a sealed document since Mr. Crawford had previously requested I read it.

I do not wish anyone to incur the wrath of this court for these leaks, but I feel obligated to state the record since some of these materials relate to my motion. I have included a more detailed summary of what I know about the leaks in Exhibit 1.

I will reiterate to this court that I have not leaked any sealed materials to individuals who have not signed the protective order and I will never do so.

I am still pursuing my motion to release the original footage of the undercover police provocateur and related exhibits through this legal process. This video should still be released by the court because the leaked versions appear to have been compressed by the apps they were posted to, which results in a loss of video and audio quality.

I would note that the government's latest filing does not improve upon the arguments made in their previous filing, which Judge Contreras found to be lacking legal substance. Even had the

---

[3] My tweet reminding defendants to not violate the protective order can be accessed at: https://twitter.com/FreeStateWill/status/1640035470871785472

[4] The second leaked undercover video was posted to multiple accounts. I do not know the original source of the leak, but part of it can be viewed here: https://twitter.com/wittycommittee/status/1641455597882163200

videos not been leaked, the government has failed to demonstrate exactly how the release of these materials would harm any individual or national security. Many MPD officers have testified publicly in court and their faces are clearly identifiable in public footage from January 6. An officer going undercover rather than wearing a uniform does not exempt the officer from public scrutiny nor make their safety a greater priority than the safety of uniformed officers or charged defendants. The safety of all is important, and I wish no harm on any individual. But if the actions of charged defendants are fair to scrutinize publicly, then so too should the illicit behavior of uniformed or undercover government operatives be scrutinized.

The government claims these videos are not relevant to my case (ECF No. 90 at 4, 7), however, these videos establish key exculpatory facts. For instance, as the officers approached the Capitol, they acknowledged they could not see any police lines on the west front (ECF No. 81-1 at 1:35). Soon after, the video shows Capitol Police standing post at the Northwest Drive entrance, making no efforts to deter protestors from entering Capitol grounds on the adjacent path (at 3:50). The video also shows several uniformed police standing on the Northwest lawn doing nothing to deter "entirely peaceful" individuals from walking past them to the east side of the Capitol (at 6:40).[5]

I will need to call these undercover officers as witnesses to authenticate all video they recorded of me, and will need to probe their integrity and illicit conduct at that time. I would also note, that Officer 2 and Officer 3 appear to be recording relevant video on their cell phones (at 7:21), and the government has not produced those recordings in discovery despite my requests.

---

[5] The government does not know the evidence well enough to realize the undercover police provocateur video is absolutely relevant to my case. This underscores that I need full access to discovery so I can find relevant materials myself. The government's ignorance of exculpatory evidence is further demonstrated by their first indictment (ECF No. 8) which claimed the Vice President-elect was at the Capitol despite Officer Carter's bodycam labeled "Escort Harris to DNC" showing him driving his patrol vehicle to escort the Harris motorcade from the Capitol at 11:21 a.m. See Exhibit 2: https://rumble.com/v2fnth8-exhibit-bodycam-footage-from-officer-richard-carter.html

**The Government Hypocritically Uses Media While Attacking Defendant Expression**

While the government accuses me of seeking to try my case in the media by motioning to release the undercover police provocateur, the fact is I first described the officer inciting the crowd in my November response to the government (ECF No. 72 at 23) and did not tweet out that filing until late February. My factual descriptions of these events were in the public space for three months before I spoke to the media about them.

To date, I have held no press conferences, I have not issued a single press release on behalf of my defense, I have turned down requests to appear in multiple documentaries, I have held no fundraisers, and I have declined numerous interview requests. During the first several months after my arrest I posted nothing to social media.

Contrast my measured communication to what the government broadcasts. A quick search of DOJ[6] and FBI[7] websites returns hundreds of press releases related to January 6. Officials from these agencies have also given many press conferences related to January 6. In TV interviews, the government admitted their objective from the beginning was to prioritize arresting the "internet stars" of January 6, and to create a "shock and awe" sensation in the media that would have a chilling effect on planned First Amendment activities (ECF No. 83 Exhibit 3).

This court should also contrast audience size. The FBI's main Twitter account has more than 3.5 million followers, and they use it to continually release January 6 updates. The FBI also has more than 2.9 million followers on Facebook. The main DOJ Twitter account has more than 2 million followers. Beyond this, the FBI has numerous regional social media accounts with large followings. On February 12, 2021, the FBI Kansas City Field Office used Twitter to boast that

---

[6] DOJ press releases can be searched at: https://www.justice.gov/news
[7] FBI press releases can be searched at: https://www.fbi.gov/news/press-releases

they had arrested me.[8] That tweet was shared in several news articles. The FBI also used Twitter to link to the DOJ database[9] of January 6 arrests; an index designed to create a chilling effect among others considering participation in First Amendment activities.



*Figure 1: The government has continuously waged an information campaign against me outside the court since my arrest.*

Compared to the government's massive social media presence, my Twitter account of less than twelve thousand followers is quite small and insignificant.

Furthermore, while the presumption of innocence may in theory exist within the court, vindictiveness prior to adjudication is rampant in American society. Facebook and Instagram banned me for life simply because I had been arrested (not convicted) for what the government has deemed was my "entirely peaceful" conduct on January 6. This creates an alarming First Amendment issue, because the government can effectually silence any dissident on major communication platforms simply by bringing politicized charges against them.

This suppression of free speech is even more concerning considering the large number of 'former' FBI and CIA employees that are in leadership positions at Facebook.[10] This lifetime ban from Facebook is not minor, as my media startup company (Free State Kansas) had several

---

[8] Access the FBI tweet announcing my arrest at: https://twitter.com/FBIKansasCity/status/1360304540797571073
[9] The FBI linking to their January 6 database: https://twitter.com/FBIKansasCity/status/1360305381185114116
[10] There are reports of numerous 'former' FBI and intelligence agency officials in leadership positions at Facebook: https://www.dailymail.co.uk/news/article-11562433/Facebook-riddled-ex-CIA-agents-ex-FBI-agents-work-Twitter.html

thousand followers and was one of the largest Facebook pages for local news in Kansas. Now the government complains to this court that I should also be silenced on Twitter – the one major communication platform that has seemingly eluded the government's censorship objectives.

If the court does not block the government's attack on the First Amendment and pursuit of censorship, Americans may lose the ability to share information and dissent. We have seen similar efforts in communist countries like China, North Korea, and Cuba, where the governments cut off dissident access to the internet and social media.[11]

If the government continues to attack my First Amendment rights and my use of Twitter, while the government simultaneously conducts a massive communications campaign against January 6 defendants outside of court, I may be left with no choice but to file a Motion to Compel the Government to Refrain from Hypocrisy.

The government's use of communication outside the court also affects my odds of preserving my freedom. The government has conducted targeted advertising through the use of January 6 wanted signs posted around Washington D.C.  These signs taint the local jury pool against "entirely peaceful" defendants such as myself. I have not seen these signs in Kansas, or Nebraska, or Missouri, or other states, and I am not aware of their presence anywhere else in the country other than D.C., so I am left to believe that part of the government's targeted information war outside the courtroom is designed to manipulate biases amongst potential jurors so that the government can more easily secure dubious convictions in District of Columbia courtrooms.

I would recall the wisdom of Justice Brandeis:

---

[11] For instance, in 2021, Cuba shut off social media access to dissidents protesting the country's economic crisis: https://apnews.com/article/business-technology-cuba-ca1ae7975e04481e8cbd56d62a7fb30e

> *Those who won our independence believed that the final end of the State was to make men free. . . Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law -- the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.*
>
> – *Whitney v. California*, 274 U.S. 375-376 (1927).

**Ethical Concerns**

In the government's most recent filing, they alleged that I violated an ethical code on pretrial publicity which they claim is binding on attorneys (ECF No. 90 at 7). First off, I do not know if these codes exist, as the government tends to make things up. Second, my undergraduate degree was in Management Ethics, not Judiciary Ethics. I am not an attorney and have no intention to become one,[12] and I do not know what the ethical standards of the lawyering trade are.[13] Third, as noted previously, the government has been hypocritical in their own use of pre-trial publicity.

As a Pro Se defendant, I am interpreting the Constitution and making legal arguments to the best of my ability. It is my understanding that I have a right to fiercely defend myself against accusations levied by the government, which is what I intend to continue doing.

And I will manage my own case in my own way, and according to my own manner! *Faretta v. California*, 422 U.S. Footnote 37 (1975)

If it pleases this court, I would be happy to offer several suggestions when this case resolves for how the government can improve upon their ethical and professional conduct in the future.

---

[12] After I win this case, I intend to retire from practicing law.
[13] And no offense, but most folks do not consider January 6 prosecutors to be exemplars of truth and ethics.

**USCP Deputy Chief has Alleged the Government has not Produced Relevant Discovery**

On March 27, 2023, it was reported that retired Capitol Police Deputy Chief J.J. Pickett affirmed that Capitol Police had produced compilation videos tracking the movement of every individual who entered the Capitol at the request of the FBI[14]. Deputy Chief Pickett believed this compiled evidence was not produced by the Department of Justice to defendants in discovery.

As a defendant, I can confirm that I have received no such compilation video in my case specific discovery, and I am unaware of these videos being produced in global discovery. This leads me to believe the government is withholding this evidence from defendants.

As Chief Pickett noted, those compilations took a significant amount of time for USCP staff to produce, and when those staff were experts with the complex USCP CCTV system. The task is much more daunting for those unfamiliar with the system. This is a significant issue since many January 6 attorneys and defendants are not proficient with the video. Many attorneys have gone to trial not knowing every CCTV camera their defendant appears on. I have put in a considerable amount of time trying to track video relevant to my case, and still there are gaps in my timeline, including missing moments that are highly exculpatory.

The government has created a discovery haystack consisting of millions of files, which makes it enormously difficult to find and sort the relevant from the irrelevant. By not producing these compilation videos, the government is intentionally making that task more difficult for defense teams. This failure to produce discovery could result in defendants being wrongly convicted simply because they or their attorneys were not able to locate key, exculpatory evidence.

---

[14] USCP Deputy Chief Pickett's statements were recorded in a John Solomon and Nicholas Ballasy article: https://justthenews.com/government/security/tuetwo-years-later-jan-6-video-footage-raises-new-questions-about-police-and

**The Press Coalition's Motion to Intervene**

On March 23, 2023, the Press Coalition (which consists of several media companies) notified me by email that they were filing a Motion to Intervene in this case. On March 28, 2023, Judge Contreras granted 'Leave to File.' The government has expressed their intention to respond to that motion (ECF No. 90 at 6). Once the government submits their response to the Press Coalition, I intend to respond to the government.

**The Dueling Dubious DiBiase Declarations**

Despite hundreds of January 6 CCTV clips now being public, Mr. DiBiase still believes other footage from those same cameras must be hidden from the American people. He believes hiding footage is a bigger national security priority than maintaining the public's trust. And in an effort to keep this footage hidden from the American people, he has issued a second declaration that on many points contradicts his first.

Early on, Capitol Police knew the CCTV should be preserved even without anyone asking them (ECF No. 71-1 at 4). DiBiase conveys the assumed it would be used in courts, but also that Congress would want to use it for their own purposes, and "possibly other entities" as well.

This demonstrates that from the very beginning, Capitol Police knew Congress could do whatever they wanted with the CCTV, and that Capitol Police were more open to sharing CCTV with "other entities" before the FBI requested the protective order be put in place. DiBiase even declared that CCTV clips were used freely in President Trump's February 2021 impeachment trial without review by Capitol Police (ECF No. 88-1 at 5).

Mr. DiBiase's first declaration was signed on March 17, 2021. By then, the FBI had already had access to January 6 Capitol CCTV for at least two months.[15] During that period, Capitol Police had allowed the FBI use the CCTV without a protective order in place. However, there was an Information Sharing Agreement put in place on January 11, 2021 (ECF No. 71-1 at 22). That Information Sharing Agreement affirmed that ownership of the CCTV remained with Congress, which prevented it from being subject to the Freedom of Information Act. So, Capitol Police retained control of releases. The one exception was that CCTV was allowed be produced as "evidence or discovery" in the judicial process (ECF No. 71-1 at 22).

If that Information Sharing Agreement were the only document in place, I would have full access to the CCTV "discovery" right now. However, the protective order was created after my February 12, 2021, arrest to prevent me from fully accessing the evidence in my case.

Mr. DiBiase's first declaration explicitly states that it was the FBI that originally sought the protective order, not Capitol Police. DiBiase declared, "It is our understanding that it is this footage [provided to the FBI] for which the United States now seeks a protective order" (ECF 71-1 at 5).

In his first declaration DiBiase noted that protective orders for USCP CCTV footage had typically been used for DUI cases (p. 3), and were approved by D.C. Superior Court judges (p. 4). Obviously, this court understands that the nature of a DUI case is categorically different than the January 6 cases, and the precedents established by the Superior Court cannot be bound upon

---

[15] In United States v. Dawn Bancroft, 1:21-CR-00271-EGS-1 at 6, FBI Special Agent Bryan Pacchioli attested that he reviewed Capitol CCTV on January 20, 2021. Even earlier cases include CCTV screenshots. For instance, United States v. Dominick Madden, 1:21-CR-00139-EGS-1 notes that Madden was identified on CCTV on January 17, 2021, however it is not clear if the agent had full access to the CCTV footage.

the District Court. There also tends to be much less public interest in DUI cases unless they result in injury or death, or lead to sensational headlines involving intoxicated politicians.

Contrast a typical DUI to January 6, which has been the biggest news story for more than two years, and has resulted in declining trust in public institutions. Americans have historically been skeptical of opaque government processes, and that skepticism has never been more intense than it is now regarding January 6.[16] Concealment of the Capitol CCTV is fueling public speculation that there is more to January 6 than is being reported. This distrust is evidenced by the recent Rasmussen Poll that shows 61% of Americans believe the government incited January 6, and 80% believe the public should be allowed to view <u>ALL</u> the footage.[17]

The first five paragraphs from the Mr. DiBiase's most recent sworn declaration (ECF No. 88-1) are almost identical to his first declaration (ECF No. 71-1) other than DiBiase changing the location of the law firm he worked for in the early 1990's from D.C. to New York.

Footnote 1 of ECF No. 88-1 at 4, introduces a major conflict between the two DiBiase declarations. The first declaration attested there was more than 14,000 hours of CCTV footage preserved from the 8-hour period between noon and 8 p.m. on January 6, which was provided to the Committee on House Administration and the Senate Rules Committee from the 116th Congress, as well as to the FBI and MPD (ECF No. 71-1 at 4).

However, by DiBiase's second declaration, the footage from between noon and 8 p.m. on January 6, shrinks to 12,671 hours (ECG No. 88-1 at 4). There is no explanation given by DiBiase for the conflicting totals for this 8-hour period.

---

[16] The only cure for this growing distrust is transparency and sunshine.

[17] The Rasmussen poll shows that 70% of Republicans, 57% of Democrats, 61% of black voters, and 64% of other minorities believe it is at least somewhat likely the government incited January 6.
https://www.rasmussenreports.com/public_content/politics/biden_administration/61_believe_feds_helped_incite_capitol_riot

Additionally, DiBiase states in his second declaration that the 12,671 hours for that 8-hour period is what was originally given to the January 6 Select Committee (116th), and that the current Committee on House Administration (117th) has been given the same access as the January 6 Select Committee (ECF No. 88-1 at 4).

If this is true, Capitol Police withheld more than a thousand hours of CCTV footage from the January 6 Select Committee (116th) while they were doing their work, and are now withholding the same number of hours from the Committee on House Administration (117th).

|  | FBI | MPD | 116th SRC | 116th J6C | 116th CHA | 117th CHA |
|---|---|---|---|---|---|---|
| J6: Noon to 8 p.m. | >14,000 | >14,000 | >14,000 | 12,671 | >14,000 | 12,671 |

Figure 2: The total number of CCTV hours DiBiase has declared each agency and committee received for the 8-hour period between noon and 8 p.m. on January 6.

To make matters more confusing DiBiase declared that the 116th Committee on House Administration and the 116th Senate Rules Committee eventually received CCTV for the entire 24-hour period from January 6 (ECF No. 71-1 at 4).

However, DiBiase declares the January 6 Select Committee (116th) and the 117th Committee on House Administration have only received additional CCTV from 6 a.m. to noon inside the Capitol and House Office Buildings, but not the exterior or the visitor center; and no footage from before 6 a.m. or after 8 p.m. (ECF No. 88-1 at 4). This is visualized in the figure below.

|  | FBI | MPD | 116th SRC | 116th J6C | 116th CHA | 117th CHA |
|---|---|---|---|---|---|---|
| J6: Midnight to 6 a.m |  |  | red |  | red |  |
| J6: 6 a.m. to Noon |  |  | red | red | red | red |
| J6: Noon to 8 p.m. | red | red | red | red | red | red |
| J6: 8 p.m. to Midnight |  |  | red |  | red |  |

Figure 3: A visualization of the CCTV time ranges DiBiase has declared that each agency and committee received for January 6

> [1] The Select Committee had access to all Capitol Police cameras from all exterior cameras, and all interior Capitol and Capitol Visitor's Center (CVC) cameras from January 6 at 1200-2000 hours which is estimated to be 12,671 hours of video. The Capitol Police later provided the Select Committee, at its request, with footage from all Capitol, Cannon, Longworth, and Rayburn interior cameras for January 3, 4, and 5 at 0700-2200 hours, January 6 at 0600-1200 hours and footage from all CVC interior cameras for January 5 at 0700-2200 hours. This is an additional 28,386 hours of video.

*Figure 4: Footnote from Declaration of Thomas A. DiBiase (88-1), dated March 16, 2023, which describes what CCTV footage was turned over to the Select Committee (2021-2023) and the Committee on House Administration (2023-Present). This totals 41,057 hours of CCTV footage and is declared by Mr. DiBiase to be the CCTV collection Tucker Carlson had access to.*

While it is important to note what DiBiase declared was provided to the 117th Committee on House Administration, the court should also consider what DiBiase did not declare:

- Mr. DiBiase did not declare any video from the three Senate office buildings.
- Mr. DiBiase did not declare any video from before 7 a.m. or after 10 p.m. on J3-J5.
- Mr. DiBiase did not declare any video from the House office buildings after noon on J6.
- Mr. DiBiase did not declare any Visitor Center CCTV on J3 or J4, or before noon on J6.
- Mr. DiBiase did not declare any exterior CCTV from before noon on J6.
- Mr. DiBiase did not declare any interior Capitol CCTV from before 6 a.m. on J6.
- Mr. DiBiase did not declare any CCTV whatsoever after 8 p.m. on J6.

I have included the figure below to visualize what Mr. DiBiase did and did not declare.



*Figure 5: A visualization of Mr. DiBiase's second declaration of what video was and was not turned over to the committees.*

**The Government has Withheld Thousands of Hours of Relevant CCTV in Discovery**

If we extrapolate Mr. DiBiase's second declaration of 12,671 hours of video for the 8-hour period (noon to 8p.m.) from the Capitol interior, visitor center, and exterior cameras, this results in 38,013 hours of video for the full 24-hour period of January 6.[18] For the four-day period from January 3 to January 6, those cameras should produce 152,052 hours of video.[19]

But where is this footage? Does it exist? And does the Department of Justice have a copy? These questions remain unanswered. Mr. DiBiase declared what video he turned over to the congressional committees, but he failed to declare how much video Capitol Police has preserved in total, and whether Capitol Police turned over additional CCTV to the FBI beyond the more than 14,000 hours that was originally provided. It is also alarming that even Mr. DiBiase's declaration of 12,671 hours far surpasses what the government has produced in discovery.

In Global Production letters, the government boasts they have produced more than 361 days of footage in evidence.com. However, if we were to translate Mr. DiBiase's declaration of 12,671 hours into days, it would be approximately 528 days of video. This would mean the government has failed to produce 167 days of CCTV video from relevant areas.

However, to be more precise. Not all of the 361 days of video in discovery are USCP CCTV. The 361 days also includes MPD CCTV, Secret Service CCTV, and bodycam footage from MPD, Arlington County, Fairfax County, Montgomery Police, and Virginia State Police.

On November 29, 2022, the previous representative for the government, Mr. Crawford (who acknowledged I was "entirely peaceful" on January 6), provided me with an index of the Capitol Police CCTV that had been produced in discovery. This index lists 21,160 video files from 637

---

[18] This does not account for the missing footage from Mr. DiBiase's original declaration of more than 14,000 hours.
[19] These extrapolations do not include estimates for interior footage from the House or Senate office buildings.

cameras. Most of these files list the video duration, which totaled comes to almost 247 days of video. Another 146 files do not list duration, but if we were to multiply them by the average length of the other video files (~16.9 minutes) that would result in another 41.2 hours of footage. That would bring the total produced by the government to ~248 days of Capitol Police CCTV.

However, there are some important parameters to note. While most of the cameras produced are from the noon to 8 p.m. timeframe described by Mr. DiBiase, 1833 files in the index start at 8 p.m. or later. This results in 478 hours (~20 days) of produced CCTV video falling outside of Mr. DiBiase's declared 12,671 hours.

In addition to this, the Global Discovery No. 21 letter notes the government produced an additional 86 files from the morning of January 6 (recorded as early as 9 a.m.) in connection with a Proud Boys discovery request.[20] These videos, totaling approximately 25 hours, were recorded prior to the noon to 8 p.m. timeframe declared by Mr. DiBiase for the 12,671 hours.[21]

It should be noted that Mr. DiBiase did not declare that any exterior footage prior to noon was produced to the congressional committees, so this 25 hours of footage from the morning indicates the government may possess more CCTV than Tucker Carlson had access to.

Beyond the 86 morning files produced in Global Production No. 21, an additional 649 files produced in discovery begin before noon on January 6. These total ~200 hours of video, some of which runs into the noon hour.

If we subtract the 248 days of USCP CCTV produced by the government from the 528 days of CCTV Mr. DiBiase declared in relevant areas from between noon and 8 p.m., we discover that

---

[20] Most of these relate to Proud Boys walking to the east side of the Capitol prior to lunching at the food trucks.
[21] These videos also demonstrate the FBI has CCTV beyond the 8-hour period DiBiase attested was provided to the FBI in his first declaration. This court would be wise to inventory everything the government possesses.

defendants are missing at least 280 days of footage in discovery. This is the equivalent of 840 missing CCTV cameras.

However, there have been a handful of new CCTV cameras produced by the government out of thin air in recent global productions. The Global Production No. 24 letter dated January 25, 2023, discloses five cameras that "were inadvertently omitted" by the government.

In the Global Production No. 25 letter dated March 6, 2023, the government found an additional eight cameras "that were omitted from prior productions," including four cameras from inside the Capitol. "We recently identified" them, claims the government in the letter.

While it's possible the government only recently became aware of camera 0461 by watching Jacob Chansley stroll through the Capitol on Tucker Carlson, I find it hard to believe the government failed to identify camera 0462 when it was shown at the President's impeachment.

Even with these 13 recently produced cameras, the newest DiBiase declaration informs us there are at least 827 more cameras the government has "inadvertently omitted" from discovery.

Beyond obtaining all the cameras, we also need a broader timeframe than noon to 8 p.m. My belief is that all video from January 6, and the days leading up to January 6, is relevant. Many individuals who played a significant role in how events unfolded on January 6, were inciting the crowd outside the Capitol early in the morning. The MPD ops plan also shows a planned event at the Capitol at 1 a.m. on January 6. Additionally, CCTV inside the Senate Carriage Doors from 2:04 p.m. shows a Capitol Police officer frantically signaling a masked man in a green hoodie, black backpack, and black ballcap to get down into the basement. The plain clothed man then entered the elevator and the down arrow flashed. We need to know what was going on in all areas just minutes before what we are told was the first entry.

**The DiBiase Declaration Raises New Concerns**

While we now have a declaration from Mr. DiBiase regarding what Mr. Carlson's team had access to, we do not yet have a sworn declaration from the government as to how much CCTV they have access to. A comparison of the DiBiase declaration to the government's current discovery production reveals that thousands of hours have not been produced by the government to defendants. If this honorable court is to rule on defendant access, It would be wise to first inventory what defendants will be given access to.

WHEREFORE I, William Alexander Pope, respectfully request this response to the government and update to this Honorable Court.

Respectfully Submitted,

By: William Pope

  /s/  
William Pope  
Pro Se Officer of the Court

Certificate of Service
I certify that a copy of the forgoing was filed electronically for all parties of record on this 31st day of March, in the year of our Lord, 2023.

  /s/  
William Alexander Pope, Pro Se