# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        v.

WILLIAM ALEXANDER POPE,

        Defendant.

Case No.: 1:21-cr-00128-RC

---

# MOTION TO COMPEL THE GOVERNMENT TO PRODUCE ALL MATERIALS RELATED TO UNDERCOVER POLICE AND TO PRODUCE MISSING POLICE BODY CAMERA RECORDINGS

---

## Overview

The government has failed to produce all requested footage and documents related to the activities of more than two dozen D.C. Metropolitan Police Department undercover officers on and before January 6, 2021. Furthermore, it is now known that the officer who was repeatedly urging people to advance up the steps to the Capitol, was also infiltrating the Proud Boys organization against MPD policy and in violation of federal law, and that the government is withholding text messages exchanged between that officer and the Proud Boys. It is also now known that undercover D.C. police were praising individuals who broke windows at the Capitol and thanked individuals who were removing fencing. This pattern of encouraging activity that the government is now prosecuting is exculpatory to January 6 defendants. Additionally, the government has failed to produce all police bodycam footage related to the events of January 6, 2021. For these reasons, and those detailed in the pages ahead, I must move this Court to compel the government to immediately produce the requested Brady materials.

### Background on the Need to Compel

I first requested all video recordings made by the 28 officers assigned to MPD's Electronic Surveillance Unit on January 6, 2021 more than five months ago, on March 13, 2023. Despite several follow-up emails to AUSA Kelly Moran since then, the government continues to stonewall this request and has refused to adequately answer questions about MPD's Electronic Surveillance Unit. Since no resolution on this matter seems to be forthcoming, I have no choice but to file this motion to compel production (as I advised was possible in ECF No. 131).

From: William Pope
Sent: Monday, March 13, 2023 9:43 AM
To: Moran, Kelly (USADC)
Cc: Nicole Cubbage
Subject: 44k Hours & ESU Videos

Good morning Kelly,

I know that Judge Contreras gave a deadline of Friday to get the official position of Congress on defendant access to the 44k hours by this Friday, March 17. Could you please send me their official statement as soon as you receive it?

Also, an MPD document was posted to Twitter over the weekend listing the names of the MPD Electronic Surveillance Unit. Some of these names are also on evidence sheets connected to the undercover police provocateur video, however I have not seen video from each of the 28 officers on this list. In addition to this I have not yet seen the video recorded by the two officers officers who were with the officer urging people to advance up the steps.

Where can I access the video recorded by those two officers, as well as all of the video and other media recorded by each of the other 28 ESU officers on this list?

**ESU/INTEL/CID Response**

| Assignment Log | 1. Incident Name | 2. Date Prepared | 3. Time Prepared |
|---|---|---|---|
| | First Amendment Demonstrations | 12/28/20 | 1046 hours |
| 4. Unit Name/Designators | 5. Unit Leader (Name and Position) | 6. Operational Period | |
| ESU/Intel | Inspector Robert Glover | 1/5/21 and 1/6/21 | Various |
| ESU – (1000 hours until relieved) | | | |
| Lt. Z. Barcus | ESU Supervisor | | |
| Sgt. T. Harris | ESU Supervisor | | |
| Sgt. J. Lipscomb | ESU Supervisor | | |
| R. Roe | R. Melvin | J. Streets | |
| A. Faverio | W. Gill | C. Turner | |
| A. Treadwell | W. Turner | R. Hawkins | |
| L. Woods | K. Green | M. Collado | |
| D. Butler | T. Peyton | V. Young | |
| I. Jackson | A. Sabir | Det. R. Leiva | |
| Det. M. Callahan | Det. O. Lake | Det. A. Abdella | |
| S. Ellis | N. Tomasula | H. Nicholls | |
| K. Boone | | | |

Thanks,

Will Pope

*Figure 1: I first requested a copy of all January 6 recordings made by MPD's Electronic Surveillance Unit on March 13, 2023. Continued government stonewalling necessitates that I file this motion to compel.*

On Tuesday, August 8, 2023, Ms. Moran said she would have a deliverable for some of my discovery requests that same week. She listed my request for all video from MPD's undercover officers as one of the items that would be included. I thanked Ms. Moran for the update and let her know that if I didn't receive the items, I would assume a motion to compel would be needed.

On August 9, 2023, I filed a motion (ECF No. 131) seeking permission to respond to the government's cross-motion by August 24, 2023. That filing also informed the Court that my pending discovery requests and Ms. Moran's promised deliverable had still not been received from the government, and that it was possible I would need to file a motion to compel production. True to form, the government produced no deliverable that week, so I followed up with Ms. Moran on Saturday, August 12, 2023, asking if she would have her deliverable to me by Monday, August 14, 2023.

Ms. Moran responded on Monday, August 14, 2023, with a long list of excuses for why my various discovery requests wouldn't be fulfilled. However, Ms. Moran did promise to send me the latest discovery production letter (No. 29) and a report from the most recent production related to MPD's Electronic Surveillance Unit.

I responded asking Ms. Moran why the DOJ had failed to fulfill my clearly articulated, simple request for the Investigative File Report for undercover Detective Ricardo Leiva from January 6, 2021, or to produce all video recorded by the 28 officers who were working undercover in MPD's Electronic Surveillance Unit on January 6.

The next day, August 16, 2023, Ms. Moran did upload two ESU internal affairs investigative reports for Officer Tomasula and ESU Lt. Barcus, but no additional video. Ms. Moran also told me that, "The questions you raised in your email are addressed in the report."

However, my questions about the missing video were not addressed in the report, and in fact, the two reports have led to more questions about misconduct by undercover police. Despite these reports already being excessively redacted,[1] including more than one hundred pages entirely blacked out, the government has classified these two reports as 'highly sensitive,' which prohibits me from directly possessing them. In addition to the lengthy redactions, the government has removed all of the attachments from the PDF copy of the Barcus report, which according to the report's attachment index, contain highly relevant information on the activities of undercover officers on January 6, 2021.

Despite the Global Discovery Production No. 29 letter saying that files related to Tomasula and Barcus were produced on August 11, 2023, my standby counsel has checked and (as of 8/18/23) tells me these files have not yet appeared in Relativity. This includes file range CAPD_009734532 – CAPD_009734773 for Tomasula, and file range CAPD_009733774 – CAPD_009734817 for Barcus. So, even though the government claims in the production letter that this discovery has been produced, the government has effectually prevented defense teams from searching for or stumbling upon these highly explosive and exculpatory materials.

When I asked Ms. Moran about the missing files, missing attachments, and excessive redactions, she responded on Wednesday, August 16, 2023, that, "the attachments are still in the

---

[1] To put the excessiveness of these redactions in context, the government has even redacted my name and case numbers from a copy of my filing, ECF No. 72, which was referenced in the report and included as an attachment.

process of being redacted."[2] Ms. Moran also promised to produce them to my standby counsel by the end of the week. That did not happen.

Another week has passed without the government producing a promised deliverable. Ms. Moran has also completely avoided addressing my repeated request for video from the 28 officers assigned to MPD's Electronic Surveillance Unit on January 6, or addressing my request to produce an unredacted copy of the 90 pages of text messages between undercover Officer Tomasula and the Proud Boys he infiltrated.

I am not a Proud Boy and have consistently discouraged others from joining the group (from long before January 6, 2021 to the present). But since the government's own theory is that the Proud Boys carried out a conspiracy, and since defendant Dominic Pezzola broke some of the first windows which set off a chain of events that influence my own case; and since defendant Joe Biggs and his associates were involved in scenes the government has identified as being relevant to my own case; and since defendant Ethan Nordean walked up the steps right behind Tomasula[3] who was repeatedly urging those around him to go up; any communications between law enforcement or CHS's and the Proud Boys that may have influenced the mental state or actions of the Proud Boys are relevant to my defense. These Tomasula text messages should be produced to me in full, not redacted.

Furthermore, MPD's internal investigation on Tomasula and my own research has identified that other undercover MPD officers were, in real time, praising protestors who broke windows at the Capitol, and thanking persons who removed fencing. My research has also

---

[2] It is ridiculous for the government to still be redacting after claiming to have produced these items in Relativity!

[3] ECF No. 82, Exhibit 7 (sealed pending approval of my motion to change sensitivity designations), shows Ethan Nordean walking up the steps to the Capitol right behind undercover Officer Tomasula.

revealed that several undercover officers were recording media that has not yet been produced in discovery. The government has also failed to produce all body camera recordings in discovery.

Since, after many attempts to resolve these issues, the government shows no indication they will provide these requested materials, I am asking the Court to compel production.

**Further Relevance**

Bodyworn camera footage and undercover police footage is relevant to all January 6 cases as a physical record, and because the video captures how law enforcement personnel contributed to events unfolding. Many bodycam videos also offer candid assessments by officers of their department's leadership decision making and operations. For instance, Officer Matthew Fleming's bodycam footage (See Exhibit 1[4]) shows how officers who were standing post on the west terrace were told by supervisors to fall back and give protestors free access to the west terrace door. For twelve minutes these MPD officers stood back and watched people enter the Capitol. Later, at 3:16 p.m., Fleming's bodycam records Officer Jawaun Campbell (who was in the unit with Fleming as they watched protestors enter the Capitol for ten minutes), remarking of their leadership, "I can't believe they let them in."[5]

Another example comes from Officer Joseph Young's body camera (See Exhibit 3[6]), where at 2:27 p.m. Young records Officer Pittmon assessing "we fucked this shit all the way up." Officer Young then agrees. Pittmon then disdainfully curses "Glover!" in reference to MPD

---

[4] Exhibit X is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39g1iz-exhibit-1-bodycam-footage-from-officer-matthew-fleming.html

[5] To make this sequence of events clear, I have created Exhibit 2 from Officer Flemings bodycam footage. See:
https://rumble.com/v39g17p-exhibit-2-police-admit-they-let-protestors-in.html

[6] Exhibit 3 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39fzi9-exhibit-3-bodycam-footage-from-officer-joseph-young.html

Inspector Robert Glover, the designated Incident Commander on January 6, who took operational command of the west front of the Capitol. "There should have been a riot set up before they even got here bro," assessed Pittmon.



*Figure 2: At 2:27 p.m. on January 6, 2021, Officer Pittmon candidly assessed that police had "fucked this shit all the way up."*

In previous filings I have also drawn attention to Officer Terry Thorne waving protestors towards the Capitol (ECF No. 81, Exhibit 10), as well as an officer saying that protestors should be allowed to "take this motherfucker" as people entered the west door (ECF No. 81, Exhibit 11).

Video of undercover police is also highly relevant to January 6 cases, including my case in particular. Since undercover police are not uniformed, they influence the crowd as presumed peers. The only way to determine the precise relevance of their video is for the defense to review what undercover officers recorded and assess how that relates to the facts of a specific case. But defense teams cannot determine relevance if the government does not produce all recordings made by undercover government operatives.

The government has already demonstrated themselves incapable of determining the relevance of these materials to my defense. The Court may recall that the government claimed

Officer Tomasula's video was not relevant to my case (in ECF No. 86 at 2, and ECF 90 at 4, 7). However, I pointed out in ECF No. 95 at 3, that undercover Officer Tomasula was covertly surveilling me, which makes his video directly relevant to my defense despite the government's claims to the contrary. This example shows that the government cannot be trusted to determine which undercover recordings are relevant or exculpatory to the defense. Defense teams must have direct access to all recordings made by undercover government operatives to make those relevancy determinations themselves.

The government has also intentionally withheld these Brady materials from defense teams until after the government's discovery malfeasance was publicly exposed.

In United States v. Nordean, 21-cr-000175, ECF No. 734 at 2, counsel for Dominic Pezzola noted, "On Friday, March 31, federal prosecutors pulled defense counsel aside and disclosed there were additional undercover officers belonging to Metro PD among defendants on Jan. 6." The government disclosed this to Pezzola's counsel only after Pezzola's counsel filed a motion referencing my filings that detailed undercover police inciting the crowd at the Capitol. Pezzola's counsel further noted that the government "torturously avoided disclosing the full scale of undercover CHSs among the Proud Boys on January 6" (734 at 1), and that on March 31, 2023, during trial, the government finally disclosed that there were "previously undisclosed text messages between the undercover officers and Proud Boy supporters which evidence very close, familial and/or intimate contact and relationships" (734 at 3).

This is even more alarming considering that by February 16, 2023, the DOJ was emailing Tomasula regarding his Proud Boy contacts (CAPD_009734532). The government allowed the Proud Boys trial to proceed for another month and a half before they disclosed these exculpatory facts to counsel for the Proud Boys. Once the defense received them, the trial was almost over,

and it was too late to use those materials to cross-examine witnesses. Pezzola's defense also noted the government's late disclosure was not of materials already available in global productions but was evidence the government had never provided in the January 6 discovery.

In my case, I am trying to proactively obtain the relevant facts to prevent the government from again withholding information from a defendant until it is too late. These Brady materials from MPD still have not been provided to me, a January 6 defendant, even though I have specifically requested everything related to MPD undercover operations. Since the government deemed these materials relevant to Pezzola, whose case relates to the first entry into the Capitol which set off a sequence of events that affects almost every other January 6 case (including my own), these materials are relevant to my defense. And Pezzola's counsel, who has seen these materials, contended they are exculpatory, which creates a Brady obligation for the government to produce them to all January 6 defendants. Additionally, Pezzola's counsel believed the few undercover videos the government has produced "may be the tip of a much larger iceberg" that the government has failed to disclose (United States v. Nordean, 21-cr-000175, ECF No. 748 at 4). MPD's own Internal Affairs found that materials related to Tomasula, were "potentially discoverable material" and "may prove favorable to an accused" (CAPD_009734532 at 3).

Therefore, since the government has intentionally withheld relevant and exculpatory materials from discovery, and falsely denied that recordings made by undercover operatives are relevant to my case, it falls to this Court to compel the government to produce all materials related to undercover government operatives who were at the Capitol on January 6, 2021.

## Part 1: Missing Undercover Police Video

**Overview of the MPD Electronic Surveillance Unit Video Produced So Far**

While 28 officers were assigned to the Electronic Surveillance Unit detail on January 6,[7] the government initially only produced video from six officers (Boone, Faverio, Green, Melvin, Roe, and Tomasula) in Global Production No. 10, on January 14, 2022. On April 6, 2023, the government also produced two videos recorded by Detective Ricardo Leiva, who I referred to as 'Officer 2' in ECF No. 72 at 23.[8] However, the government has not produced any recordings made by the other 21 ESU officers. And of the seven officers the government has produced video for, some appear to have made recordings the government has not produced. So, defense teams do not have all recordings made by ESU officers.

The internal affairs investigation report for Officer Tomasula's conduct (CAPD_009734532) includes an ESU roll call sheet for January 6, 2021, as attachment 17. The roll call makes clear that Lt. Barcus, Sgt. Tyrone Harris, and Sgt. Jacob Lipscomb were acting in supervisory roles. There were also eight teams of undercover ESU officers deployed on January 6, including Team 2, consisting of Tomasula, Leiva, and Callahan. The other seven teams consisted of between two and four officers each. The names of officers assigned to these other teams have been redacted from the roll call sheet, but their assignments are listed. Three officers assigned to teams were carrying camcorders. Two officers, including Tomasula, were carrying GoPro cameras. Eight officers, including Leiva, were assigned to carry cell phones capable of livestreaming video to the MPD command center.[9] Nine officers were designated as 'UC,' including Callahan.[10] Three officers were designated as 'Hawk.'[11] In addition to the eight teams,

---

[7] An MPD operations plan listing ESU assignments for January 4 through January 7, 2021, was tweeted by attorney Joe McBride on March 10, 2023: https://twitter.com/McBrideLawNYC/status/1634410408495783936?s=20.

[8] The government has not produced the file report for Detective Leiva's video as they did for six other ESU officers.

[9] Video livestreamed to the MPD command center was also recorded to a server for evidence preservation.

[10] This 'UC' role was apparently to serve as a lookout for other ESU officers who were recording, however video of Callahan shows him using a cell phone on Capitol grounds to record media, so all these officers designated as 'UC' may have also recorded discoverable materials on January 6, 2021.

Officer Boone (whose name was not redacted from the roll) was operating solo, designated as 'ESU 3,' and assigned to carry a camcorder, which is listed as a Sony HDR-CX900 in his Investigative File Report.

*Table 1: On January 6, undercover MPD officers recorded video with a wide range of devices, from professional video cameras to cell phones that livestreamed their feed directly to the MPD Joint Operations Command Center (JOCC).*

| Officer | Device | Video Resolution | Number of Files | Largest File | Total File Size |
|---|---|---|---|---|---|
| Kenneth Boone | Sony HDR-CX900 | 1440x1080 | 8 | 1.31GB | 3.85GB |
| Anthony Faverio | Apple iPhone 8 | 480x640 | 5 | 992MB | 2.02GB |
| Keith Green | "iPhone" | 480x640 | 4 | 656MB | 771MB |
| Ricardo Leiva | Cell Phone | 480x640 | 2 | 579MB | 691MB |
| Roy Melvin | Canon XA40? | 3840x2160 | 5 | 4.55GB | 10.2GB |
| Ryan Roe | Canon XA40 | 3840x2160 | 18 | 1.82GB | 6.87GB |
| Nicholas Tomasula | GoPro Hero 8 | 1920x1080 | 6 | 3.72 GB | 18.7GB |

During the internal investigations of Tomasula and Barcus, MPD investigators conducted audio-recorded interviews of approximately 30 officers connected to the Electronic Surveillance Unit. These audio recordings have not yet been produced by the government in discovery. The summaries of most of these interviews were attached to the end of the Barcus report (CAPD_009734774), but the government has cut those and other attachments out of the PDF copy of the Barcus report that was produced in discovery. Even if the summary attachments are eventually produced, the audio-recordings will still be needed by defense to verify that accuracy of the information and for examination of officers. The need for the original audio recordings is underscored by the fact that MPD transcriptions of undercover ESU video recorded on January 6, omit key statements made by officers in their videos. MPD summary reports cannot be trusted.

When MPD Agent Richard Ehrlich of the Internal Affairs Division opened criminal inquiries into Tomasula and Barcus in February 2023, Ehrlich determined that there was "no additional evidence, including videos or documents, located by ESU related to either December

---

[11] It is unclear what the 'Hawk' designation refers to, but it seems to be a term used by ESU for specific recording devices. I speculate that since hawks have excellent eyesight, it's possible that ESU refers to their 4k resolution cameras as hawks (such as the Canon XA40 carried by Officer Roe). I also speculate 'Hawk' could refer to a flying drone or a camera mounted on a telescopic pole, such as those carried by several individuals on Capitol grounds.

11, 2020, or January 6, 2021, that had not already been provided to the USAO"

(CAPD_009734532 at 7). However, even if it is true that MPD provided all ESU materials to the

DOJ, there has been no affirmation by the DOJ that all these discoverable ESU materials have

been relayed to defense teams. In fact, the government produced two ESU videos on April 6,

2023, well after they had received the discoverable ESU materials from MPD. This game of hide

and seek is not new. I know from using the Congressional access terminals that the government

continues to withhold more than a thousand Capitol CCTV cameras from discovery.[12] More than

two and a half years after the events at the Capitol, the government continues to obstruct justice

in January 6 cases by withholding key evidence, including the remaining ESU materials from

defense teams.[13]

**Officer Nicholas Tomasula (Officer 1)**

        I described the actions of Officer Tomasula[14] in detail in ECF No. 72 at 23, and in ECF

No. 90 at 2, the government confirmed that my descriptions of Tomasula joining the crowd in

chants of "drain the swamp" and my descriptions of Tomasula inciting the crowd to advance up

the steps by yelling "Go! Go! Go!" and "Keeping going!  Keep going!"[15] were correct. On

August 11, 2023, the government produced an internal affairs investigation report[16] on Tomasula

that both confirmed Tomasula urged protestors to move forward, and that Tomasula had been

---

[12] ECF No. 113 details the missing CCTV cameras and moves to compel production. This matter is still pending.

[13] When Enron withheld discoverable materials from legal proceedings, an Obstruction of an Official Proceeding statute was enacted that may apply to obstructive DOJ officials who are withholding January 6 materials!

[14] In my past filings (such as ECF No. 72) I referred to Tomasula as Officer 1.

[15] During an interview, Tomasula himself admitted he incited the crowd, according to 21-cr-00175 No. 748.

[16] The Barcus and Tomasula investigative reports are highly redacted, even redacting my name and case number. Despite excessive redactions, the government still designated these reports as 'highly sensitive,' which prevents me from possessing copies.

infiltrating the Proud Boys and coordinating with the FBI on his communications with the Proud

Boys prior to January 6.

Tomasula was one of three undercover officers that was made available to attorneys for

Nordean, et al., to interview after the government disclosed near the end of trial that undercover

MPD were "among the Proud Boys on January 6." According to a filing by Pezzola's counsel,

who interviewed Tomasula, Tomasula had communications with Proud Boys on his phone, but

Tomasula destroyed his phone[17] (United States v. Nordean, 21-cr-000175, ECF No. 748 at 4).

The MPD investigation of Tomasula found that, "Tomasula did not preserve all potentially

discoverable material, including any such material which may prove favorable to an accused":

> *Specifically, between December 2020 and January 2021, Investigator Tomasula*
> *communicated with several individuals affiliated with the Proud Boys organization, via*
> *text message on his personal phone and the Telegram messaging application, while*
> *conducting a First Amendment investigation. Investigator Tomasula did not ensure these*
> *messages were preserved, which resulted in the messages being automatically deleted.*
> *Further, he did not have authorization to utilize his personal phone for this purpose, nor*
> *approval to use the Telegram application.* (CAPD_009734532 at 3)

Though Tomasula's text messages were supposedly deleted, the investigative report's

index of attachments lists Attachment 19 as being text messages between Tomasula and the

Proud Boys.[18] Attachment 19, spans pages 152 to 242 of the report, but these 90 pages are

---

[17] The contents of Tomasula's phone are not the only ESU materials that have been destroyed. Sergeant Harris told internal investigators that "they had lost some of the ESU files due to water damage in the storage area."

[18] It's unclear how these text messages were obtained by MPD if Tomasula's phone was destroyed, and his messages deleted. It is possible texts were obtained from January 6 defendant phones seized by the government. It is also possible Tomasula was involved in group texts with some of the many FBI CHS's in the Proud Boys.

entirely blacked out. These redactions are a Brady violation since the report characterizes these text messages as discoverable materials which "may prove favorable to an accused."

Tomasula, Leiva, Callahan, and three other unnamed undercover MPD officers infiltrated the Proud Boys at Harry's Bar in D.C. on December 11, 2020. While there, Tomasula and other officers made contacts with many different members of the Proud Boys, and Tomasula and Leiva were invited up to the hotel room of a Proud Boy he had met earlier that week. While in the room, Tomasula used police funds to purchase a Proud Boys t-shirt and hoodie, which the department kept for use in potential future undercover operations. Though their mission was electronic surveillance, the MPD investigative report claims that none of the undercover officers recorded video on December 11, 2020. Afterwards, Tomasula continued to communicate with Proud Boys using his phone and the Telegram application.[19] The department knew of these contacts, and Detective Callahan even connected Tomasula to the FBI to share information.[20]

Tomasula's Investigative File Report for December 11, 2020, says:

*During the tour, I introduced myself to various members of chapters throughout the US. I made contact and spoke with a leader from the NY chapter, Virginia, Tennessee, Florida, North Carolina, and South Carolina. Every one of these individuals that I spoke with were unsure of the plans for that day but they all knew of separate marches that would begin before the main march on the next day. I did not witness any individual carrying*

---

[19] Tomasula's investigative report says that Captain Kim told Tomasula to stop communicating with the Proud Boys sometime after January 6, 2021.

[20] Lt. Barcus was also aware of Tomasula's Proud Boy contacts and was under the impression that the FBI wanted Tomasula to continue communicating with them. However, Sgt. Harris assessed that Tomasula's contacts were "a violation of the First Amendment investigations policy." MPD Internal Affairs found facts that suggested, "Tomasula may have conducted a First Amendment Investigation without authorization and outside the parameters of the Police Investigations Concerning First Amendment Activities Act of 2004." (CAPD_009734532) This suggests the FBI may have also been conducting investigations in violation of the PICFAAA of 2004.

*any illegal firearms however, most people state that they knew Antifa would be showing*

*up on the 12th and that they had "gear" in their rooms and would be ready for them.*

*Myself and Dt. Leiva spoke with one male subject from North Carolina that invited us to*

*go to room 412 and in the Harrington Hotel. Both of us went up there to gather*

*information and found that the people in the room were selling merchandise. Once inside*

*we were met by a male and female subject and they began showing us merchandise. We*

*made a purchase of a sweatshirt and t-shirt. We did not see any contraband in the room*

*other than marijuana. Later on in the day we learned that the plan for ther [sic] 12th was*

*that the leadership of PB would be meeting at 9 am to discuss the day, then they would*

*meet the main groups in front of Harry's at 10 and the march would begin at 11 and the*

*first marching location would be Freedom Plaza. I also observed the leader of the proud*

*boys who goes by the name of "Enrique." This male seemed to have a security team*

*around him the entire time along with what appeared to be a "handler," who would*

*direct him and seemed to be organizing things from the background. Lastly, I spoke with a*

*female who is named [redacted by the government]. She stated she is from Virginia and*

*knows the leadership of proud boys. I exchanged contact information with this female.*

*She also reported to me that she can get me in touch with a local chapter about joining.*

After also surveilling the Proud Boys on December 12, 2020, Tomasula sent a document

to ESU leadership, who forwarded it to Lt. Lamond,[21] who was in charge of MPD Intel (a

separate unit from ESU). The forwarded email was titled "Proud Boy Intel." In the attached

document authored by Tomasula, he further described the man he surmised was Enrique Tarrio's

---

[21] Lt. Shane Lamond is now facing criminal charges for sharing MPD intel with Proud Boys leader Enrique Tarrio.

"handler." The document also contained a photograph that has been degraded in the PDF produced by the government. However, Tomasula's description is as follows:

> The picture below is of a Proud Boy "Leadership" meeting. The male in the center with the tan tactical vest on is Enrique who definitely is known as the figurehead of the Proud Boys. He is the one that the chapter heads from around the country go to when decisions need to be made. The male subject with the black jacket, under armour [sic] sneakers, and red baseball cap seems to have been the person who called the plays during the weekend. When Enrique would call for leadership meetings, he and the male in the red hat would always meet. The female with the red shirt and "Press" vest on also was involved in the leadership meetings and never left Enrique's side. She did not seem to be press as I did not see her taking a lot of pictures.

Again, the picture Tomasula included with this intel has been turned black and white and degraded in the PDF produced by the government so it is hard to make out details. The photo appears to show an older man with a large nose and glasses wearing a high collared, dark jacket. This is the man characterized by Tomasula as Tarrio's "handler." The lady with the press vest seems to have light brown or dirty blonde hair, and is wearing a plaid shirt, a face mask, and dark yoga pants. This photo is discoverable material, so the government has an obligation to produce the full quality original and any information they have on Tarrio's "handler."

When it was reported that Harry's bar would be closed for January 6, 2021, to keep the Proud Boys away, Captain Kim of the MPD requested Tomasula to ask his Proud Boys contacts what their plans were for January 6. Tomasula reported back the following:

*My source has told me that some people are planning to march at the white house at 930*

*am on the 6th. And that in the afternoon they are planning a street party in front of*

*Harrys. They know it will be closed but people will be bringing grills and booze.*

On January 6, 2021, Tomasula was again working alongside Detectives Leiva and

Callahan, and together they were designated as 'Team 2' on the ESU roll call for the day. The

Criminal Complaint in the case of United States v. Fi Duong, 21-cr-00541-1, says that Tomasula

was actively working undercover throughout the day of January 6, including on the morning of

January 6. It was in the morning that Tomasula met defendant Fi Duong (Jim)[22] at Freedom Plaza

before later running into him again as Tomasula was urging protestors to advance up the steps to

the Capitol. No video has been produced by the government of this morning interaction between

undercover Officer Tomasula and Fi Duong, or from any other surveillance work from the

morning of January 6., such as their response to reports of a man with a rifle in the trees.[23]

Tomasula's investigative report says Tomasula, Leiva, and Callahan stayed at the Ellipse during

President Trump's speech.

Following President Trump's speech, Tomasula, Leiva, and Callahan chose to go to the

Capitol. Many of Tomasula's actions, such as joining the crowd in chants and repeatedly urging

protestors to advance up the steps to the Capitol are described in ECF No. 72. Tomasula told

---

[22] Fi Duong's Criminal Complaint (which was written like a fed fantasy novel) notes that undercover MPD Officer Tomasula introduced Duong to an undercover FBI employee on January 13, 2021. That undercover FBI employee then repeatedly attempted to convince Duong to manufacture explosive devices to entrap him. CAPD_009734532 notes that other ESU officials such as Detective Callahan, Sgt. Harris, Captain Kim, and a redacted MPD commander were also involved in planning the connection of Fi Duong to the undercover FBI personnel. On January 13, 2021, Callahan sent an email to other ESU members that included an "FBI approved OPS Plan for tonight."

[23] According to interview summaries in the MPD Internal Affairs reports, Leiva, Callahan, and Tomasula found the man and ascertained he did not have a rifle as reported.

MPD Internal Affairs that he went up the steps because he "believed he couldn't get out and forward was the only direction he could go."[24]

In an attempt to explain why he assisted others up the steps, "Tomasula stated he called to the crowd to 'help them up' as others were climbing up to the marble railing because he didn't want them to fall and get hurt." Tomasula's Investigative File Report for January 6, (which was written more than four months later on April 8, 2021), says that Tomasula "exited the Capitol building grounds" between 12:30 and 1:30. However, Tomasula's GoPro video was recorded between approximately 1:40 and 2:40 p.m. Video also shows that Tomasula was near Leiva and Callahan at the west front at 5:14 p.m. as police cleared the plaza.[25] On the evening of January 6, Tomasula texted [government redacted] individuals asking where the Proud Boys planned to meet that night (CAPD_009734532 at 11).



*Figure 3: Undercover Officer Tomasula's investigative File Report says he left Capitol grounds between 12:30 and 1:30 p.m., but broadcast footage shows Tomasula was near other undercover officers at the west front at 5:14 p.m.*

---

[24] Tomasula's claim that forward was the only direction he could go on the stairs is similar to claims made by January 6 defendants such as Richard Barnett, who said he was swept into the doors of the Capitol by a sea of people and "had no choice." See: https://twitter.com/BigoBarnett/status/1670243077162778628

[25] CAPD_009734532 says that ESU officers who had left Capitol grounds were later ordered to return.

Since Tomasula falsified times in his report and destroyed his phone, Brady materials are clearly being hidden and erased. The government has an obligation to produce the full facts of Tomasula's involvement on and before January 6, as well as an explanation for why his phone and communications were destroyed and why his remaining texts are now fully redacted.

Furthermore, the internal investigation of Tomasula claimed that he only recorded five videos on January 6, with each being 11 minutes and 48 seconds.[26] However, there are six video files for Tomasula in discovery, with the last one being approximately 25 seconds long. The fact that MPD's internal investigators do not even know how many videos were recorded by Tomasula could suggest there is more Tomasula footage that needs to be produced in discovery. These issues are broad and alarming, neccesitating this Court to compel government disclosure.

**Detectives Ricardo Leiva (Officer 2) and Michael Callahan (Officer 3)**

On April 6, 2023, the government miraculously found more undercover MPD footage and produced it in global discovery.[27] The two video files, CAPD_008469631 and CAPD_008469632, were recorded by Detective Ricardo Leiva.[28] The first recording begins while Tomasula was recording with his GoPro. The second recording shows police clearing the west plaza after 5 p.m. The MPD Internal Affairs investigation of Tomasula claims these are the only two videos recorded by Leiva on January 6, however, open-source video shows Leiva recording at other times, and in his interview, Leiva said he recorded other scenes.

---

[26] Tomasula's approximately one hour of GoPro footage was split into five equal sized files and one shorter 25-second file. This splitting may have been done to fit the large files onto the DVDs MPD uses to store evidence.

[27] This late disclosure shows that the government withheld key evidence for more than two years (an obstruction of justice for defendants who needed those exculpatory materials in trial), and likely possesses more exculpatory evidence recorded by undercover operatives that has not yet been produced.

[28] The government has failed to produce Detective Leiva's Investigative File Report for January 6, 2021, which all ESU officers are required to submit with video they record.

These additional recordings raise further questions about the behavior of undercover officers at the Capitol. For instance, at about the 10:35 mark of Leiva's first recording (CAPD_008469631), Leiva interacts with a protestor on Capitol grounds who says "thanks brother for coming out." Leiva responds, "absolutely man, you too, you gotta be here." When MPD Internal Affairs interviewed Leiva during their investigation of Tomasula, Leiva also admitted that when he had seen someone breaking a window at the Capitol, he ran up to them saying "hey what's up man, you're doing an amazing job, awesome awesome awesome." Leiva claims he ran up to the man to record the glass-breaker's face, but the government has not produced this recording in discovery.

Since the government has not disclosed all undercover operatives who were working at the Capitol, let alone all video they recorded, we don't yet know how many other undercover operatives thanked protesters for being on Capitol grounds or encouraged them to break windows. Any such instances are exculpatory to defendants, and the government has a Brady obligation to identify them and produce materials documenting their behavior.[29]



*Figure 4: The black space above is an artistic recreation of the five minutes of video Detective Leiva recorded going up the northwest steps to the Capitol. Only this section of the video is completely blacked out and audio garbled. [Of course, this could also serve as an illustration of the 90 pages of entirely redacted text messages between Officer Tomasula and the Proud Boys].*

---

[29] MPD ESU misconduct was not just limited to January 6, or their interactions with the Proud Boys. Detective Leiva said he had never been told that undercover MPD "shouldn't have been carrying Black Lives Matter flags while working antifa events" until a training conducted shortly after January 6 (required by the MPD General Counsel).

Unfortunately, approximately five minutes of Leiva's first recording is blacked out and audio garbled while he is going up the steps to the Capitol. This is a strange anomaly, and it is unclear what caused this.[30] At the 35:46 mark of Leiva's first recording (shortly after the blacked-out portion ends), Ashli Babbit passes Leiva and Callahan. This video indicates it is likely Mrs. Babbitt was next to Leiva and Callahan as they went up the steps. Ten seconds after Babbit is seen, Callahan exclaims "people are inside," and Leiva excitedly yells "oh shit!"[31] Callahan then asks Leiva if his video is live; soon after answering yes, Leiva ends the recording.



*Figure 5: Within earshot of Ashli Babbit, Callahan exclaimed "people are inside!" and Leiva yelled "oh shit!"*

Though the Tomasula investigative report claims that Detective Callahan was not equipped with a recording device on January 6, open-source video clearly shows Callahan holding a cell phone with a video recording app open. Furthermore, the video produced for

---

[30] MPD's investigation of Tomasula notes that, "Detective Leiva's recording malfunctioned and recorded only audio for approximately five minutes as they walked up to the West Terrace" (CAPD_009734532 at 5).

[31] These statements are clearly audible in Leiva's video but have been omitted in MPD's transcription. These omissions further justify the Court compelling the government to produce audio recordings of all ESU interviews.

Tomasula and Leiva shows Callahan holding a cell phone and recording. It is bizarre that an

MPD report would claim Callahan did not have a recording device and captured no video, when

there is visual evidence documenting both. The government has not produced any of Callahan's

recordings, or his Investigative File Report for January 6.



*Figure 6: Callahan was seen filming with a cell phone in videos recorded by Tomasula and Leiva, as well as in open-source videos, but the government has not yet produced any footage recorded by Callahan, and MPD reports deny he had this recording device.*

Leiva's second recording ends with him next to Callahan and Tomasula at the west front.

It seems strange that no video at all has been produced for Callahan, and no recordings made by

Tomasula after 1:40 p.m. have been produced by the government.



*Figure 7: Leiva and Callahan remained on Capitol grounds near Tomasula as the crowd at the west front thinned.*

**Officer Ryan Roe**

On January 7, 2021, the Twitter user @Twinity5 posted a tweet-thread[32] detailing suspicious actors she observed in the crowd at the Capitol, including individuals she observed talking into concealed radios. In that thread, @Twinity5 posted photos and video of a man who has been hashtagged #FenceCutterBulwark removing snow fencing on the west lawn of the Capitol. @Twinity5 observed #FenceCutterBulwark communicating with a man holding a camera, and she speculated that the two men could be engaged in a criminal conspiracy.



*Figure 8: A Canon camera matching the Canon XA40 carried by undercover Officer Roe, was used by an individual dressed in black who was recording video in the exact same place at the same time that undercover Officer Roe was recording footage.*

Undercover MPD Officer Ryan Roe noted in his Investigative File Report for January 6, that he filmed with a Canon XA40. This is the same camera held by the man that @Twinity5 observed communicating with #FenceCutterBulwark. Video recorded by Officer Roe (See Sealed

---

[32] The full @Twinity5 tweet-thread show Officer Roe, #FenceCutterBulwark, and other suspicious actors can be viewed here: https://twitter.com/Twinity5/status/1347346192229953537

Exhibit 4[33]) also shows #FenceCutterBulwark removing fencing in the same area filmed by @Twinity5. At the 14 second mark of CAPD_000003728, a voice consistent with the voice of Officer Roe says, "appreciate it brother."

I have been able to synchronize Roe's footage to @Twinity5's No. 3 tweet video where #FenceCutterBulwark is removing fencing next to Officer Roe (See Sealed Exhibit 5[34]) These synchronized clips make it clear that Officer Roe was speaking to #FenceCutterBulwark (who was removing fencing) when Roe said, "appreciate it brother." This raises questions. Since the government has not identified the other members of Roe's ESU team, this coordination between Roe and #FenceCutterBulwark could imply that #FenceCutterBulwark was an ESU officer assigned to Roe's team.

In @Twinity5's 'Side Story 1' and 'Side Story 2' tweets, she speculated[35] that undercover Officer Roe was associated with a group of nearby suspicious individuals dressed in black and may have been working with #FenceCutterBulwark. It is reasonable for the defense to question why Officer Roe expressed his appreciation to #FenceCutterBulwark for removing fencing, and why Roe referred to #FenceCutterBulwark as "brother."

Roe is also listed in a summary report for the MPD Electronic Surveillance Unit (United States v. Nordean, 21-cr-000175, ECF No. 748-1) as having worked at BLM Plaza on the night of January 5, and being ordered by Sgt. Harris to record video. Though the government has

---

[33] Sealed Exhibit 4 is file CAPD_000003728, recorded by Roe, and is designated as 'sensitive' by the government.

[34] Sealed Exhibit 5 is Roe's footage synched to @Twinity5's footage. This contains video designated as 'sensitive.'

[35] @Twinity5's intuition about undercover Officer Roe proved to be correct, and she also correctly pointed out other undercover MPD officers filming in her #11 tweet which shows Officers Green and Melvin.

produced videos recorded by undercover Officer Boone[36] at BLM Plaza on January 5, they have

not produced Officer Roe's January 5th recordings (even though he was seen holding a camera).



*Figure 9: Undercover Officer Ryan Roe saying "appreciate it brother" to #FenceCutterBulwark as he removes fencing.*

According to the ESU summary report, on January 5, 2021, Roe recorded individuals

who were forecasting that something major would happen the following day. We know from

publicly available videos that an individual known as Ray Epps was in the area Roe was

recording when Epps said, "tomorrow we need to go into the Capitol." Indeed, both Ray Epps

and Officer Roe appear in the January 5th recordings made by Officer Boone. It is unclear why

---

[36] Officer Boone's January 5 video (CAPD_000003771) records an individual carrying a video camera who has facial features identical to Roe and is wearing the same hat, coat, and type of facemask that Roe wore on January 6.

the government has not produced the January 5th video recorded by Roe in discovery, or why the January 5th intelligence Roe gathered was not broadly disseminated in a meaningful way. Any such materials are relevant to my defense and should be produced in discovery.

**Sgt. Tyrone Harris**

No undercover video recorded by Sgt. Tyrone Harris has been produced by the government, even though Harris is listed on the ESU assignment for January 6. According to an interview summary provide by the Internal Affairs Division, Harris noted that he typical stays in uniform and serves as the field contact between ESU and uniformed operations (CAPD_009734532 at 17). This is supported by video. Harris arrived at the Capitol in uniform at around 1:45 p.m. on January 6, 2021, and there are five bodycam recordings listed for Harris in discovery. The first two videos (See Exhibits 6[37] and 7[38]) are short and document his arrival on scene. The third bodycam video (See Exhibit 8[39]) shows Harris leading uniformed officers at the west front of the Capitol. In the final two videos (See Exhibits 9[40] and 10[41]), Harris interacted with four undercover ESU officers (Faverio, Green, Melvin, and #Badge2561MPD) who were filming at the west front and during curfew arrests.

---

[37] Exhibit 6 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39pya0-exhibit-6-bodycam-footage-from-sergeant-tyrone-harris-no.-1.html

[38] Exhibit 7 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39pz4r-exhibit-7-bodycam-footage-from-sergeant-tyrone-harris-no.-2.html

[39] Exhibit 8 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39q5eb-exhibit-8-bodycam-footage-from-sergeant-tyrone-harris-no.-3.html

[40] Exhibit 9 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39q8lt-exhibit-9-bodycam-footage-from-sergeant-tyrone-harris-no.-4.html

[41] Exhibit 10 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39qbjl-exhibit-10-bodycam-footage-from-sergeant-tyrone-harris-no.-5.html

The government has not disclosed why the summary report (United States v. Nordean, 21-cr-000175, ECF No. 748-1) produced by Harris for January 6 only lists five ESU officers filming on January 6, even though more than two dozen officers were assigned to ESU to conduct electronic surveillance. The government also produced videos in discovery recorded by officers (Tomasula and Leiva) who are not listed in Harris' summary report for January 6. This raises the question of whether MPD attempted to conceal evidence of their undercover officers inciting the crowd at the Capitol. During his interview for the Tomasula investigation, Harris said it is possible for ESU officers to delete GoPro or camera videos without uploading them to evidence systems (CAPD_009734532 at 17). This suggests there may be a culture of improper destruction of Brady materials within MPD ESU.

**Officers Faverio, Green, Melvin, and #Badge2561MPD**

While the names of the officers assigned to seven of the ESU teams have been redacted from the January 6 ESU roll sheet, we do know that ESU Officers Faverio, Green, Melvin, and another officer wearing badge number 2561, arrived at the Capitol together, and remained close to each other throughout the day.

After arriving, this team of officers began filming crowds at the west front. Faverio and Green livestreamed to the MPD command center with their cell phones, while Melvin captured incredible detail of the west front crowd with his 4k camcorder.[42]

---

[42] Melvin's footage (especially when he set the camera down eliminating camera shake) is perhaps the most visually stunning January 6 video that America has never seen. There is no reason it should remain sealed.



*Figure 10: Ronald Wilkins body camera captured this team of undercover officers as they head into the Capitol.*

Some videos have been produced by the government for Faverio, Green, and Melvin. However, January 5th videos recorded by Melvin have not been produced like Officer Boone's January 5th videos have. These officers also appear to have recorded some January 6 events that have not been produced by the government in discovery. For instance, at the direction of Sgt. Harris, Officers Faverio and Green were filming with their cell phones during curfew arrests, however only the footage Faverio recorded has been produced in discovery. The undercover officer wearing badge number 2561 was also recording with a cell phone at the west front near undercover officers Melvin and Green. None of the footage recorded by #Badge2561MPD has been produced by the government. Since this ESU team appears on numerous bodycam recordings with their badges displayed, their role as undercover police is not a secret. For instance, in addition to appearing on Sgt. Harris' bodycam footage, this team also appears in footage recorded by Ronald Wilkins (See Exhibit 11[43]) and Jessica Hawkins (See Exhibit 12[44]).

---

[43] Exhibit 11 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39qng4-exhibit-11-bodycam-footage-from-ronald-wilkins.html

[44] Exhibit 12 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39qqdj-exhibit-12-bodycam-footage-from-jessica-hawkins.html



*Figure 11: Once in the Capitol, this ESU team stayed near the tunnel area. Faverio recorded some tunnel footage at a distance.*

While this ESU team mostly filmed the events of January 6 from a distance, their actions do provide some insights into how MPD ESU operates. After some of Faverio's footage was leaked earlier this year,[45] a clip of Faverio saying that MPD ESU goes undercover as antifa in crowds went viral on social media.[46] The police posture of entering the January 6 crowd, dressed in black and pretending to be antifa provocateurs, raises questions of whether other ESU teams were provoking protestors to elicit aggressive or destructive behaviors. Since the government seems to be terrified to produce the footage recorded by the other ESU teams in discovery, it seems likely that other ESU teams may have engaged in illicit conduct on January 6. Immediately after January 6, the MPD Office of General Counsel was so concerned about ESU behavior at the Capitol, that the entire unit was retrained on January 15, 2021 (CAPD_009734532 at 28).  This indicates there are more discoverable materials to be produced!

---

[45] I did not possess a copy of Faverio's footage at the time it was leaked, and I always obey the protective order!

[46] The clip of Faverio saying MPD goes undercover as antifa in crowd can be accessed at:
https://twitter.com/wittycommittee/status/1641455597882163200?s=20



*Figure 12: Sgt. Harris' bodycam captures him directing this ESU team to film as curfew arrests were made later in the evening.*

**Officer Kenneth Boone**

The government has produced three clips recorded by Boone on the night of January 5, 2021, where he was filming protestors, including Ray Epps, near BLM Plaza. No Investigative File Report for Boone's ESU activities on January 5, has been produced by the government.

According to his Investigative File Report for January 6, and a summary report of ESU activities (21-cr-00175-TJK, 748-1, at 2), Boone also responded to 16th and I Street NW (BLM Plaza) on the morning of January 6 to "assist with a first amendment assembly," but the government has not produced any footage of this response in discovery. The government has only produced one 13-minute video recorded by Boone at the Capitol on January 6, and it seems strange that Boone would record so little video at the Capitol when his assignment was to conduct Electronic Surveillance. I strongly suspect the government has failed to disclose and produce other footage recorded by Boone at the Capitol.

On the night of January 6, Boone surveilled people (including defendants such as John Sullivan) outside the Hamilton Hotel after curfew. When a police unit arrived, Boone filmed curfew arrests. While Boone's footage is designated sensitive, these arrests were also captured on public video and non-sensitive police bodycams. For example, see the bodycam recordings of Cappello (See Exhibit 13[47]), Lee (See Exhibit 14[48]) and Mejia (See Exhibit 15[49]).The fact that numerous non-sensitive body cameras captured the same arrests that Boone recorded from across the street illustrates that ESU footage is excessively designated as 'sensitive' by the government.

**TFO Scott Brown**

Brown is not listed among the 28 undercover ESU officers in the MPD operations plan for January 6, however in United States v. Nordean, 21-cr-000175, ECF No. 748 at 3, the defense noted that prosecutors had made Brown available to defense for interview and that he had volunteered to do some ESU shifts "during that timeframe." The Pezzola filing lists Scott Brown as a TFO, which presumably stands for 'Task Force Officer' with the Joint Terrorism Task Force - a collaboration run by the FBI, which includes other federal and local agencies. The government has not disclosed how many FBI-JTTF TFO's were at the Capitol on January 6, 2021, and no discovery related to TFO Brown has been produced to me by the government.

---

[47] Exhibit 13 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39quqn-exhibit-13-bodycam-footage-from-christopher-cappello.html

[48] Exhibit 14 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39qx46-exhibit-14-bodycam-footage-from-mark-lee.html

[49] Exhibit 15 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39qzwi-exhibit-15-bodycam-footage-from-carlos-mejia.html

## Part 2: Issues with Bodycam Footage

### Some Officers Wore Body Cameras the Government has not Produced Footage for

I am aware of several officers who are seen on video wearing a body camera that the government has not produced video for. Since the government has not produced a list of body cameras that have been lost or stolen, and since the government has not produced MPD reports detailing which officers failed to activate their cameras on January 6, I am left to assume that the government is withholding exculpatory bodycam recordings from global discovery. Phuson Nguyen is an example of an officer who wore a camera on January 6, that the government has not produced video for. The government should either provide Nguyen's recordings or provide an explanation for why they do not have recordings for officers like Nguyen who wore cameras.



*Figure 13: Phuson Nguyen was seen wearing a body camera on January 6, but the government has not produced his recordings.*

### For Some Officers, the Government has Produced Only One Short Recording

The Code for the District of Columbia (D.C. Official Code §5-116.33(a)(3)) requires that MPD report how many internal investigations were conducted on officers who failed to turn on their body cameras during interactions. However, no internal affairs records for officers failing to turn on their body cameras on January 6, 2021, have been produced to defense teams in discovery. For many officers, there are no bodycam recordings documenting most of the time

they were at the Capitol interacting with protestors. And for some officers, only one short video has been produced by the government.

Take the example of Officer McHauley Murphy (See Exhibit 16[50]). The government has only produced one 5-minute video recorded by Officer Murphy inside the Senate Wing Doors just after 4 p.m. Since a recording has been produced, we know Officer Murphy's body camera was not lost or stolen, but the lack of footage indicates there should have been an internal investigation if Murphy failed to activate his bodycam during the majority of his response to the Capitol. The government has either withheld other videos recorded by Officer Murphy, or the government has withheld MPD records detailing an internal investigation into Murphy's failure to turn on his body camera during other interactions at the Capitol.

**Some Footage Has Been Produced from Body Cameras Without an Officer's Name**

The government has loaded some bodycam footage to evidence.com attributed as '6DLoaner' rather than an officer's name. There are two such cameras this '6DLoaner' designation is given to: serial number X6039BD5U (See Exhibits 17[51] and 18[52]) and serial number X6039B9ZW (See Exhibit 19[53]). Since knowing the officer who recorded a video is necessary for authenticating evidence, the government has a Brady obligation to supply the recording officer's full identifying information in discovery.

---

[50] Exhibit 16 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39r248-exhibit-16-bodycam-footage-from-mchauley-murphy.html

[51] Exhibit 17 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39rkod-exhibit-17-bodycam-footage-from-6dloaner-serial-number-x6039bd5u-no.-1.html

[52] Exhibit 18 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39rqbd-exhibit-17-bodycam-footage-from-6dloaner-serial-number-x6039bd5u-no.-2.html

[53] Exhibit 19 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39rw47-exhibit-19-bodycam-footage-from-6dloaner-serial-number-x6039b9zw.html

**Some Bodycam Footage Will Not Load Properly in the Government's Evidence Systems**

I have tried several times to view Officer John Wilson's bodycam video (Filename: "Axon Body 3 Video 2021-01-06 1426" from camera X6039B0F2), but this file will not load in the government's evidence.com system. A non-functioning evidence system is not a waiver to avoid providing Brady materials, because the government cannot be allowed to create technical difficulties that hide materials that are inconvenient to the government's case. Until Officer Wilson's recording is adequately produced for defense to review, I must assume Officer Wilson's bodycam footage is extremely damaging to the government's case and exculpatory to defendants.

**Some Bodycam Footage May Have Been Altered by the Government**

There are some files that are missing standard marks of authenticity, which could be an indication that the footage has been altered by the government to remove facts that are inconvenient to the government. Since the government has not produced MPD reports of which cameras malfunctioned on January 6 (which I have requested), there is no way for defense teams to check whether these anomalies were equipment malfunctions.

Typically, MPD Axon bodycam videos begin with two minutes of silent footage which is recorded when the camera was buffering before the officer pressed the 'event' button to start recording.[54] When the officer activates the 'event' button, the camera beeps, which notifies the officer and those nearby that the device is recording. To stop a recording, the camera's 'event' button must be pressed and held for three seconds. A recording can also be stopped by holding the power button on top of the device for three seconds. Either way, the camera will give off unique beeping notifications. However, if a recording is stopped by pushing the off button, it

---

[54] An officer can also activate recordings less than two minutes after powering the device. These recordings still begin with a beep, but do not capture a full two minutes of silent, buffered video at the beginning.

may take the device a few seconds to save the file. The 'three second press' feature prevents most recordings from being ended accidentally.

However, among the bodycam videos produced by the government in evidence are some anomalous files, where recordings begin with no beep at all. Take the example of Officer Neil McAllister's bodycam recordings.

There are four bodycam recordings for Officer McAllister produced by the government in discovery (See Exhibits 20[55], 21[56], 22[57], and 23[58]). The first (Exhibit 20) and last (Exhibit 23) of the four recordings include two minutes of silent, buffered video at the beginning, followed by the standard beep when Officer McAllister activates the 'event' (record) button. However, the second (Exhibit 21) and third McAllister (Exhibit 22) recordings include no such activation beep. Both of these recordings begin less than a minute after the previous recording ended, and in both cases, nothing seems to be pressing the 'event' button for three seconds to end the previous recordings. In both cases, between the gaps in recordings, Officer McCallister viciously beats a protestor who is not resisting. It is reasonable to question whether these gaps are anomalies or if evidence is being altered to remove facts that are inconvenient for the government.

The first anomalous gap occurs right before Officer McCallister tackled a man to the ground at 2:28:06 p.m. The last image seen on the video (At the 54:57:23 mark of the video) is

---

[55] Exhibit 20 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39s26r-exhibit-20-bodycam-footage-from-neil-mcallister.html

[56] Exhibit 21 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39sa0p-exhibit-21-bodycam-footage-from-neil-mcallister-no.-2.html

[57] Exhibit 22 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39sb9f-exhibit-22-bodycam-footage-from-neil-mcallister-no.-3.html

[58] Exhibit 23 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v39sc0n-exhibit-23-bodycam-footage-from-neil-mcallister-no.-4.html

the protestor's belt loop just inches away from the body camera, then the screen goes black for

the next six frames except for the Axon logo and timestamp in the upper right corner. Oddly,

there is a glow around the timestamp that seems to include some remaining video pixels.



*Figure 14: McAllister's bodycam went completely black without anything pressing the 'event' button for three seconds to stop the recording. The two images above are back-to-back frames near the end of the video produced by the government.*



*Figure 15: There is a strange halo effect around the timestamp in the final six black frames of McCallister's first video, as if background video was removed through some type of screening process. This is clearly seen when these frames are enlarged.*

Since these body cameras record 30 frames of video per second, and since the 'event' or

'power' button must be pressed for a full three seconds to stop a recording, six frames of video

(one fifth of a second) is not enough time to turn off the device even if the protestor's body

contacted the event button on the body camera as McAllister was tackling him.[59]

Twenty-two seconds after this video ends, McAllister's second video begins. During this

twenty-two second gap between McAllister's videos, McCallister repeatedly beat the man he

tackled to the ground even after the man told McAllister he was down and not resisting.

---

[59] Video from multiple angles shows that McAllister's arms were reaching for the protestor, not pressing buttons on his body camera, so it could not have been McAllister who stopped the recording.



*Figure 16: Bodycam footage from various angles shows that nothing was touching Officer McAllister's body camera when it mysteriously began recording again at 14:28:38, after he stopped punching a man who had no longer been resisting.*

Strangely, bodycam video from other officers shows that McAllister's hands also were not on his camera when his second recording mysteriously begins (See Exhibits: 24-Exum,[60] 25-Tyler,[61] 26-Boone,[62] and 27-Volcin[63]). When synchronized (See Exhibit 28[64]) these body cameras show that McCallister was repeatedly punching a man who was no longer resisting during the gap between his videos.[65] Either McAllister's camera somehow turned itself off and back on (without beeping), or McAllister's recordings have been altered.

The second anomalous gap in McAllister's recording occurs while McAllister and Lt. Bagshaw were beating defendant Victoria White in the head with fists and batons (See Exhibit

---

[60] Exhibit 24 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v39sgo9-exhibit-24-bodycam-footage-from-ryan-exum.html

[61] Exhibit 25 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v39ss5n-exhibit-25-bodycam-footage-from-marvin-tyler.html

[62] Exhibit 26 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v39u0l5-exhibit-26-bodycam-footage-from-anthony-boone.html

[63] Exhibit 27 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v39u8zb-exhibit-27-bodycam-footage-from-ricardo-volcin.html

[64] Exhibit 28 synchronizes multiple angles of McAllister beating the protestor: https://rumble.com/v39u9oz-exhibit-28-synced-bodycam-footage-of-mcallister-beating-a-protestor.html

[65] Note: There is a double beep in Exum's recording at 14:28:23. Exum's camera beeps every two minutes, which is the factory setting for this model of Axon body camera. Many MPD bodycams had this setting turned off.

29[66]). Since this occurred in the packed tunnel, it is impossible to determine if McAllister's 'event' button was accidentally pressed for three seconds to end the recording. However, since McAllister's third recording begins less than a minute after his second[67] without the typical beeping noise at the beginning, and since both anomalous gaps include McCallister or other officers beating a defenseless person, I have to consider the possibility that this second gap was either altered or that McAllister has a bodycam that always malfunctions[68] when he beats people.

Though these two McAllister incidents do not involve me, the possibility that the government might hide, alter, or destroy video is extremely relevant and concerning to all January 6 defendants. For this reason, the government must be made to produce all police body camera recordings in their original form, and to provide documentation for why video is missing for officers wearing cameras.

---

[66] Exhibit 29 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v39uahr-exhibit-29-bagshaw-and-mcallister-beating-victoria-white.html

[67] The beginning of McAllister's third recording also includes more than twenty seconds of blank white screen with a timecode in the upper corner. When synchronized to CCTV, it becomes clear the white screen occurs while Lt. Bagshaw repeatedly punches Victoria White in the face and a nearby man begs Bagshaw "please don't beat her."

[68] The government has not yet produced the requested reports detailing which bodycams malfunctioned on January 6, so I cannot verify if McAllister's camera malfunctioned until the Court compels production.

**Materials to be Compelled for Production**

In the preceding pages, I thoroughly evidenced that the government is withholding important discoverable materials, including materials that MPD has determined "may prove favorable to an accused." Since attempts to confer with the government regarding requests for these Brady materials have resulted in months of government stonewalling, I am left with no choice but to motion the Court to compel government production of these items:

- All unredacted materials provided by MPD to the government, including:
  - All ESU video recordings and photographs made between November 13, 2020 and January 7, 2021 related to First Amendment activities, including all materials from January 5 and January 6, 2021.
  - All ESU Investigative File Reports related to First Amendment Activities that occurred between November 13, 2020, and January 7, 2021.
  - All emails and other communications from individuals assigned to MPD ESU, MPD Internal Affairs, or the MPD Office of General Counsel relating to January 6, 2021, December 11 and 12, 2020, November 14, 2020, or concerns about actions taken by ESU officers at First Amendment gatherings.
  - All audio recordings of MPD Internal Affairs interviews of ESU officers.
  - All unredacted MPD Internal Affairs summaries of ESU officer interviews.
  - All communications between Lt. Lamond and the Proud Boys.
  - All communications between Officer Tomasula and the Proud Boys.
  - All communications between any other MPD officers and the Proud Boys and/or other defendants in January 6 cases.
- All unaltered police body camera recordings from January 6, 2021.

- All information on the man Tomasula identified as Enrique Tarrio's "handler."

- Reports on all body worn cameras that malfunctioned on January 6, 2021.

- Reports on all body worn cameras that were lost or stolen on January 6, 2021.

- Reports on all officers who were investigated by MPD Internal Affairs for not activating their body worn cameras during the events of January 6, 2021.

I also move the Court to remove the sensitivity designations from the two sealed exhibits I have submitted with this motion, and to change the sensitivity designations for the (already excessively redacted) MPD Internal Investigations reports on Tomasula (CAPD_009734532) and Barcus (CAPD_009734774) from 'highly sensitive' to 'sensitive' so that I may possess them to more easily reference as I prepare my defense.

As I have shown, the requested discoverable materials are specifically relevant to my case and are also generally relevant to most other January 6 cases. These items should have been voluntarily disclosed by the government long ago. But since the government continues to string me a long with promises of deliverables that never materialize, and since the government is obstructing justice for hundreds of accused Americans (including myself) by withholding these Brady materials, I must move this court to expeditiously compel production.

Respectfully submitted to the Court,

By: William Pope

/s/

William Pope
Pro Se Officer of the Court
Topeka, Kansas

<u>Certificate of Service</u>

I certify that a copy of this was filed electronically for all parties of record on August 21, 2023.
Sealed exhibits containing 'sensitive' footage have been emailed directly to all parties.

<u>/s/</u>
William Alexander Pope, Pro Se