# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:21-cr-00128-RC |
| v. | |
| WILLIAM ALEXANDER POPE, | |
| Defendant. | |

## RESPONSE TO THE GOVERNMENT'S OPPOSITION TO ECF NO. 139

**The Government Conceded ECF No. 139 by not Filing Opposition Within 14 Days**

Local Criminal Rule 47(b) for the United States District Court of the District of Columbia states that:

> *Within 14 days of the date of service or at such other time as the Court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion.  If such a memorandum is not filed within the prescribed time, the Court may treat the motion as conceded.*

ECF No. 139 was filed on Monday, August 21, 2023, and the government failed to respond within 14 days of service. The Court should therefore treat ECF No. 139 as conceded by the government and grant my motion to compel.

The government did file a late opposition (ECF No. 145) on Thursday, September 7, 2023, 17 days after ECF No. 139 was filed. Though the government conceded ECF No. 139, by not filing on time, I am exercising my right to respond to ECF No. 145 due to the government habitually misconstruing the facts of this case.

**The Government did not Address Whether They Have Produced All ESU Materials**

In ECF No. 145 at 1, the government says they produced materials related to MPD's Electronic Surveillance Unit ". . . on January 14, 2021,[1] April 7, 2023, and August 11, 2023." This rolling production demonstrates that the government withheld exculpatory materials for more than two years, and as ECF No. 139 pointed out the government is still withholding exculpatory materials. Rather than producing an affidavit to the Court swearing that the government has produced all CCTV, bodycam footage, and video recorded by undercover government operatives in discovery, the government instead completely dodged the issue of missing video in ECF No. 145. In fact, the government's filing admits that they still have materials they need to produce. The government's game of discovery hide and seek is delaying resolution of January 6 cases, including mine, and justifies the Court compelling production.

**Evidence Shows the Government has not been Truthful About ESU Officer Locations**

In ECF No. 145 at 2, the government claims that, "officers in the ESU were present on the West side of the Capitol," rather than on the East side of the building. However, video produced by the government in discovery shows that Officer Roe was at times filming on the East side of the Capitol, and that Sgt. Harris was on the East side of the Capitol when he arrived. Additionally, Officers Faverio, Melvin, and Green, came from the East Side to the West. I am also aware of other officers who were assigned to ESU who were on the East side of the Capitol. Furthermore, both Tomasula and Leiva filmed me on the West side of the Capitol, which makes their recordings and testimony relevant to my case.

---

[1] The letter for Global Production No. 10, says that the government actually produced the first ESU materials on January 14, 2022, not on January 14, 2021. The 2022 date is also evidenced in several other government filings.

**Defendants are Better Able than the Government to Determine what is Exculpatory**

In ECF No. 139, I provided many specific explanations for why the requested materials are relevant. In this filing I am adding several more. Perhaps the greatest reason to compel full production is that if the government is systematically hiding and altering evidence, then their entire global production process is tainted, which taints all the January 6 prosecutions.

It is important to remember that Defendants, not the government, are best able to identify what is exculpatory. The government has tinted goggles that amplify their perception of an individual's guilt while preventing the government from seeing innocence. This is why the government repeatedly claims materials are not relevant or are not exculpatory, when in fact they are. It is likely then, that materials withheld by the government from discovery, including body worn camera recordings and undercover police materials, also contain exculpatory information.

In ECF No. 52 at16, the government acknowledged that "<u>defendants are in a better position to determine what evidence they believe is exculpatory and will help in their defense</u>," and that the government intended to "provide the defense with all data that may contain such information." But I cannot sift through all relevant materials if the government has withheld it. For more than two years, the government withheld information that undercover officers congratulated those that broke windows in the Capitol (ECF No. 139 at 5). This is after the government acknowledged on July 12, 2021, receiving numerous discovery requests from defense teams inquiring about officers allowing protestors to enter, officers removing fencing, and officers encouraging or failing to discourage charged behaviors (ECF No. 30-1). It has been more than two years since the government disclosed those requests to this Court. My motion, ECF No. 139, echoes many of the same discovery requests because they have not yet been filled.

**Government Misrepresentation of Facts Demonstrates They Ignore what is Exculpatory**

The most impressive aspect of the government's filing is that they managed to lie seven times in a single sentence (ECF No. 145 at 2). Since the government continues to represent demonstrably false claims to the Court, and since my brother's appointed counsel has seemingly not evaluated the video evidence in this case before making demonstrably false assertions to the Court about me,[2] I have no choice but to set some facts straight so that the Court will not develop an undue bias towards me before I am able to present the full evidence in my defense at trial.

To begin, I must point out that Mr. Searby in ECF No. 122 at 7 and 8, and the government in ECF No. 1-1 at 5, claimed that me streaming a video to Facebook somehow demonstrates criminal intent. However, in the video I did not communicate any intent to commit crimes, I only reported on topics I had been covering as a journalist. This video was also not livestreamed to my personal account, but rather to my Facebook page which clearly identified me as a journalist and the publisher of my news website, Free State Kansas.

The government has failed to notify the Court that I brought a laptop and camera on my trip, intending to write and publish an article about the events I observed on January 6. The government has also failed to notify the court that a JTTF Task Force Officer assigned to my case in Kansas filed a report on January 10, 2021, acknowledging that I ran a news website, Free State Kansas, and that I had been publishing news articles covering the leadup to January 6.

---

[2] Should this case not be severed, and should Mr. Searby still be representing my brother, I will file my own motion to sever due to Mr. Searby's inability to competently assess evidence, etc., which will prejudice a jury against me.



*Figure 1: I, through my news website, Free State Kansas, was reporting on events leading up to January 6, 2021.*

I came up with the idea for a Kansas news website during the summer of 2016, and at that time registered domain names and Twitter handles. In 2017, I filed corporation paperwork registering my news company, Free State Kansas, with the state of Kansas. I have kept that registration status active ever since, intending to resume normal publication after I win this case and the chilling effect of the government's frivolous prosecution is behind me.[3]

For two years, I taught myself web development and worked on building an online platform. I tested the platform by launching my first news website, The Western Cyclone.[4] Shortly after launching The Western Cyclone, I launched Free State Kansas.[5] By January 6, 2021, my Free State Kansas Facebook page had thousands of followers and was one of the ten most followed news pages in Kansas.

---

[3] The government's attack on the First Amendment following January 6, had a chilling effect on my journalism.

[4] The Western Cyclone is the namesake of a mid-1880s African American newspaper from the all-black pioneer town of Nicodemus, Kansas, where I lived in 2012 and 2013.

[5] I chose the name Free State Kansas for my main website because it honors Kansas' legacy of entering the Union as a free state rather than a slave state. This is also the inspiration for my FreeStateWill Twitter handle.

During the time I was building my website, I earned a master's degree from the University of Iowa's School of Journalism. I then enrolled in the Leadership Communication Ph.D. program at Kansas State University and was planning a dissertation on community journalism just days before January 6.  The federal government has also recognized me as a "representative of the news media" when they have evaluated and granted my FOIA applications (See Exhibit 1). For instance, in 2019, I submitted a Freedom of Information Act request as a member of the press for financial records for Nicodemus National Historic Site. I did this to investigate how Congressional appropriations for Nicodemus were being spent because the agency had shut down uniformed ranger operations at Nicodemus in violation of the park's enabling legislation.[6] My investigative journalism revealed that the National Park Service was using money specifically appropriated by Congress for Nicodemus as a slush funds for other parks in the agency's Midwest Region. This had a big impact, because it resulted in the National Park Service returning ranger operations to the historic all-black town of Nicodemus.[7]

First Amendment Freedom of the Press does not require me to have academic qualifications in journalism, or to own a media company, or to be recognized as a member of the press by the federal government, yet I have all these credentials evidencing my track record in journalism. My purpose for going to Washington on January 6 was to report on events, and afterwards, my brother and I intended to visit several national parks on the east coast. I brought my laptop on the trip, intending to write an article that gave a Kansas perspective on the events of the day. Cell reception on January 6 was spotty, but when I could get a signal, I posted reports to my Facebook page where I was explicitly listed as the Publisher of Free State Kansas. The

---

[6] This would be like the National Park Service eliminating all staffing at Yellowstone or on the National Mall.

[7] The NPS misuse of Nicodemus appropriations illustrates that federal agencies can be corrupted and abused by bad employees. This reporting also shows that I have a great respect for the Legislative Branch as an institution.

government is now trying to use my on the ground journalism as evidence against me despite it being factual reporting and commentary of events containing no criminal intent. My reporting on January 6, 2021, is exculpatory, not incriminating. The only intent demonstrated was to exercise the First Amendment, to cover the events of January 6, 2021. As events unfolded, I put myself in a position to observe, just as many other journalists did. My brother stayed near me because we had agreed to stay close for safety, and we had seen many reports of people who had been viciously attacked at the November 14 and December 12 rallies. We considered Washington D.C. to be a dangerous city and personal safety was our concern.[8] These concerns were justified because visitors to D.C. were also attacked on the night of January 6 (See Exhibit 2[9]).

Because the government began immediately threatening to arrest those who went to the Capitol, and because entire websites and social media accounts were being removed from the internet after January 6, I never published an article. I instead took my news website and social media pages down temporarily until things cooled off. This illustrates the chilling effect the government's Orwellian reaction to January 6 had on First Amendment activity.

There are numerous examples of other journalists who went inside the Capitol. An RMG news reporter climbed in through a window, becoming the fifth person inside. An LA Times reporter walked into the Columbus Doors in front of the Oath Keepers. The two people who walked into the Senate Wing Doors immediately in front of Jacob Chansley were members of the media (including a NY Times photographer), and two of the three who walked in right behind Chansley were also press.

---

[8] Even though I had discussed body armor for safety reasons, I did not bring it on the trip. And even if had worn it, doing so would be no different than other journalists who wore visible body armor, helmets, and gas masks at the Capitol on January 6. Everything my brother and I discussed bringing was intended to comply with local laws!

[9] Exhibit 2 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v3hqjqi-exhibit-2-bodycam-from-zachary-compher.html



*Figure 2: Many journalists (including reporters for the Washington Post) wore body armor on January 6. I did not.*

The government's false narrative also alleges: "William was near the front of the crowd. attempting to block the entryway" (ECF No. 125 at 3). The only reason I approached the Senate Carriage Doors in the first place is because I am a journalist, and I believed I should observe and report what was going on. At the Senate Carriage Doors, I obeyed the officer's commands while also believing I had a First Amendment right to be in a position to observe what was taking place. There were many moments when I could have simply walked in, but I didn't. I would have never entered the Capitol had I not been pushed in.

As in many January 6 cases, events happened very quickly, and the actions of others affected things around me in ways I could not anticipate. At one point a man went down in the doorway. I stepped up intending to keep the door from hitting the officer as he dealt with the man. At almost the same moment, another man began pushing me into the door. Video shows the man who has been hashtagged as #FrodoTheFash[10] repeatedly lunging into me, and my body being jolted from his impacts. Since the flag I held prevented me from seeing who was behind

---

[10] For more than a year, I have repeatedly asked the government for information on #FrodoTheFash, which they have not provided. This individual is one of the most egregious actors from January 6, who physically confronted police throughout the day in many locations, but he has not yet been arrested. If the government continues to withhold information on this suspicious actor, I will be forced to file a motion to compel production.

me, I thought it may have been an officer pushing me in, and I tried to get out of the pusher's way, but I was also not eager to go in the door. While I was being pushed, I attempted to keep my feet in place, but while the lower half of my body was trying to stay planted, my upper body was being pushed in. This caused me to tip forward and faceplant a wall inside the door.

I do not know if faceplanting into walls is common practice inside DOJ offices. To the government's prosecutors this may seem like normal human behavior, but here in Kanas, faceplanting into walls is never intentionally done among folks with common sense. On January 6, I did not faceplant into a wall for the fun of it, but because I was being pushed through the door, into the Capitol.[11] The government is either very poor at analyzing these facts on video or is intentionally lying about what happened to prop up their hollow indictment.

After I was pushed into the Capitol and faceplanted the wall, the only thing I saw when I turned back around to face the door were police officers. Because that was the only perspective I had, I concluded incorrectly at the time that one of the officers must have been the one who pushed me in. However, since the officers had previously been allowing people to exit the door, I returned to the door hoping for an opportunity when my brother and I could exit together in an orderly way. Again, things happened very quickly. At about the same time I returned to the door (approximately 2:18:25), video shows #FrodoTheFash pushing past me again. The second time #FrodoTheFash assaulted me was jarring enough to cause my hat to fall off, and I nearly lost my flagpole. The video shows me letting the hat fall to the floor because I did not want to bump or interfere with the officers around me. The video also shows me trying to stay off to the side, out of the officer's way, waiting for a calm moment to exit. However, while I was expecting to be able to exit, the officers changed tactics from allowing people to walk out, to closing the door.

---

[11] I have not spoken to my brother about why he entered behind me, but I suspect he did so because we had agreed beforehand to stay together at all times for safety, and he did not want us to be separated.

Due to how events were quickly unfolding, I was trapped with my back to the doorframe, walled in by officers on the other three sides of me. The video shows me trying to hold my flag as tight to my body as possible, attempting to stay out of the officers' way. Mr. Searby and the government continue to file demonstrably false statements about the flagpole in the door. For instance, in ECF No. 128 at 4, the government claimed, "William wedged his flagpole he was carrying into the door jamb to keep it from closing at approximately 2:18:43." The problem with this claim is that the video evidence completely debunks it. I was not even facing the joint of the door; I made no action to "wedge" the flag in the door, and I was completely unaware that the tip of my flagpole entered the door joint. The video clearly shows the flagpole entered the joint of the door when an officer bumped me (as I was trying to stay out of their way). Were it not for the officer's bump, the flagpole would have never been caught in the door. And it was not until the flag jumped up in my arms that I realized that officers had closed my flagpole in the door, and I then worked to help them remove it. Again, this is all on video. The facts are on my side.

Yet Mr. Searby's claims in ECF No. 122 at 7, that, "the Government has produced in discovery evidence depicting William Pope allegedly using a flagpole to hold open a door to the Senate entrance to the Capitol, allowing in protestors behind him." Likewise, the government asserts in ECF No. 145 at 2, that I was ". . . using a flagpole to prevent law enforcement from securing the door, allowing other rioters to enter the U.S. Capitol building." These filings illustrate that neither Mr. Searby nor the government have carefully evaluated the video evidence. Not only are they wrong about how the flagpole got there, but they are also demonstrably wrong about other people getting in because of it.

Can Mr. Searby point out a single protestor I 'allowed in behind'? No! Because the CCTV clearly shows there were none who entered. How does one make such a blatant error

unless they have not reviewed the video evidence, or they are intentionally trying to deceive the Court?[12] Yet Mr. Searby and the government continue to spread this false and defamatory fable that is easily refuted with video.[13] Their claims are factual impossibilities!

      There are many other points in my favor which will be raised in trial, however, I cannot allow these demonstrably false claims by the government and Mr. Searby to go unchecked to the point of biasing the Court against me. I am a journalist who self-reported not because I thought I was guilty of a crime, but because I am an upstanding citizen who thought letting authorities know about my presence was the right thing to do. In return for attempting resolution through direct communication, I have received three years of despicable treatment for conduct the government's own prosecutor (Mr. Crawford), deemed "entirely peaceful."



*Figure 3: As I left Capitol grounds, I took this photo of the east side, intending to use it in a news article about the day's events.*

[12] Mr. Searby's performance is giving my brother excellent appealable issues, but it would be better to win!

[13] I would produce a sealed exhibit of this entire scene for the Court; however, I am currently prevented by the Court from possessing the CCTV needed to make this exhibit, which would completely exonerate myself.

**Seeding Clouds to Make it Rain: Complexity Theory as a Defense**

In *United States v. Rivera*, 21-cr-00060-CKK, No. 62 at 13, Judge Kollar-Kotelly ruled:

*Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption.*

The government cited Judge Kollar-Kotelly's ruling in *United States v. Eicher*, 22-cr-00038-BAH, No. 95 at 2, arguing that the presence of individuals at the Capitol contributed to a collective outcome. The government has also continuously argued in January 6 cases that the 'crowd was the weapon' This has been used as a prosecutorial strategy to pin broader guilt on entirely peaceful protestors. Furthermore, the government continues to show video montages in trials which depict actions of individuals that are entirely unrelated to the specific defendants. This advancement of 'flooded field' or complexity theory has gone unchecked too long.

These concepts are not new to me. I have studied them academically and understand how network effects in complex environments play out. All of society is an interconnected, dancing landscape. One might even argue that the broader cultural environment in America and the world also contributed to events at the Capitol on January 6, and the subsequent obsessive prosecutions. However, if Judges can use a raindrop theory to find a defendant guilty, and if the government can use a raindrop theory to argue for more severe punishment for January 6 defendants, then I must address raindrop theory in my defense. And to address a complexity/raindrop theory in my defense, I must also use raindrop theory as a defense.

Defendants were not the only 'raindrops' at the Capitol on January 6. As I have shown in ECF No. 139 and other filings, undercover government operatives were also present, repeatedly urging people to advance up the steps to the Capitol, congratulating those who broke windows, and thanking those who removed fences. The evidence will show that these actions by government operatives had a network influence effect on the crowd, pushing an already complex environment past a critical threshold. In essence, government operatives seeded the clouds (or in this case crowds) to make it rain, which flooded the fields. Because government operatives were causally responsible for the flood – a critical threshold which has resulted in criminal charges for hundreds of defendants – I will use their cloud seeding as a defense against flooded field theory.

**MPD Lt. Lamond Was Undercover at the Capitol Within Sight of the Proud Boys**

The government has alleged that Lt. Shane Lamond, who supervised the Intelligence Branch of MPD's Homeland Security Bureau, frequently communicated intelligence directly to members of the Proud Boys (*United States v. Lamond*, 1:23-cr-00177, No. 1). The Lamond indictment at Paragraph 71, also notes that Lamond claims he had conversations with Proud Boys leader Enrique Tarrio on January 6, 2021.

On January 6, 2021, Lt. Lamond was working undercover approximately 50 yards from the Northwest scaffolding as members of the Proud Boys pushed past police to get to the West Terrace. Since the government alleges that Lt. Lamond was sharing intelligence with the Proud Boys, and since Lamond claims he communicated with the Proud Boys on January 6, and since Lt. Lamond had a direct view of the Proud Boys taking the scaffolding, I believe Lamond may have been communicating information to the Proud Boys or others that aided and abetted their advance up the stairs and into the Capitol. Any such communications would be exculpatory and discoverable since it would evidence law enforcement personnel directly contributing to events

at the Capitol. Even if Lamond did not directly share intelligence with the Proud Boys, he may have intentionally withheld intelligence from MPD in order to aid his friends in the Proud Boys who were advancing up the steps to the Capitol. This too would be discoverable information.

Additionally, video shows Lamond working with other undercover operatives at the Capitol throughout the afternoon and into the evening of January 6, 2021. The MPD operations plan for January 6, 2021, lists 17 officers working under Lamond in the Intel Unit.[14] Any communications or recordings made by Lt. Lamond or officers from the MPD Intel Unit related to the events of January 6, must be produced by the government in the global discovery.

**Undercover and Uniformed MPD have Antifa Information the Government is Concealing**

At approximately 10:15 a.m. local time on January 6, 2021, several undercover D.C. police stopped a car containing three persons. Those individuals, Jonathan Kelly, Leslie Grimes, and Dempsey Mikula sang "we are antifa" while traveling to D.C. from Michigan (See Exhibit 3[15]) and had been conspiring with other antifa using Defendant John Sullivan's online server. Early on January 6, they and other antifa infiltrated crowds near the Ellipse (See Exhibit 4[16]). Undercover officers who stopped their vehicle said they had received reports that the individuals were carrying weapons. No footage of this incident has been produced by the government in discovery, however, Kelly livestreamed part of the police stop to Facebook (See Exhibit 5[17]).

---

[14] The MPD Intel Unit is separate from the Electronic Surveillance Unit, however both units work undercover.

[15] Exhibit 3 can be accessed at:
https://rumble.com/v3hqlqg-exhibit-3-kelly-grimes-and-mikula-sing-we-are-antifa.html

[16] Exhibit 4 can be accessed at:
https://rumble.com/v3hqn4e-exhibit-4-jonathan-kelly-antifa-infiltrates-j6-crowds.html

[17] Exhibit 5 can be accessed at: https://rumble.com/v3hqo5c-exhibit-5-undercover-mpd-detain-antifa.html



*Figure 4: At least four undercover officers participated in the antifa traffic stop, and at least two of them wore bracelets consistent with the Electronic Surveillance Unit. The government has not produced video recorded by any of these officers.*

At least two of the undercover officers who participated in the stop were wearing rubber bracelets like other members of the Electronic Surveillance Unit. One of the officers wore the exact rainbow-striped bracelet prescribed to ESU in the MPD operations plan for January 6, 2021, while another officer (with badge number 3671) wore a lighter colored bracelet.



*Figure 5: The MPD operations plan described the rainbow-striped bracelets to be worn by undercover surveillance officers. Some ESU officers wore different colors, but this appears to be the same one worn by the officer in the 'Childish Gambino' hoodie.*

When officers asked Jonathan Kelly whether he consented to having his vehicle searched, Kelly declined consent, and officers called for a dog to sniff around the vehicle for signs of illegal contents that would justify a search. A little over ten minutes into Kelly's livestream, a team of uniformed MPD officers showed up to replace the undercover police. These uniformed officers wore body cameras, and instructed Kelly, Grimes, and Mikula to get out of the vehicle while they waited for the dog to arrive.



*Figure 6: Leslie Grimes (center) and Dempsey Mikula (right) nervously anticipated police searching their vehicle for weapons.*

Near the 21:45 mark of Kelly's livestream, Kelly asked an officer if his body camera was recording, and the officer confirmed that it was. Kelly's livestream also captured beeping noises consistent with multiple Axon body cameras recording. This beeping is heard every two minutes, beginning at the 12:54 mark, and continuing through the 30:54 mark. User manuals for Axon body cameras note that these cameras have factory settings that cause them to beep every two minutes while the camera is recording unless the beep setting is turned off. In addition to this, MPD policy requires that officers activate their body cameras when making contact with suspects. These facts evidence that MPD possesses relevant body camera footage from this incident on January 6, 2021, which the government has not produced in global discovery.



*Figure 7: Several MPD officers wearing bodycams responded to the Leslie Grimes felony gun arrest. It is MPD policy for officers to record incidents like this, yet no bodycam footage of the vehicle search and arrest has been produced in the January 6 discovery.*

Indeed, the government has deemed the Grimes arrest relevant enough to the January 6 cases to produce body camera footage from the officer who transported Grimes from the scene of the arrest to the booking facility (See Exhibit 6[18]), but the government has withheld recordings from the many other officers who were on scene during the stop, vehicle search, and arrest.



*Figure 8: The only bodycam produced for the Grimes arrest is from transport officer Rodney Johnson. Grimes was first booked as James Connoley after refusing to produce an ID, using the name of a violent, socialist revolutionary leader from Ireland. Grimes was released the next day, January 7, 2021, when D.C. federal prosecutors dropped the felony charges.*

I have already offered several other examples of officers activating their body camera recording when making contact with individuals. For instance, in ECF No. 81 at 15, I pointed out

---

[18] Exhibit 6 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v3hqqvy-exhibit-6-bodycam-from-rodney-anderson.html

that three MPD officers had activated their bodycams while stopping armed suspects who turned out to be undercover DOJ/DEA agents. In that same filing, I included an exhibit from Carlos Mejia showing Michael Sherwin present at another incident where individuals were searched for weapons. Mejia was one of several officers who activated their bodycams for that incident.

ECF No. 81 at 15 also includes an exhibit from Daniel Harrington, who was one of the officers who activated his body camera at the Ellipse when sent to search an individual for weapons. In the Harrington recording, a man who was presumably an undercover officer tipped off Harrington to the suspect in the crowd that he had been called in to search.



*Figure 9: An individual in plain clothes (circled) pointed Officer Harrington to the suspect he had been called in to search.*

In ECF No 139 at 31, I offered exhibits from three of the officers who made contact with individuals outside the Hamilton Hotel. Another example of MPD activating their body camera during a contact comes from Officer Lauren Griffin, who started recording when she made contact with members of the Oath Keepers (See Exhibit 7[19]). There are many other examples of officers recording contacts with suspects, which makes it all the more stunning that the government is pretending that recordings of the antifa vehicle search do not exist or are not relevant to January 6 cases. It is not as if recordings of vehicle stops and searches are too sensitive to produce. The government has produced multiple recordings of officers searching a

---

[19] Exhibit 7 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqrzs-exhibit-7-bodycam-from-lauren-griffin.html

vehicle for weapons (See Exhibits 8[20] and 9[21]). The government has also produced recordings of officers making contact with a suspicious person in a vehicle (See Exhibits 10[22] and 11[23]).

While the government has withheld recordings of the antifa vehicle stop, the government has produced many other recordings that are far less relevant to events at the Capitol. For instance, just before 9 p.m. on January 5, Officer Anne deRoo activated her bodycam to record herself testing her taser (See Exhibit 12[24]). Many recordings, such as Officer Pedro Pena's from 5:39 a.m. on January 6 (See Exhibit 13[25]), only show officers inspecting vehicles. Dennis Stewart's recording shows officers responding to a gas station then buying a Snapple (See Exhibit 14[26]). Todd Cory's recording shows officers responding to an AutoZone, then checking the price of oil (See Exhibit 15[27]). I don't mind the government producing irrelevant bodycams; the problem is the government withholds relevant recordings. The bodycam footage from the antifa traffic stop is more relevant to January 6 cases because Jonathan Kelly and Dempsey Mikula were in the crowd at the Capitol. Since the government is advancing a theory that argues

---

[20] Exhibit 8 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqtgo-exhibit-8-bodycam-from-maximilian-park.html

[21] Exhibit 9 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqu9o-exhibit-9-bodycam-from-markell-jones.html

[22] Exhibit 10 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqvck-exhibit-10-bodycam-from-james-corcoran.html

[23] Exhibit 11 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqwf2-exhibit-11-bodycam-from-sean-corcoran.html

[24] Exhibit 12 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqwqq-exhibit-12-bodycam-from-anne-deroo.html

[25] Exhibit 13 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqy08-exhibit-13-bodycam-from-pedro-pena.html

[26] Exhibit 14 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqybw-exhibit-14-bodycam-from-dennis-stewart.html

[27] Exhibit 15 is not considered a material subject to the protective order and can be accessed at:
https://rumble.com/v3hqzcg-exhibit-15-todd-cory.html

each raindrop contributed to the flood, they cannot withhold discovery relating to the antifa raindrops who contributed to flooding Capitol grounds.

Many of John Sullivan's actions are widely known. Forty minutes before anyone entered the Capitol, Sullivan recorded[28] himself reiterating his prediction (made on his antifa server) that the Capitol would be broken into. As he neared the Capitol, Sullivan urged others to advance and help those who were "fucking shit up." Like Jonathan Kelly, Sullivan carried a bullhorn to promote chaos, and used it near the scaffolding to call for the crowd to "burn this shit down." Before anyone entered the scaffold, a man in a red snowflake hat asked Sullivan "you guys gonna come in the building, and Sullivan responded "yeah, let's go!" Shortly after that, Sullivan announced "Fuck this shit up; we taking this by storm; I'm ready; we got enough people for this shit!" Sullivan, also told the crowd, "they can't shoot all these people." As Sullivan neared the scaffolding, he said "I'm about to go fuck shit up." Sullivan then bullhorned at police guarding the scaffold entrance "you work for us, fuck you!" About thirty seconds before the crowd rushed the scaffolding, Sullivan bullhorned "if we don't get them [Congress], we'll burn this shit down." Sullivan then rushed the scaffolding, bullhorning to the crowd, "hold the line." At the top of the scaffolding near the police line, Sullivan said, "this is a revolution, motherfuckers, let's go, we taking this shit!" After breaking through police lines, Sullivan said "this shit's ours," and, "we accomplished this shit." Sullivan then yelled for people down on the lawn "to get up here."



*Figure 10: John Sullivan recorded himself urging the crowd to "burn this shit down" moments before they rushed the scaffold.*

---

[28] An archived copy of Sullivan's footage can be accessed at: https://archive.org/details/CcWoDMZenyzdxzy5p

Sullivan's footage also captures many details that are exculpatory to me and my brother. For instance, other people were also trying to get out, but like me, they were blocked by police from exiting. One lady next to me even tells an officer, "I'm trying, I'm trying" as he kept pushing her towards the door, into other officers. And Sullivan points out that it would be crazy for an officer to push him "through that shit," which was preventing Michael and I from exiting.



Figure 11: On January 6, Jonathan Kelly (antifa) was the last person on the SW Scaffolding and had to be physically removed by police. The next week, on January 14, he was posting articles about how the FBI had found no evidence of antifa at the Capitol.



Figure 12: Jonathan Kelly, a self-identified communist/antifa was physically removed by police from the Southwest Scaffolding.

Sullivan's antifa server comrades, Johnathan Kelly and Dempsey Mikula also went to the Capitol. Video shows that Kelly, who wore a gas mask and had a baseball bat, was the last person in the southwest scaffolding and had to be physically removed by police (See Exhibits 16,[29] 17,[30] and 18[31]). Kelly and Mikula then faced off with police lines and stayed at the Capitol past the curfew (See Exhibits 19,[32] 20,[33] and 21[34]).



*Figure 13: Dempsey Mikula (antifa) smoking after curfew on January 6, between the Capitol and federal courthouse.*

On January 7, 2021, federal prosecutors dropped the felony charges on Leslie Grimes. This lack of prosecution compared to others January 6 cases, and the fact that the government continues to hide information about the ESU officers who conducted the antifa car stop and body camera recordings demonstrates the government is intentionally concealing information about this antifa seditious conspiracy. Such information is exculpatory in my case.

---

[29] Exhibit 16 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v3hr5kg-exhibit-16-bodycam-from-ricardo-volcin.html

[30] Exhibit 17 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v3hr6nw-exhibit-17-bodycam-from-enrique-simmons.html

[31] Exhibit 18 can be accessed at: https://rumble.com/v3hr6z6-exhibit-18-antifa-removed-by-police.html

[32] Exhibit 19 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v3hreey-exhibit-19-bodycam-from-johel-sanchez.html

[33] Exhibit 20 is not considered a material subject to the protective order and can be accessed at: https://rumble.com/v3hro1u-exhibit-20-bodycam-from-timothy-watts.html

[34] Exhibit 21 can be accessed at: https://rumble.com/v3hrojc-exhibit-21-antifa-out-past-curfew.html



Figure 14: The week before January 6, John Sullivan used his antifa server to call for Civil War.

Kelly and Grimes were clearly conspiring with John Sullivan using Sullivan's online server. On December 29, 2020, John Sullivan posted an image of firearms and tactical gear on his antifa server along with the message "Civil War and Revolution."[35]

By January 4, 2021, Jonathan Kelly had been added to Sullivan's antifa server, and was welcomed by Sullivan. The following day, January 5, 2021, Grimes posted "Hello Comr8s." Individuals using Sullivan's antifa server began discussing plans to lookup blueprints for "tax buildings" online so they could firebomb them by throwing fireworks into broken windows. In addition to this, antifa co-conspirators on Sullivan's server began sharing tactical plans for attacking police lines using a Roman legion formation.

Sullivan also posted to his antifa server encouraging his co-conspirators to bring "tactical



Figure 16: Jonathan Kelly (Soupforthefamily) was greeted by Sullivan when added to his server.



Figure 15: Individuals on Sullivans antifa server planned to attack police lines using a Roman tactical formation equipped with Molotov cocktails.

[35] A video capture of Sullivan's server can be accessed here:
https://rumble.com/v19iv62-absolute-proof-antifa-planned-to-storm-capitol-on-january-6th-john-sullivan.html

gear/bullet proof vests." On January 6, Sullivan posted a photo of himself with a Trump hat, which was intentionally worn by Sullivan to make it easier to infiltrate the crowds and cause chaos. Grimes and Kelly also posted photos of themselves infiltrating the crowds near the Ellipse, and Kelly asked his antifa co-conspirators on Sullivan's server whether he should "start blasting Fuck Donald Trump on my megaphone." This demonstrates that those conspiring with Sullivan had a general objective to cause chaos on January 6, 2021.



*Figure 17: On January 6, self-identified antifa Jonathan Kelly and Leslie Grimes were conspiring with other antifa on defendant John Sullivan's Discord server "Insurgence" which was used for antifa coordination on and before January 6. Sullivan posted as 'Jayden X,' Kelly posted as 'Soupforthefamily – Lansing MI,' and Grimes posted as 'Red – Grand Rapids – MI (CPUSA).'*

As his video demonstrates, Sullivan provoked the crowd before entering the Capitol. Once inside, Sullivan yelled at police caused the situation at the Senate Carriage Doors to become more chaotic, influencing officers to change their tactics to closing the doors rather than continuing to allow people to walk out, and specifically, preventing an opportunity for my brother and I to walk out together in an orderly way. Since Sullivan was conspiring with Kelly and Grimes on his antifa server, I believe ESU recordings and MPD bodycam recordings of Kelly, Grimes and Mikula may have captured clues relating to their conspiracy to create chaos.

Since the government has used screenshots of footage recorded by John Sullivan in my charging documents, thereby deeming Sullivan to be relevant to my case, I will need to explore

Sullivan's planning and coordination with other self-identified antifa, and their collective actions

on January 6. This makes all ESU recordings and bodycam recordings of Sullivan, Kelly,

Grimes, Mikula, and any other conspiring antifa relevant to my defense, and the government has

a Brady obligation to produce all such recordings and any other tips or related materials in

discovery. This also further justifies my request for the Court to grant my motion to compel the

government to produce all ESU recordings and body worn camera footage (ECF No. 139).

Furthermore, I continue to oppose the government's request for an in-person hearing to

throw me in the D.C. Gulag. They are only making this request because I have exposed their

many false statements and systematic discovery problems. Rather than working to correct these

evidentiary and integrity issues to serve the interests of justice, the government has instead

chosen to attack my freedom to prevent me from keeping them honest.

But I will continue to speak the truth to preserve our Free State.

Respectfully submitted to the Court,

By: William Pope

/s/

William Pope
Pro Se Officer of the Court
Topeka, Kansas

Certificate of Service
I certify a copy of this was filed electronically for all parties of record on September 14, 2023.
/s/
William Alexander Pope, Pro Se