# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:21-cr-00128-RC |
| v. | |
| WILLIAM ALEXANDER POPE, | |
| Defendant. | |

## MOTION TO DISMISS COUNT ONE: CIVIL DISORDER

On February 10, 2021, FBI Special Agent Clay Chase filed a criminal complaint and statement of facts against me in the D.C. District Court, listing among my charges 18 U.S.C. 231(a)(3) – Civil Disorder. Eight days later, the government filed an indictment with Civil Disorder being Count One. On November 11, 2021, the government superseded that indictment, alleging in a revised Civil Disorder charge that my actions on January 6, somehow adversely affected interstate commerce. However, at the core of this charge is the allegation that I somehow intentionally obstructed, impeded, and interfered with a law enforcement officer.

The government brings this allegation despite the government being unable to charge me with 18 U.S.C. § 111, which makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with law enforcement. This means that the government is instead charging me with some kind of vague non-forcible, non-violent, non-resistive, non-intimidating, alleged interference with Law Enforcement.[1] This is an overly broad and dangerous use of 18 U.S.C. 231(a)(3) that justifies the Court dismissing Count One.

---

[1] Essentially, the government is charging entirely peaceful First Amendment activity as felonious behavior.

This extreme application of the Civil Disorder statute to those who are not forcibly interfering with law enforcement means that anytime three or more people engage in acts of violence – see 18 U.S. Code § 232(1) – a thousand other people who are entirely peaceful at that same protest are at risk of felony arrest for whatever First Amendment activity, or even minor infraction, the government alleges to be interference. This statute is inherently unfair, since many, like me, condemn violence, and do not engage in violence, yet are subject to felony charges because of violence committed by others.

In *Johnson v. United States*, 576 U.S. 591, 595 (2015), The United States Supreme Court found that the government violates the Due Process Clause of the Fifth Amendment when they take away "someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." The Supreme Court also found in *Kolender v. Lawson*, 461 U.S. 352 (1983), that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." And in the Johnson case, the Supreme Court made clear that a vague law is not "constitutional merely because there is some conduct that clearly falls within the provision's grasp;" the Court gave the example of an overly vague provision against grocery price gouging that the Supreme Court struck down in *United States v. L. Cohen Grocery Co.*, 255 U.S. 89 (1921), even though the justices agreed that a thousand dollars for a pound a sugar would clearly be "unjust and unreasonable."

This is the case with the overly vague Civil Disorder statute. Throwing Molotov cocktails and fireworks at law enforcement officers guarding the federal court in Portland is felonious behavior, but not every peaceful demonstrator voicing their own grievances for their own reasons

on those same streets should be subject to felony Civil Disorder simply because a federal prosecutor argues (perhaps using a Raindrop Theory) that all those staying in the streets after curfew made it more difficult to restore order, and thus interfered with law enforcement.

Consider that Dr. Martin Luther King was once arrested for disobeying a police order in Montgomery, Alabama. The Civil Disorder statute did not exist at that time, but if some future activist engages in similar civil disobedience to a police order, they could be subject to felony charges if others in the same protest become violent. This future MLK might condemn violence (as I do) and refuse to participate in violence (as I did on January 6), but the government's broad and dangerous application of the vague Civil Disorder statute will make them a felon. This is what the Supreme Court warned of in *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972):

> *It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.*

Arbitrarily charging those who peacefully engage in First Amendment freedoms with felony civil disorder is unjust and unreasonable. Since Count One of my indictment is overly vague, it should be dismissed in accordance with FCRP Rule 12(b)(3)(iii) and (v), which allows a charge to be dismissed before trial when there is "a defect in the indictment or information, including . . . lack of specificity . . . [and] . . . failure to state an offense." Even though the indictment reflects the language of the statute, the vagueness of the statute itself makes Count One unconstitutional. Under the rule of lenity, this ambiguity justifies the Court in taking the more lenient interpretation of the law. *United States v. R.L.C.*, 503 U.S. 291, 293 (1992).

**The Civil Disorder Statute in Context**

The Civil Disorder statute traces back to the Civil Obedience Act of 1968. The prior summer had been marked by intense civil rights protests across the nation. Senator Russell Long, a segregationist from Louisianna, authored the Civil Obedience Act because he was motivated to suppress the black civil rights movement. In his introduction of the bill (Congressional Record included as Exhibit 1), Sen. Long lamented Louisianna school districts "had exhausted all their legal remedies" to resist the *Brown v. Board of Education* decision, and were being forced to racially integrate, which was incurring the wrath of the Ku Klux Klan in his state.[2]

However, the bulk of Long's concern was not directed at the Klan, but at Dr. Martin Luther King and civil rights protests across the nation. Long cited Dr. King's practice of civil disobedience in the face of unjust laws as the flashpoint of demonstrations, and Long believed that Dr. King played a causal role similar to how a single cancer cell creates a tumor.

---

[2] Long was a strong proponent of segregation. Following the Brown v. Topeka Board of Education decision, Long proposed a constitutional amendment to limit Supreme Court Justices to short terms, and shortly afterwards, he signed the 'Southern Manifesto' in a pact to oppose all desegregation and civil rights legislation in Congress.

> Just as a single diseased cell develops into a killing cancer, so has the entreaties of a misguided few to ignore those laws one does not agree with, spawned a widespread disregard for law and order generally. The material and inevitable result has been the ultimate in lawlessness, wanton killing, and senseless, destructive rioting in the streets.
>
> We might trace this ominous development from a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963. At that time, Dr. King addressed a tense crowd with inflammatory words saying that they should "break the laws which one considers unjust."
>
> At the time of this act, Dr. King was defying a court order as he led a march of more than a thousand Negroes, marching, singing, and shouting through the streets of Birmingham, Ala.

*Figure 1 Sen. Long compared Dr. King to a cancer when introducing the Civil Obedience Act.*

Sen. Long's answer to the civil rights movement was the sweeping and overly broad Civil Obedience Act. Senator Hart of Colorado objected that the bill would make a felony out of "every scuffle in a schoolyard," which, "would be unwise, imprudent, and unnecessary." This overly broad and vague scope of the Civil Disorder statute has not yet been considered by the United States Supreme Court, but that consideration is coming.

When the federal government makes it felonious to engage in the same conduct as Dr. Martin Luther King, the government wades America into the dangerous cold waters of chilling First Amendment rights.

Consider that in the effort to advanced civil rights for black Americans, Dr. Martin Luther King engaged in civil disobedience and was arrested 29 different times. Dr. King and his colleagues were charged[3] with trespassing, parading without a permit, obstructing a sidewalk, disobeying police orders, disorderly conduct,[4] and engaging in mass public demonstrations.

These charges are nearly identical to the allegations the government has brought against me. I face two counts of trespassing, two counts of obstructing passage, one count of disorderly conduct, and one count of parading. The two other charges I face were legislated after Dr. King's death. The constitutionality of one, 18 U.S.C. 1512(c)(3), is now under consideration in the

---

[3] A partial list of Dr. King's arrests can be found here: https://www.blackhistory.com/2019/11/martin-luther-king-jr-was-arrested-29-times-crimes.html#google_vignette

[4] In June 1964, Dr. King and 17 others were arrested for trespassing, and four of his colleagues were charged with disorderly conduct during a protest in St. Augustine, FL. https://www.nytimes.com/1964/06/12/archives/martin-luther-king-and-17-others-jailed-trying-to-integrate-st.html

Supreme Court. The other, Civil Disorder, was legislated by Congress to target Dr. King, and considering its present abuse by the government, will end up in the Supreme Court.

Since my underlying charges parallel charges faced by Dr. King, and since King had an established record of peaceful civil disobedience, there is a good likelihood that King would have eventually been arrested for felony civil disorder had he not been murdered at about the same time

> "Dr. King talks of leading new Negro marches into white neighborhoods of Chicago and Cicero, Ill., where similar marches drew white attacks last year."
>
> As a matter of fact, Mr. President, I am fully convinced that when marches of this sort are organized, it is the intention of those who organize them to provoke just that kind of reaction. If they do not provoke it, they do not get the publicity they seek; so they have to provoke it in order to gain the kind of recognition and attention that they desire.

*Figure 2: Sen. Long justified the Civil Disorder statute by pointing out that Dr. King intended to lead more protests.*

the bill was passed. We now know that the FBI was spying on Dr. King and targeting him before his death. And when introducing the Civil Obedience Act, Senator Long intentionally connected King to riots in the mid-1960s and projected that black civil rights protests would continue and intensify in the year ahead. The goal of Sen. Long's Civil Disorder law was to crush the First Amendment activity of dissidents like King who voiced grievances.

By Long drawing a connection between Dr. King and the riots, Long was essentially outlining the nexus by which Dr. King might be charged under the felony civil disorder statute he was introducing. In my own indictment, the government has taken the words from 18 U.S. Code § 231, to allege that, I "committed and attempted to commit and act to obstruct, impede, and interfere" with law enforcement. There is no boundary on this overly vague clause. Consider the possibility that during some future protest a descendant of Martin Luther King might bullhorn "one has a moral responsibility to disobey unjust laws" (the words of Dr. Martin Luther King), and simultaneously the crowd begins throwing rocks at police. MLK's descendant might be against violence, but since Section 231 requires no physical force, the government can use the

statute's vagueness to allege the words of MLK's great-great-great-granddaughter attempted to, and did, interfere with law enforcement during a civil disorder by inflaming the crowd.

And Senator Long would celebrate such an indictment from somewhere in hell.

As noted by defense counsel in U.S. v. Jay James Johnston, 23-cr-00237-CJN, "penalizing 'any act to obstruct, impede, or interfere,' § 231(a)(3) reaches the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content." Furthermore, "incident to and during the commission of a Civil Disorder" is also vague, and there is no intent requirement in the statute, which adds vagueness, meaning unknowing persons might be charged with a felony.

The potential abuses of this overly broad and vague statute are vast. Even if this administration uses the statute to charge entirely peaceful January 6 protestors, the next administration might use it to charge a women's rights march or a political opponent who calls for more aggressive demonstrations in the streets. Perhaps there will be a brawl during a Michigan v. Ohio State football game, and in the heat of the moment some players who are not engaged in the fight, but want to protect their teammates, ignore orders from police to return to the sideline. Subsequently, sponsors become outraged and interstate commerce is affected. Under the Civil Disorder statute, Ohio State players who did not throw a punch might be charged with a five-year federal felony by a prosecutor who graduated from Michigan.

The Civil Disorder statute was crafted by a racist Senator who wanted to wield it against the black civil rights movement. However, as control of political power shifts over time, Civil Disorder will be abused by all sorts of unjust persons who are motivated to harm their opponents. A vague discretion cannot be entrusted to prosecutors who have historically wielded vague

charges in wild excess and have repeatedly been chastised by the Supreme Court. More often than not, vague laws without objective standards are wielded to suppress First Amendment activity by political dissidents. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969).



*Figure 3: Twenty years ago this week, my brother and I witnessed the Rev. Shuttleworth commemorate the 50th anniversary of the Supreme Court's Brown v. Topeka Board of Education ruling at the Monroe Elementary School. During his remarks, Shuttlesworth said the decision began the "second American revolution" – political speech similar to January 6 defendants.[5]*

     I have several personal experiences that give me a unique perspective of the Civil Disorder statute. When I was a child, my parents move to Louisianna in the early 1990s, where my dad was hired to preach at a church in Baton Rouge. One week a black family attended worship. Afterwards, my dad was approached by members of the congregation who told him that it was ok if blacks visited, but that they didn't want them attending regularly. My father was shocked at this, and not long after, we moved to Kansas. My experiences in Louisiana give me a window into the world of Senator Long. His motivation for legislating Civil Disorder was to

---

[5] Reverend Shuttlesworth's remarks at the opening of the Brown V. Board of Education National Historic Site can be viewed here: https://www.c-span.org/video/?181873-1/brown-v-board-education-site-dedication#!

maintain segregation. Sen Long explicitly admitted this while introducing the Civil Obedience Act, when he warned of "new battlefronts . . . spreading more widely from Negro neighborhoods into white areas of big cities." This segregationist mindset motivated the overly vague language of 18 U.S. Code § 231, and this statute will continue having negative consequences until Congress repeals it, or the Court exercises the courage to recognize it as void for vagueness.

Growing up in Topeka, I have known those who were plaintiffs in the Brown V. Board of Education decision. The week I graduated from Topeka High School, I attended the 50th anniversary of the Brown v. Board decision and the opening of Brown v. Board of Education National Historic Site. The lesson I gained in Topeka public schools is that only when segregationist laws are overturned can all of society advance.

I have also lived for more than a year as the only white man in the historic all-black town of Nicodemus, Kansas. This town was founded by settlers fleeing the post-reconstruction laws of the Jim Crow south. Those pioneers essentially segregated themselves on the prairie, thinking that isolation was preferrable to persecution for protesting the denial of their rights.

I also have the perspective of working for the National Park Service at President Lyndon B. Johnson's ranch in Texas. Johnson was the ultimate legislator who signed more bills into law than any other President in American history.[6] The prolific legislation was a point of pride to LBJ, and many of these bills, such as the Wilderness Act and the Freedom of Information Act, stand up to the test of time. However, some bills signed by LBJ, such as the Civil Obedience Act, were poorly thought out and were rushed to passage under enormous political pressure.

---

[6] Due to the sheer number of bills signed by President Johnson, I was not even aware that the Civil Obedience Act existed until I was charged with it. It certainly wasn't a part of LBJ's legacy that the NPS wanted to highlight.

By early 1968, Johnson's approval was sinking, and he became frustrated by the Vietnam protests and unrest in the Civil Rights Movement. That frustration intensified in his final year,[7] and clouded Johnson's consideration of what First Amendment ramifications the Civil Disorder law would have.[8] In many respects it set back his other civil rights legislation.

On January 19, 1968, ten days before Senator Long introduced the Civil Obedience Act, Dr. King gave his final speech on a college campus at Kansas State University.[9] During that convocation, King condemned violence, and called for continued peaceful civil disobedience, but he also addressed rioting: "it would be an act of moral irresponsibility for me to condemn riots and not be as vigorous in condemning the continued existence of intolerable conditions in our society, which cause people to feel so angry and bitter that they conclude they have no alternative to get attention but to engage in this kind of violence; what we must see is that a riot is the language of the unheard."



Figure 4: Dr. King speaking at Kansas State University in 1968 – his final address on a college campus.

---

[7] President Johnson cited frustrations with civil unrest and his desire to focus on the conflict in Vietnam when announcing that he would not seek re-election on March 31, 1968. He was a distracted President and did not adequately consider the Civil Disobedience Act. https://www.historyplace.com/speeches/lbj-decision.htm

[8] Ironically, I went from spending Presidents Day in 2015 working in LBJ's boyhood home, to spending Presidents Day in 2021 in jail, charged with the overly vague Civil Disorder statute that President Johnson signed into law.

[9] Full text of Dr. King's speech: https://www.k-state.edu/inclusion/documents/king-legacy-docs/MLKatKState%20-%20Speech%20Transcript%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%20Dr.%20Martin%20Luther%20King%20Jr.%20Speech.pdf

"The language of the unheard" implies that despite our First Amendment rights, part of society believes they are unable to have in practice what is granted to them in the Constitution. In recent years, we have seen "the language of the unheard" spoken during the summer of 2020, on January 6, and now on university campuses throughout America. Most who exercise First Amendment rights during these events remain – like I was on January 6 – or like Dr. King was during his many protests – entirely peaceful. However, because a racist Senator crafted an overly broad and vague statute, peaceful civil disobedience is now being charges as a felony.



*Figure 5: Before losing my teaching job at Kansas State University following January 6, I taught public speaking and the speeches of Dr. King. One of my classrooms was in the same building where Dr. King delivered his 1968 address to campus.*

Prior to January 6, 2021, I taught public speaking at Kansas State University. In my classes, I intentionally used Dr. King's speeches to illustrate lessons. One of my classrooms was in the same building that Dr. King delivered his final college address, and every day as I walked back to my office, I passed a bust of Dr. King commemorating his visit to campus. After January 6, I lost my job teaching about Dr. King. I was fired not because I am charged with parading like Dr. King, or because I am charged with trespassing like Dr. King, or because I am charged with

obstructing passage like Dr. King, but because I am charged with a felony, Civil Disorder, that was legislated to target Dr. King. Now my lessons on Dr. King go unheard.

However, Dr. King's words still burn within me, and it would be irresponsible of me to abandon his legacy and succumb to a statute designed to attack the First Amendment rights of Dr. King and all Americans. The government has exercised their broad prosecutorial discretion to ignore federal marijuana laws for those who smoked weed in the rotunda on January 6, but sadly, the D.C. U.S. Attorney has chosen to continue embracing the racist legacy of Senator Long by charging hundreds of peaceful citizens with the tainted Civil Disorder statute. By continuing to use this racist and unconstitutionally vague statute to crush the peaceful exercise of First Amendment rights, the DOJ sullies their own reputation among Americans.

**This Statute Should Be Voided for Vagueness Due to Lack of Proximity and Intent**

In ECF No. 1-1 at 9, the government, clarified the Civil Disorder charge:

*For purposes of Section 231 of Title 18, civil disorder means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual. See 18 U.S.C. § 232(1).*

The statutory language of "during the commission of a civil disorder," makes clear that any interference committed under 18 U.S.C. 231(a)(3) must be simultaneous to civil disorder. And under 18 U.S.C. § 232(1), civil disorder must include, "acts of violence by assemblages of three or more persons." So, the interference must be simultaneous to some acts of violence.

This statute is vague, but it should seem obvious to a reasonable person that were violent acts committed by an assembly of three persons in another part of Washington, D.C., those acts

would be irrelevant to me, and shouldn't result in me being charged with felony civil disorder. If there is no direct proximity and awareness of three or more persons engaging in acts of violence when the alleged interference with law enforcement occurred, then the statute is overly vague, unjust, and unreasonable.[10]

Without some degree of awareness or proximity being required, then the vagueness of the statute would result in even the most minor offense being subject to up to five years in prison.

The Court might consider a hypothetical scenario where antisemitic campus protestors realize that because they have harassed Jewish students during the spring semester, they are now blacklisted by major employers and cannot get a job. Angered, these protestors move from the George Washington University campus to instead protesting outside the U.S. Department of Labor, which is across the street from the D.C. District Court. Just prior to them arriving, a District Judge realizes they have left something inside the courthouse, and rather than taking the time to re-park in their normal spot, the judge pulls into the fire lane and runs inside, thinking it will only take a few minutes. As the judge is in the courthouse, protestors begin assaulting Department of Labor employees and set the Department of Labor Building on fire. A civil disorder is immediately declared, and fire trucks rush to the scene, but the car belonging to the judge is blocking access to the fire hydrant. Blocking a fire hydrant is normally a minor $50 fine in D.C. but this also becomes a violation of 18 U.S.C. 231(a)(3) because it impeded firefighters during a civil disorder. The judge may not have known a civil disorder was declared, or that more than three persons engaged in violence, but the judge finds themselves in prison because an

---

[10] For instance, I left Capitol grounds before anyone entered the tunnel on the west side of the Capitol. The government cannot show that I was aware of, or in proximity to, any violent acts in the tunnel. So, it is impossible for me to have interfered with law enforcement during those moments.

administration doesn't like the judge and they use their broad prosecutorial discretion to exploit the vagueness of the statute just as the government has done to me.

While this is entirely a hypothetical scenario, hopefully it allows the Court to envision what it would be like to suddenly be facing a serious felony charge even though there was no awareness or intent to violate 18 U.S.C. 231(a)(3). Being charged for a felony despite lack of awareness should shock a reasonable person's sense of fairness. For this reason, because the statute lacks objective requirements for proximity and awareness, it should be considered void for vagueness, and Count One should be dismissed.

While I am still uncertain how the government alleges me to have interfered with law enforcement, I know for a fact that the government has failed to show that I had any awareness of an assembly of three or more persons simultaneously committing acts of violence.[11] The government also cannot show that I was aware that a civil disorder had been declared.[12]

If the government is alleging that me being pushed into the Capitol was interference, I would agree that the man who pushed me into the Capitol assaulted me, and assaulted police, but he has not been charged. And even though was a loud assembly of other people near those doors, I am not aware of any other person there who assaulted police.[13] So, due to the lack of three proximate violent persons, and due to my lack of awareness that a Civil Disorder had officially been declared, Count One should be voided for vagueness and dismissed.

---

[11] The Court likely agrees that an act of violence is different from minor disorderly conduct, or moving bike racks, or singing the National Anthem, or parading in the Capitol.

[12] Capitol Police made no effort to use their loud public address system until late in the evening, long after I'd left: https://twitter.com/FreeStateWill/status/1489647844084572160

[13] Since the government has not charged anyone for assault at the Senate Carriage Doors, it's possible the government does not believe any of their actions meet the threshold for violence under 18 U.S.C. 231(a)(3).

**The Civil Disorder Statute Should Be Voided for Vagueness Due to No Commerce Nexus**

As defense counsel in United States v. Robert Turner, et. al, 22-cr-00019-RCL at 14, pointed out, Section 231(a)(3) lacks a proper nexus to interstate commerce, exceeds the Commerce Clause power of Congress, and was not properly designed to regulate economic activity. Furthermore, the statute is excessively vague, because it does not limit the statute to acts that directly impacted commerce, or to acts that had more than a trivial effect on commerce as required by *United States v. Morrison*, 529 U.S. 598 (2000).

In my case, the government can show no act of mine that directly interfered with commerce. In fact, I was one of the first to leave Capitol grounds and leave Washington D.C. Other than being on the metro, walking on sidewalks to and from the metro, or being on public park land, the entirety of my time spent in Washington was inside an area that already had road closures in place for permitted First Amendment activities. Because the government can show no action of mine that directly impacted commerce, the government relies on secondary effects caused by the decisions of public officials. For instance, district officials declared a curfew that the government argues negatively impacted interstate commerce (I left Washington before the curfew began). These same officials closed streets and declined additional law enforcement and National Guard support prior to January 6, which did directly affect commerce.[14]

This prosecution theory seemingly relies on butterfly effect logic[15] since there was no direct nexus between me and commercial activity. And since butterfly effect legal logic is used to make the jump from a defendant's actions to interstate commerce, why can't it also be used to

---

[14] January 5, 2021, letter from Mayor Bowser: https://twitter.com/MayorBowser/status/1346530358674792466

[15] Mathematician Edward Norton Lorenz famously theorized that a butterfly flapping its wings on the other side of the world might set off a chain of events that ends up creating a tornado in Kansas.

bridge the gap between a defendant's actions to some far-removed interference with police? Afterall, section 231 doesn't require direct and forcible interference with police like section 111 does. By using butterfly effect logic, prosecutors might claim that a stunning flatulent episode by Mitch McConnel increased wind speeds in Washington on January 6, that resulted in tear gas blowing into the eyes of police, which in turn interfered with commerce. While this reasoning may seem outrageous, Civil Disorder is so overly vague, that the Courts have thus far allowed prosecutors to essentially fit a butterfly's flapping wings into the parameters of the statute as a way to connect January 6 defendants to interstate commerce.[16]

Consider a scenario where a semitruck passing through Minneapolis runs over a nail, then blows out a tire, which causes the truck to block a narrow interstate offramp. At the same time a riot breaks out nearby in downtown Minneapolis and protestors set a Target on fire. Police and firemen try to respond, but because the interstate ramp is blocked by the truck, they detour and it takes them an additional 15 minutes to arrive on scene. This delay causes millions of dollars in additional damage and drastically harms interstate commerce. Despite the flat tire being randomly caused by a 'butterfly effect' nail in the road, and despite the driver having no intent to interfere with police or firemen, and despite the driver having no proximity or relation to the riot, he is charged with felony civil disorder due to the vague nature of the statute.[17]

---

[16] Judging from his introductory remarks for the Civil Obedience Act, it seems that Senator Long was looking forward to the possibility of charging Dr. King's distant national influence as interference with police during riots.

[17] The involuntary nature of the truck driver blocking the road might be compared to 18 U.S. Code § 1112 – Manslaughter. Yet while involuntary manslaughter includes the direct nexus of 'killing' between the accused and the victim, 18 U.S. Code § 231 is so vague that there is no direct causality required, thus allowing butterfly effect legal voodoo to creep in. While proving involuntary manslaughter might require a lack of due caution, a truck driver exercising excellent caution who by chance runs over a nail might still be charged with Civil Disorder.

Perhaps during the same Minneapolis riot, a young child who has just been taught how to dial 9-1-1, calls emergency services while her parents are in another room helping other children. About the same time, the kid trips over a toy and begins crying loudly. The dispatcher hears this and several responders are sent to the residence, depriving the city of important resources. Because of this, the riot intensifies, and more buildings burn down. Later, a federal prosecutor files a scorching indictment alleging that the parents dangerously interfered with law enforcement and commerce by not controlling their child. The jury pool is full of bitter people who were directly affected by the riot, and the district court has strict change of venue rules, so each parent is convicted of felony civil disorder and sentenced to a year in prison.

These may seem like ridiculous scenarios that no prosecutor would indict, but when used as thought exercises they expose the dangerous ambiguity of 18 U.S.C. 231(a)(3) that is exploited in the January 6 cases. Without adequate specifics written into the law, any prosecutor can argue a vague butterfly effect theory that requires no direct nexus between the defendant and the alleged outcome, and can send entirely peaceful citizens to prison on felony counts. This ambiguity is unjust and unreasonable, so Count One should be voided for vagueness.

**The Civil Disorder Statute Destroys Assembly Rights and Violates the Eighth Amendment**

The mere construct of 18 U.S.C. 231(a)(3) has the potential to destroy First Amendment assembly rights. Consider the hypothetical of a civil rights march that is parading peacefully down a street, protesting the death of young black man shot by police. Being a spur of the moment assembly without much organization, these civil rights protestors failed to seek and obtain the appropriate permit to make their march lawful. During this march, three members of the Ku Klux Klan begin committing acts of violence against some stragglers at the back of the parade. Because there are three violent persons, the conditions for a civil disorder have been met.

Even though the civil rights marchers are not members of the Klan, thousands of them are unlawfully in the streets impeding federal law enforcement from responding to the Klan's violence. These marchers are given orders by the federal officers to move, but they refuse because they are angered by the recent police shooting and believe they have a First Amendment right to be in a public space and have their grievances heard. Even though these marchers have not engaged in violence themselves, they are ultimately charged with felony civil disorder under the same application of 18 U.S.C. 231(a)(3) that the government has used on me.

These civil rights marchers, like Dr. Martin Luther King, believe their message was so important that they were willing to engage in peaceful civil disobedience. They were willing to risk a traffic infraction or a minor trespassing or parading charge but did not want to cross the line into felony behavior. Much to their surprise, they receive a felony indictment.

Felony civil disorder is charged only because the three Klansmen[18] who did not share their commitment to peaceful protest engaged in acts of violence during their assembly. The vague and dangerous construction of the Civil Disorder statute makes it so that the Constitutional speech and assembly rights of many thousands of peaceful protestors can be suppressed and severely criminalized because an unrelated few committed violent acts. This is what transpired in my case. I engaged in no violence, but the government has charged me with felony civil disorder punishable by up to five years in prison because persons who I did not know or witness on

---

[18] In this hypothetical scenario, two of these three violent Klansmen are also FBI informants, similar to how FBI informant Michael Alen Jones was punching police at the Capitol on January 6, 2021. Since 18 U.S.C. § 232(1), does not make an exception for violence done by federal informants, the federal government could both create the conditions for civil disorder and use broad prosecutorial discretion to charge for vague, non-violent interferences. Some future administration might do this as a way to crush mass public demonstrations against their policies.

January 6 chose to become violent. My First Amendment activity has been deemed a criminal felony because of what others did.

Most reasonable persons would agree that punishment for the actions of others is unjust, unreasonable, and un-American. Beyond this, I would argue that an entirely peaceful person being charged with a five year felony based on the actions of others is cruel and unusual punishment, which violates the Eighth Amendment of the Constitution. The Supreme Court has in the past considered cases where a defendant was convicted and sentenced within the clear parameters of the law, yet that punishment did not pass the test of common sense. The most famous example may be *Solem v. Helm*, 463 U.S. 277 (1983), where a South Dakota man was sentenced to life in prison for writing a bad check. If the average citizen can conduct a proportionality assessment and find the civil disorder statute overly vague and the punishment for it to be grossly unreasonable, so should the District Court. I believe the Court should fairly consider the vagueness of the statute, the lack of violence in my actions, and the excessive cruelness of the prospective punishment, and opt for lenity.

Seventy years ago this week, the Supreme Court cast out the unjust laws of racial segregation of public schools. Now the Court has an opportunity to void another attack on civil rights. I therefore move that Count One, Civil Disorder, be dismissed from my indictment.

Respectfully submitted to the Court,

By: William Pope

/s/

William Pope
Pro Se Officer of the Court
Topeka, Kansas

<u>Certificate of Service</u>
I certify a copy of this was filed electronically for all parties of record on May 13, 2024.
<u>/s/</u>
William Alexander Pope, Pro Se