Case 1:21-cr-00128-RC    Document 268-1    Filed 05/13/24    Page 1 of 6

and to keep willing participants in the extension of the debate, so let me reply very briefly.

In most of the actions—indeed, I venture to say in every one of the acts of violence or threats of violence that this bill would reach—there is a violation of State law.

I would assume—though I certainly do not know Louisiana law—that trespass on a mayor's property or anyone else's front lawn and the structuring of a cross and the burning of it would be a violation of State law.

Mr. LONG of Louisiana. I am not sure it is, frankly, but I assume it is.

Mr. HART. Let us make that assumption.

Generally speaking, law enforcement is colorblind. But sometimes it is not. We attempt, by this bill, to supply Federal jurisdiction for those situations where it has not been provided. Let us hope that very soon it will be colorblind everywhere. But whenever it is not colorblind, in these areas we make provision.

The Senator from Louisiana, who earlier was bewailing the extension of Federal criminal law to the point where we would have a national police force, now is arguing for the extension of the bill so as to cover every violation, every intrusion, and—as earlier the Senator from Mississippi said—every scuffle in a schoolyard. We believe that would be unwise, imprudent, and unnecessary.

(At this point, Mr. HOLLINGS assumed the chair as Presiding Officer.)

Mr. LONG of Louisiana. If one is going to enact meaningful legislation, he should not discriminate. We are talking about a section against discrimination. If we are going to do it equitably, we should do it for everybody and to everybody. We should not do it for some and to some. Everyone should be treated the same. So I am making the argument against discrimination in this case.

I believe it would be better to junk the entire statute and forget about it; but if we must pass the bill, it does seem to me that everyone should be protected under the bill instead of just a few.

I was visiting just a few days ago here with the mayor of Baton Rouge, and his visit brought to mind an incident—or, should I say, a series of incidents.

The mayor of that city has several times taken a position that he thought that justice, honor, and his conscience required him to take as an elected official of that city. On some three occasions, the Ku Klux Klan visited his home to burn a cross on his lawn.

If that man is to be intimidated and discouraged from his duty as he sees it, it seems most patently correct that he would be denied the benefits of this proposed law because he is a white man being intimidated by white men. Why should it be necessary that he be a Negro to be protected in the right of doing his duty as his honor and his conscience require him to do it?

I hope it will not test the patience of other Senators for me to cite another incident that occurred in Baton Rouge. I believe it serves the same illustrative point.

Recently, a dedicated member of the school board sat with other members of the school board, and he felt that they had no choice but to go along with a court order requiring them to integrate. They had exhausted all of their legal remedies. They had no other choice, and they would have to think in terms of complying with the court order.

Some time in the next day or so, members of the Ku Klux Klan called at his home when he was not there, and they terrified his wife and children—intimidating the man and scaring his family because he was doing what he felt his duty required of him as an elected public official. Why should the proposed statute require that there must be an incident of a black man threatening a white man or a white man threatening a black man, when it is wrong in any event?

Over 100 years have passed since the terrible and bloody conflict which divided this country in bitter camps, each side fighting and dying for causes which it held dear.

From that low point in our history we have become a strongly united people, forming the greatest Nation in all the world. Along with such a development, terrific responsibility has become an integral part of the duties of this Nation, and of every individual fortunate enough to live within this country. As a united people, side by side, we have fought in two gigantic world wars. Every responsible person in this country today must realize that, had the North and South become separate nations in the 1860's, ultimate reunification of our people would nevertheless have been compelled by subsequent unforseen and unsuspected circumstances.

Faced by today's inner problems and outside enemies, a unification of this country now is indispensable if we are to continue as a nation.

As we thus strive for a continuation of this vital unity, it becomes the duty of everyone of us in this body to study the proposed legislation, the reasons, if any, for such legislation, and to determine in our hearts and minds what should be done in the best interest of our country. If we are seriously to do this, I think it becomes imperative that we consider history; previous legislation on this subject; the evils that proponents claim this legislation will cure, and the actual curative powers of the suggested remedies. It is also absolutely necessary to study the constitutionality of the proposed legislation.

The 13th amendment simply provides that neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to its jurisdiction, with the added provision that Congress shall have power to enforce that amendment by appropriate legislation.

The 14th amendment might be divided into four parts: First. That all persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and the States wherein they reside.

Second. No State shall make or enforce any law which shall abridge the privilege or immunities of citizens of the United States.

Third. Nor, shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Fourth. Congress shall have power to enforce, by appropriate legislation, the provisions of that amendment.

It should be abundantly plain that part 2, enumerated herein, applies to State action only, and to citizens of the United States only. The word citizen becomes of prime importance.

Only in part 3 of that amendment herein, is it made applicable to any person and certainly that part refers to State action.

It follows that, with reference to part 4, Congress does have the power to make appropriate legislation, covering the provisions of the 14th amendment, but certainly such legislation must be in conformity to the amendment itself.

The 15th amendment simply provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Further, it provides that Congress shall have power to enforce this amendment by appropriate legislation. The power that Congress has to enact legislation under the 15th amendment is to legislation in behalf of citizens of the United States as defined in the 14th amendment, so that no citizen will be deprived of his right to vote, or that such right be denied or abridged by the United States or by any State, because of the race, color, or previous condition of servitude of that citizen.

It certainly must be noted that the 15th amendment applies to any citizen of the United States who is denied his rights, or had had his rights abridged by State action, on account of his race, color, or previous condition of servitude.

This amendment says nothing whatever about "unwarranted economic pressures" or "social" aspects, and says nothing whatsoever concerning "religion." As a matter of fact, constitutional amendment 1 provides:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.

Thomas Jefferson and the other fathers of our Constitution would be appalled to find that Congress had entertained any idea of legislating to any extent whatsoever upon religion or prohibiting the free exercise thereof.

Shortly after the War of the States, Congress did enact certain civil rights bills. These measures were enacted over the violent protect of the President of the United States, and that is a matter of history. The majority of these laws were enacted at a time when 11 Southern States had no representation in Congress. Over the years a number of these statutes were nullified by decisions of the Supreme Court. In one such case, United States against Cruikshank, the Court said:

The 14th amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the law; but this provision does not any more than the one which precedes it, and which we have just considered, add anything to the rights which one citizen has under the Constitution against another. The equality of the rights of citizens is a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power. That duty was originally assumed by the States; and it still remains there.

The Court has further said the 14th amendment does not invest Congress with the power to legislate upon subjects which are within the domain of State legislation or State action. That it does not authorize Congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of State laws, and the actions of State officers, executive or judicial, when these are subversive of the fundamental rights specified in the amendment.

In the case of United States against Stanley, et al., the Court said:

And so, in the present case, until some State law has been passed, or some State action by its officers or agents has been taken, adverse to the rights of citizens sought to be protected by the 14th amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity; for the prohibitions of the amendment are against State laws and acts done under State authority.

On page 14, the Court wisely said:

If this legislation (meaning civil rights legislation of 1875) is appropriate for enforcing the prohibitions of the amendment, it is difficult to see where it is to stop. Why may not Congress with equal show of authority enact a code of laws for the enforcement and vindication of all rights of life, liberty, and property? If it is supposable that the States may deprive a person of life, liberty, and property without due process of law (and the amendment itself does suppose it), why should not Congress proceed at once to prescribe due process of law for the protection of everyone of these fundamental rights, in every possible case, as well as to prescribe equal privileges in inns, public conveyances, and theaters? The truth is that the implication of a power to legislate in this manner is based upon the assumption that if the States are forbidden to legislate or act in a particular way on a particular subject, and power is conferred upon Congress to enforce the prohibition, which gives Congress power to legislate generally upon that subject, and not merely power to provide modes of redress against such State legislation or action. The assumption is certainly unsound. It is repugnant to the 10th amendment of the Constitution, which declares that powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people.

On page 17 of this decision, the U.S. Supreme Court made this pertinent observation:

The wrongful act of an individual, unsupported by any such authority (State authority), is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the State, nor not done under State authority, his rights remain in full force and may presumably be vindicated by a resort to the laws of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and sell, to sue in the courts, or be a witness or a juror; he may, by force or fraud, interfere with enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow citizen; but, unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the rights; he will only render himself amenable to satisfaction or punishment; and amenable therefore to the laws of the State where the wrongful acts are committed.

This case can be read with much profit, and with assurance that neither the 13th nor the 14th amendment authorizes legislation except as against State action, and can never descend to the individual in any State. It should be a matter of interest that these cases just referred to and discussed were rendered on October 15, 1883, and at a time when many of those who had a part in the passage of the 13th, 14th, and 15th amendments were living.

Now, Mr. President, from this short elementary recitation of the constitutional law covering the matter before the Senate today, it must become evident to those willing to see the facts that the measure we are being asked to vote for could not itself pass a valid test of constitutionality. It violates the Constitution by going beyond the limits prescribed by the 14th amendment. It violates the spirit of the 14th amendment to the Constitution by extending certain protections to certain classes of citizens while ignoring other citizens similarly situated.

In pointing up how this so-called civil rights bill discriminates against certain classes of people or against certain classes of activities, let me quote my colleague from North Carolina on this subject when he spoke of it in the 1959 civil rights hearings. The Senator from North Carolina [Mr. ERVIN], who has well presented the case against the bill before us today, was at that time discussing with the then Attorney General Rogers some proposed civil rights legislation in which the Attorney General would sue in behalf of certain persons denied equal protection of the laws and in which it would be a Federal crime to oppose with violence school desegregation. And he was stating how this legislation sought rights for some while neglecting the rights of others and punished some and neglected the punishment of others. I now quote the distinguished Senator from North Carolina [Mr. ERVIN]:

The two pending bills do not seem to be concerned about securing the equal protection of the laws for all people. They are concerned solely with certain selected groups. . . . doesn't the due-process clause of the Fifth Amendment prohibit Congress from passing a law applicable to some people and not applicable to other people in exactly the same situation?

These bills—S. 456 and S. 810—restrict the power of the Attorney General to bring suits for the benefit of persons who have been denied the equal protection of the laws on account of certain things, and not on account of other things. They don't apply to all in the same situation—to all denied the equal protection of the laws.

To pass these bills would be just about as bad constitutionally as to pass a law providing that the federal government should sue at taxpayers' expense to secure the equal protection of the laws for redheaded people, but not for baldheaded people. I can't see how the federal government can pick out certain groups and make them the favorites of the law under constitutional provisions which apply to all people equally.

I also think it will be unwise from now on until such time as the last lingering echo of Gabriel's horn trembles into ultimate silence for the Congress to pick out special groups of people and make them favorites of the law in a country whose proud boast it is that everybody stands equal before the law.

What I wonder about it why you pick out one group of citizens in this bill and exclude all other groups of citizens in like circumstances doing the same thing and provide for the punishment of one group, but all the other group to remain exempt.

You say that the people that resort to violence to prevent the enforcement of a particular kind of a decision of the Federal court shall be guilty of a Federal criminal offense, whereas other people who resort to violence to prevent the enforcement of other decrees of the Federal court shall not be punished by Federal courts for a crime.

To those of us who fervently wish to, at long last, see the end of the racial strife which divided our people, eroded our institutions, inflamed our passions, and preoccupied our national life for so long, it is distressing to see once again efforts, motivated by honest intentions, which would rekindle the worst fears of racial consciousness which today we are well on the way to overcoming without the assistance of Federal bayonets or the FBI.

Good will and tolerance in the South have grown and are growing voluntarily under the leadership of the good people of both races, and should continue to increase, provided there is not the continued interference by the Federal Government. Unfortunately, there has already been too much interference.

And so I say, Mr. President, if the Senators who propose this type of legislation are really sincere, if they are acting from truly altruistic considerations, and are not merely making a grandstand play motivated by political considerations, then they will reconsider, study the facts, and have the courage to withdraw this unnecessary, meaningless, and dangerous proposed legislation.

By and large, the people of my part of the country have shouldered the responsibility of setting their communities on the path of progressive moderation. Racial integration is a fact in the South. Our people have made great strides in setting aside old prejudices and are pitting their every resource to bringing about a social and economic renaissance which holds promise of a better life for every citizen, regardless of his race.

We of the South have been much maligned for our opposition to the various civil rights proposals down through the years. By their proponents we have been accused of the grossest of things. But the one thing of which no one can justifiably accuse us is a lack of sincerity in our dedication to our Constitution and the freedoms which it guarantees. Southern

Senators and Representatives hold honored positions in the history of this country, and their contributions to the good of the Nation are too great to be detailed at this time.

It is always with a certain amount of regret that I hear of someone questioning the motives of southerners in their resistance to civil rights legislation. My prime motivation in opposing all such legislation has been the abiding hope of preserving for the people the constitutional principles upon which this Nation was founded. For perseverance in this regard, I am prepared to put my record alongside that of any Southern Senator.

One will search in vain to find that my remarks have ever been disrespectful of the Negro or unsympathetic to his problems. It would be folly to contend that some of the most misguided of southerners have not exploited and mistreated the Negro, but my colleagues know very well the record of the Senator from Louisiana on this matter. And I am proud to say that has been the attitude of other members of my family in public service, including my father. We have always believed the Negro's thinking was very much akin to that of other less-privileged Americans, and we have constantly sought to provide him, along with other less-privileged Americans, the social and economic opportunity and capability to improve his lot.

I number among my good friends many Negroes whose good will I esteem and appreciate. I have discussed this subject with them many times and do not know of a single one who considers me intolerant of, or indifferent to, their natural desires to improve their situation and attain all the benefits our society has to offer.

Few people in this country are dedicated to keeping 20 million Negro Americans at a subservient and inferior social and economic level; indeed, most of us would like to see the Negro advance and take his rightful place, fully enjoying all the rights and privileges of American citizenship. The question that locks this great body in argument year after year is how best to approach that goal. Negroes have made phenomenal progress in this country in the past few decades, but I for one question whether such measures as that before us today will accelerate or impede that progress.

Surely, Mr. President, this bill's proponents are conscious of these very conspicuous shortcoming that I and some of my colleagues have tried to bring to light during the course of this debate.

I believe they do, but they apparently are willing to gloss over these failings in their unending quest to placate and pamper this minority group. The truth is that, though such a law has been proved unnecessary, matters have reached the point that the administration must undertake some gesture, I suppose, no matter how idle, to keep its stock high among Negro militants.

The Federal Government, through its permissive attitude in recent years, has only itself to blame for the spiraling disregard for the law now so rampant in this country.

The hundreds of senseless riots which have seriously scarred scores of our already ailing urban communities have their origins in the less destructive but morally corroding "civil disobedience" demonstrations of a few years ago.

Just as a single diseased cell develops into a killing cancer, so has the entreaties of a misguided few to ignore those laws one does not agree with, spawned a widespread disregard for law and order generally. The material and inevitable result has been the ultimate in lawlessness, wanton killing, and senseless, destructive rioting in the streets.

We might trace this ominous development from a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963. At that time, Dr. King addressed a tense crowd with inflammatory words saying that they should "break the laws which one considers unjust."

At the time of this act, Dr. King was defying a court order as he led a march of more than a thousand Negroes, marching, singing, and shouting through the streets of Birmingham, Ala.

For his efforts, Dr. King was charged with violation of a city ordinance in parading without a permit and also with defying a State court injunction against demonstrations.

There had been a great deal of opposition in the Birmingham Negro community of more than 100,000, since the demonstration came just as a new and moderate city administration was taking office in that city.

From the Birmingham jail, where he landed for his efforts, King wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt to be unjust.

Many Negroes reacted to this dubious leadership by setting off a string of racial demonstrations throughout the United States. An article in the Shreveport Times of July 31, 1963, lists 135 communities in 32 States plus the District of Columbia where these racial incidents took place. To quote this article:

> There have been many more than 135 demonstrations—in some cities they take place day after day and several times a day.
>
> Demonstrations range in scope from Hampton, Va., where two Negroes were escorted from a privately-owned amusement park, to Detroit where more than 100,000 paraded downtown in a massive walk for freedom.
>
> Generally, however, the number of demonstrators ranged from a few dozen to several hundred, though in some, participants were numbered in the thousands.
>
> In possibly a dozen of the communities, the only demonstration held was a memorial march or service for Jackson, Miss., NAACP leader Medgar Evers. On the other hand, some, including Cambridge, Md., and Savannah, have been under virtual siege.
>
> In New York City, seven demonstrations, including a sit-in at governor's office, were held in two-day periods (July 9–10). In addition to several Negro demonstrations in Atlanta during the period covered, white citizens on July 1, picketed several restaurants which recently had admitted Negroes.

In what must go down as the outstanding non sequitor of all time, Dr. King's contribution to the disruption of the internal peace and good will of a nation of 200 million people resulted in his being tapped for the Nobel Peace Prize in 1964.

Mr. President, can you imagine that? Here is a man who starts a drive to put the great cities of America to the torch by urging people to disobey laws, saying, "If you think the law is unjust, you should not obey it." Having started this trend, Dr. King received the Nobel Prize for his efforts.

In Dr. King's acceptance speech, he told the world, "I accept this prize on behalf of all men who love peace and brotherhood." But one must consider the results—not just the words.

What we once called demonstrations turned by 1965, under preachments of violence by Negro leaders, to what can only be described as riots or criminal disorders. Statistics tell the story of how these riots developed in succeeding years to a national shame and a veritable catastrophe, for the relations between people of different races.

In 1965, five major riots occurred; two in the South at Bogalusa, La., and Selma, Ala. The other 1965 major riots were in Philadelphia, Chicago, and in the Watts area of Los Angeles. Out of this violence 36 people died—three of these law officers and 33 civilians. A total of 1,206 persons were injured. The types of crimes committed covered sniping, looting, vandalism, arson, interference with firemen, and a host of others. Police made 10,245 arrests. The property damage during these 1965 riots amounted to over $40 million.

In the following year of 1966, the riots spread to 20 different serious incidents. Ten persons were killed, 467 persons injured. Over 2,000 arrests were made. The toll in property damage was over $10 million.

With the 1966 experience as a point of reference, the press began predicting early in 1967 that in the coming summer months, the country would be torn with racial strife on a much larger scale. To quote the magazine, U.S. News & World Report, of May 1, 1967:

> The summer of 1967 is likely to be another "long, hot summer" of rioting and racial conflict.
>
> That is the forecast from many people in positions to know the situation all across the country.
>
> Last year, it is remembered, was a record riot year, with outbreaks in 38 cities—small cities as well as big ones.
>
> This year, it is reported, the mood among Negroes is no better and may, in fact, be worse. Their leaders are described as growing more militant.
>
> "Black power" advocates such as Stokely Carmichael are accused of stirring Negro youth to anger.
>
> Violence already has erupted this spring: in Nashville, after a series of Carmichael speeches; in Cleveland, the scene of a massive riot last summer; in Louisville, and in Massillon, Ohio.

I pause at that place in the quotation to point out that this bill will protect Stokely Carmichael, when he goes to these places, sowing the seeds of hatred, violence, murder, sniping, arson, the worst of violence. The last thing the people of America want is the passage of a bill that would benefit Stokely Carmichael in his conduct.

I continue the quotation:

> To get a first-hand report of the nationwide situation and outlook, "U.S. News and

World Report" sent members of its staff into potential trouble spots in all parts of the country. They talked to national and local Negro leaders, officials and police in more than 25 cities.

What this survey showed was widespread alarm.

In some cities there is optimism that outbreaks will be avoided. Even optimists agree, however, that the potential for racial trouble exists and it would take only a spark—such as the arrest of a Negro—

Mr. President; this is indeed a very prophetic article—

to set off an explosion.

That means a legal arrest of someone who should be apprehended—would end in a holocaust.

Further quoting:

Virtually all the causes of Negro bitterness that existed last year remain—and other irritants are found to have been added. New battlefronts are seen developing, with danger spreading more widely—from Negro neighborhoods into white areas of big cities, from large cities to smaller towns and from coastal areas into the midlands.

Danger also is believed to be growing that more whites will turn to violence—fight back against rioters or attack Negro demonstrators. This could lead to growing bitterness among people of Puerto Rican and Mexican backgrounds who feel that their problems are being neglected while Negroes get aid.

Where are riots most likely to erupt?

"Hardly any community in this country can call itself immune to trouble this coming summer," says Floyd McKissick, national director of the Congress of Racial Equality (CORE), which has 200 branches in 43 states.

It was Mr. McKissick who called the turn last spring by naming in advance eight cities where riots occurred and predicting the likelihood of trouble in as many as 40 cities.

One can only surmise that Mr. McKissick and some of his associates did their best to make sure riots would occur in the cities which he designated had the possibility of having riots.

This year, when asked to name the most likely trouble spots, Mr. McKissick told U.S. News & World Report:

"Cleveland stands out like a very sore thumb. Nearly every city in New Jersey is in bad trouble. I'd bet that New Jersey will never get through the summer without trouble.

"Among other cities, I'd name New York, Detroit, Omaha, Kansas City, St. Louis and especially East St. Louis, Chicago—

Where Dr. King did his best to stir people up—

Gary, Ind., San Francisco and Oakland, Los Angeles, of course, and also Washington, D.C."

The Rev. Dr. Martin Luther King, Jr., warned on April 16 that at least 10 cities are "powder kegs" that could "explode in racial violence this summer." He named among those cities: New York, Cleveland, Chicago, Los Angeles, Oakland, Washington and Newark, N.J.

As head of the Southern Christian Leadership Conference, Dr. King says:

"I'll still preach nonviolence with all my might, but I'm afraid it will fall on deaf ears. The intolerable conditions which brought about racial violence last summer still exist."

Roy Wilkins, executive director of the National Association for the Advancement of Colored People (NAACP), told U.S. News & World Report:

"I will not say that we are going to have a 'long, hot summer,' or that there are explosive spots in this country, because, honestly, I don't know. I can't name any cities that are more explosive than others.

"But I know that in urban concentrations where one of three Negro teen-agers is unemployed you have the potential for irresponsible violence—violence that is illogical, not traceable to any one spark or underlying reason."

The spread of rioting into smaller cities last year is widely read as a warning of more widespread trouble this year.

"The danger spots are no longer confined to the ghettos in large Northern cities, nor to the suburbs around big cities," says Mr. McKissick.

"The danger exists in any city where there are sizable numbers of Negroes whose hopes have been denied and who feel they are pawns in this system. The danger is spreading to smaller towns in many parts of the country."

In the past, major riots have occurred outside the South. This year Dr. King reports he is fearful of riots in Southern cities, and Mr. McKissick says:

"I wouldn't name any one city in the South as a danger spot. But I wouldn't gamble on any city being safe—even in the South."

It was in Nashville, a Southern city, that the riot season of 1967 got off to an unusually early start on April 8.

Jackie Robinson, first Negro to play baseball in the major leagues, warns that rioting this year is likely to move out of Negro neighborhoods into white areas of big cities. He put it this way: "If we don't end our problems, I'm very much concerned with what could be a very hot summer—riot in Harlem or in Watts, but a hot summer on 42nd Street; in Beverly Hills and in the suburbs."

Why? Mr. Robinson reports this:

"People have been saying to me, 'Why should we run around shooting and looting in our areas? If we are going to create the problem, we'll create it in other areas.'

"In riots of past years, white people have tended to stay away from the scene, leave the trouble to police and National Guard troops. Direct confrontations between white mobs and black mobs have been largely avoided. This year, in some cities, you hear talk that things will be different. If rioting starts, says Jackie Robinson, 'I think whites are definitely at the point where there's going to be fighting back.'

"When Negroes demonstrated against rejection of an open-housing ordinance in Louisville in mid-April, they were heckled and stoned by whites.

"Dr. King talks of leading new Negro marches into white neighborhoods of Chicago and Cicero, Ill., where similar marches drew white attacks last year."

As a matter of fact, Mr. President, I am fully convinced that when marches of this sort are organized, it is the intention of those who organize them to provoke just that kind of reaction. If they do not provoke it, they do not get the publicity they seek; so they have to provoke it in order to gain the kind of recognition and attention that they desire.

"Revival of the Ku Klux Klan in some areas of the country is stirring fear of provocative action by whites."

I pause here, Mr. President, to say that there is evidence these Ku Klux Klan klaverns actually were organized because of this very thing. These people move forward, encouraging Negroes to demonstrate, to violate the rights of others, and to refuse to obey the laws that they do not like; and persons, finding themselves imposed upon, organize to defend themselves against it. I suppose sooner or later people will find it necessary to organize in all parts of the country to defend themselves against the kind of mischief some of these activities create.

Unfortunately for all Americans, the prediction of racial violence for the summer of 1967 came true in full measure. In a total of 76 major incidents spread over practically every State in the Union, North, South, East, and West, wholesale Negro violence was an almost nightly affair in the streets of our cities. Nearly 100 persons were slain.

Here is a situation where, in the last year, nearly 100 people were killed. Nearly 2,000 were injured. Police reported 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated property loss was in the neighborhood of $160 million. The estimated economic loss to riot-torn businesses was over $504 million.

Here is Congress, talking about passing a law which deals in part with the deaths of three civil rights workers in Mississippi. However, their culprits have been prosecuted under existing State and Federal law and found guilty by a jury, and yet Congress now proposes to completely ignore this situation that the whole Nation is stirred up about, which, in 1967 alone, resulted, as I have stated, in 100 people being killed and 2,000 injured, 4,289 cases of arson, 16,000 rioters arrested, property damage in the neighborhood of $160 million, and economic loss to riot-torn businesses of $504 million.

That is something the public of this country is very much concerned about. Mr. President, as a matter of putting first matters first, I shall insist, before we come to a final vote on this matter, that the Senate have an opportunity to vote on doing something about these riots. Think of that: 100 people killed, 2,000 people injured—many of them innocent bystanders. Consider also that this kind of mischief required the police and the National Guard to arrest 16,000 rioters.

Mr. President, that is more than a whole division of U.S. Army. What are we coming to in this country?

I have here, Mr. President, a proposed amendment that I will send to the desk, after I have read it, and ask that it be printed so that it will be available so that Senators can consider it.

This proposal would strike at the very thing which really concerns the people of this country: the rights and the safety of 200 million Americans whose property and whose very lives have been seriously endangered in the year 1967 and prior years as a result, in my judgment, of this doctrine, first proposed and advocated by Martin Luther King and his group, that one should not obey the laws that stand in the way of alleged "civil rights"; if one does not like the law, just disobey it. That advocacy enhanced by the Nobel Peace Prize in my judgment has in large measure brought on all these riots and presented the need for action.

Let me read what I believe should definitely be in this bill, whether it is there as a substitute for the original bill or as an amendment to it. I would say this, in

my judgment, is even more essential than the Ervin amendment. In fact, I think this amendment, either as such or as a substitute for the bill, would be a good bill, or, as an amendment, would put some good in here to offset some of the mischief I find in the present bill.

The substantive provisions of my amendment reads as follows:

### AMENDMENT NO. 517
### TITLE II—CIVIL OBEDIENCE
#### SHORT TITLE

SEC. 201. This title may be cited as the "Civil Obedience Act of 1968".

#### CRIMINAL PENALTIES FOR ACTS COMMITTED IN CIVIL DISORDERS

SEC. 202. (a) Title 18, United States Code, is amended by inserting after chapter 101 thereof the following new chapter:

"Chapter 102.—Civil Disorders

"Sec.
"2101. Civil Disorders.
"2102. Definitions.
"2103. Preemption.

"§ 2101. Civil disorders:

"(a)(1) Whoever (A) travels in commerce or uses any facility or instrumentality of commerce with intent to incite or instigate a civil disorder, or (B) incites or instigates a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function; or

"(2) Whoever (A) travels in commerce or uses any facility or instrumentality of commerce with intent to teach or demonstrate to any other person the use, application, or making of any firearm or explosive or incendiary device, or technique capable of causing injury or death to persons, knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder, or (B) teaches or demonstrates to any other person the use, application, or making of any such firearm, device, or technique knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder which may in any way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function; or

"(3) Whoever transports or manufactures for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder; or

"(4) Whoever (A) travels in commerce or uses any facility or instrumentality of commerce with intent to commit or threaten to commit any unlawful act of violence against persons or property in furtherance of a civil disorder, including, but not limited to, sniping or shooting at persons with any firearm or using any explosive or incendiary device to destroy or damage property, or (B) commits or threatens to commit any such unlawful act of violence against persons or property in furtherance of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any Federally protected function; or

"(5) Whoever (A) moves or travels in commerce or uses any facility or instrumentality of commerce with intent to commit or threaten to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer engaged in the performance of his official duties incident to and during the commission of a civil disorder, or

"(B) commits or threatens to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer engaged in the performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any Federally protected function; or

"(6) Whoever, in the course of or incident to the occurrence of a civil disorder, unlawfully takes anything of value (A) from any establishment if such establishment sells or offers for sale to interstate travelers a substantial portion of the articles, commodities, or services it sells or if a substantial portion of the articles or commodities which it sells have moved in commerce (B) from any commercial warehouse, building, or other structure if a substantial portion of the articles or commodities contained therein have moved in commerce or are intended for use in an establishment which sells or offers for sale to interstate travelers a substantial portion of the articles or commodities which such establishment sells, or (C) from any automobile, truck, or other motor vehicle which is engaged in commerce; or

"(7) Whoever uses any firearms to snipe or shoot at any person or motor vehicle moving or traveling on, or within the limits of any highway (including the entire right-of-way of any highway) located on the Federal-aid primary system or the Interstate System, as designated pursuant to title 23 of the United States Code, or throws or uses any brick, rock, or object of any kind with intent to impede or interfere with any person or motor vehicle moving or traveling on, or within the limits, of any such highway—

"Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(b) Nothing contained in this section shall make unlawful any act of any law enforcement officer which is performed in the lawful performance of his official duties.

"§ 2102. Definitions

"For purposes of this chapter:

"(1) The term 'civil disorder' means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

"(2) The term 'commerce' means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia.

"(3) The term 'facility or instrumentality of commerce' includes, but is not limited to, the United States mail, telephone, or telegraph.

"(4) The term 'federally protected function' means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection, and distribution of the United States mails.

"(5) The term 'firearms' means any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive; or the frame or receiver of any such weapon.

"(6) The term 'explosive or incendiary device' means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (1) consists of or includes a breakable container including a flammable liquid or compound and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

"(7) The term 'fireman' means any member of a fire department (including a volunteer fire department) of any State, any political subdivision of a State, or the District of Columbia.

"(8) The term 'law enforcement officer' means any officer or employee of the United States, any State, any political subdivision of a State, or the District of Columbia, while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, any political subdivision of a State, or the District of Columbia; and such term shall specifically include, but shall not be limited to, members of the National Guard, as defined in section 101(9) of title 10, United States Code, members of the organized militia of any State, or territory of the United States, the Commonwealth of Puerto Rico, or the District of Columbia, not included within the definition of National Guard as defined by such section 101(9), and members of the Armed Forces of the United States, while engaged in suppressing acts of violence or restoring law and order during a civil disorder.

"§ 2103. Preemption

"Nothing contained in this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which any provisions of the chapter operate to the exclusion of State or local laws on the same subject matter, nor shall any provision of this chapter be construed to invalidate any provision of State law unless such provision is inconsistent with any of the purposes of this chapter or any provision thereof."

(b) The table of contents to "Part I.—Crimes" of title 18, United States Code, is amended by inserting after

"101. Records and reports............2071"

a new chapter reference as follows:

"102. Civil disorders..................2101"

Amend the title so as to read: "An Act to prescribe penalties for certain acts of violence or intimidation and for certain acts committed in civil disorders, and for other purposes."

Title II contains the substantive provisions of the proposed amendment and is entitled "Civil Obedience Act of 1968." It is designed to give balance to the pending civil rights bill by recognizing that not only do citizens have rights which may have to be protected but citizens have obligations and duties to respect the rights of others.

Title II enumerates certain acts occurring during civil disorders which constitute Federal crimes and become punishable by imprisonment or fines or both.

The following acts relating to or committed during civil disorders would be considered as Federal crimes—the term "civil disorder" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual:

First. Intention to incite a riot by an individual, traveling in commerce, or actually inciting a riot which adversely affects the free flow of goods or interferes with a governmental function such as the mails.

Second. Intention by persons traveling in commerce to teach other individuals

how to discharge a gun or to use any other dangerous weapons with the purpose in mind to create a civil disorder or engaging in such acts so as to adversely affect the free flow of goods in interstate commerce.

Third. The transporting or moving of firearms, so-called Molotov cocktails, or other dangerous weapons for use in connection with riots.

Fourth. Sniping or shooting at persons or using so-called Molotov cocktails during a riot which impedes or delays the free flow of goods.

Fifth. Interfering with the lawful performance of the duty of a fireman or police officer during a civil disorder. This would also include any assaults attempted on members of the National Guard units and members of the Armed Forces—such as those activated during some of the summer riots in 1967.

Sixth. Looting during a civil disorder from establishments engaged in the sale of or stocking interstate goods as well as looting from any automobile, truck, or other motor vehicle engaged in commerce.

Seventh. Sniping and shooting at any person or automobile or other motor vehicle which is traveling on a Federal-aid highway. Also throwing bricks or rocks or any other object with the intent to interfere with the travel of that person or vehicle on such highways.

Conviction of any of the foregoing crimes would subject the individual to a fine of not more than $10,000 and imprisonment of not more than 5 years, or both.

In the event that a murder results from any of the foregoing acts, the State law would necessarily become operative and the penalties prescribed by the State for such a murder would come into play.

Title II also contains a protection clause for law enforcement officers which specifically exempts them from the criminal penalties should any of their actions during a riot result from the lawful performance of official duties. This protection is designed to give police officers of the country assurance that lawful performance of their duties will not subject them to conviction of the Federal offenses contained in title II.

It is important to note that this proposed amendment reaches both the individual who travels between States as well as the individual who resides in a specific State.

It achieves this objective by making it a crime for an individual traveling between States to intend to incite a riot, to assault, or to interfere with lawful authority.

On the other hand, an individual who resides in a State and who engages in sniping, looting, arson, or any of the other criminal acts set forth in the amendment need only interfere by his actions with goods shipped in interstate commerce or activities of a governmental nature to be guilty of the proposed prescribed Federal crimes. This amendment therefore would reach not only the Rap Browns and Stokely Carmichaels but individuals whom they persuade to engage in riotous action and who otherwise might not be subject to criminal sanctions.

There are a number of other thoughts which occur to me concerning ways in which our citizens can be safe on the streets and protected from the violence and mischief that they have suffered as a result of the hatred and ill will existing between races, hatred and ill will that has been stirred by such people as Stokely Carmichael, Rap Brown, Mr. McKissick, and others.

I shall perhaps enlarge my proposal later, to make these people responsible for what occurs as a result of their conduct, and to try to make those people themselves liable for civil damages, as well as criminally liable, for the great injury they have done to society. I invite other Senators to review my proposal and perhaps consider offering suggestions on how to expand it to afford greater protection to our defenseless and unprotected citizenry.

A matter comes to mind that might be considered. It happened in my hometown recently. After the inflammatory speeches of Rap Brown and Stokely Carmichael, while most of our Negro community did not heed them, a few people seemed to have been stirred up by them, to the extent that we have had sniping at cars traveling on the interstate highway and brickbats being thrown through windshields of cars traveling on the interstate highway.

Recently, at one of the principal street corners, where a great deal of traffic passes, some young Negroes kept throwing rocks at cars, until finally one of the rocks hit a white boy on a motorcycle and killed him. That was a very unfortunate event. The people who did it have been arrested. But the people who are responsible for it, who are fundamentally responsible for it, are not so much the persons who threw those stones as are the Carmichaels and the Rap Browns, who stirred those people to engage in that type of conduct and persuaded them that that is what they should do.

If we are going to seek to pass a civil rights bill, it should be a bill that would protect the public from irresponsible rabble rousers, instead of a bill that would protect such persons from the public.

So we have an opportunity here to strive to protect everybody's civil rights—the rights of 200 million people, rather than the rights of a limited number.

Mr. President, I have quite a bit of material that I should like to discuss. I believe it will take several hours, and I do not believe I should seek to do it all at this late hour, because not many Senators will be present in the Chamber to hear it.

Therefore, I ask that the amendment I discussed be received and printed and lie on the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ADJOURNMENT

Mr. LONG of Louisiana. Mr. President, if no other Senators desire to speak at this time, I move that the Senate stand in adjournment until 12 o'clock noon tomorrow.

The motion was agreed to; and (at 6 o'clock and 3 minutes p.m.) the Senate adjourned until tomorrow, Tuesday, January 30, 1968, at 12 o'clock meridian.

## NOMINATIONS

Executive nomination received by the Senate January 29, 1968:

U.S. DISTRICT JUDGE

Edward J. Schwartz, of California, to be U.S. district judge for the southern district of California, vice James M. Carter, elevated.

POSTMASTERS

The following-named persons to be postmasters:

ALABAMA

Shelton C. Alexander, Theodore, Ala., in place of S. E. Harding, retired.

ARIZONA

Benjamin A. Munoz, Solomon, Ariz., in place of M. W. Kempton, retired.

CONNECTICUT

Joseph G. Vallo, Canton, Conn., in place of W. G. Adams, retired.

Ralph G. Gidlund, Canton Center, Conn., in place of G. C. Case, retired.

FLORIDA

Astrid O. Mascoe, Bokeelia, Fla., in place of C. C. Knight, deceased.

Harry E. Cathell, Elfers, Fla., in place of E. A. Boyd, retired.

Leo A. Acree, Kissimmee, Fla., in place of F. S. Ledbetter, Jr., retired.

INDIANA

V. Thomas Fettig, Seymour, Ind., in place of I. R. Love, deceased.

IOWA

Maurice L. Clark, Panora, Iowa, in place of D. D. Dygert, decline.

MISSOURI

Rex L. Luallin, Conway, Mo., in place of J. C. Smith, retired.

Ernest Wing, Sunrise Beach, Mo., in place of L. J. Thickstun, retired.

NEW YORK

Edgar J. Yelle, Au Sable Forks, N.Y., in place of J. J. Murphy, retired.

Richard W. Dennelly, Great Neck, N.Y., in place of J. O. Kline, deceased.

Frank V. Farsetta, Pearl River, N.Y., in place of J. V. Lynch, retired.

Florence E. Green, Piffard, N.Y., in place of Anna Torcello, retired.

Mason A. Gossoo, Shandaken, N.Y., in place of F. P. Platz, deceased.

NORTH DAKOTA

Donald L. Hertz, Mandan, N. Dak., in place of J. J. Murray, retired.

OHIO

Paul R. Behun, Campbell, Ohio, in place of John Galida, retired.

Karl R. Maul, New Washington, Ohio, in place of Joseph Yanka, retired.

VIRGINIA

Marion H. Meador, Jr., Cumberland, Va., in place of G. W. Garrett, retired.

WISCONSIN

Carol M. Hudson, Green Valley, Wis., in place of Lydia Sievert, deceased.

Arthur C. Howell, Palmyra, Wis., in place of M. L. Sollars, resigned.

Robert W. Walton, Platteville, Wis., in place of L. V. Newman, retired.

Bradford S. Croeker, South Milwaukee, Wis., in place of W. J. Corry, retired.